1

                    USA v. Strauss, 7:24MJ46, 4/10/2024


1                       UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
2                            ROANOKE DIVISION

3    **************************************************************

4    UNITED STATES OF AMERICA,    CRIMINAL CASE NO.:  7:24MJ46
                                  APRIL 10, 2024, 4:30 P.M.
5                                 ROANOKE, VIRGINIA
             Plaintiff,          DETENTION/PRELIMINARY HEARING
6    vs.

7    EVAN STRAUSS,                Before:
                                  HONORABLE C. KAILANI MEMMER
8                                 UNITED STATES MAGISTRATE JUDGE
             Defendant.          WESTERN DISTRICT OF VIRGINIA
9
     **************************************************************
10
     APPEARANCES:
11

12   For the Government:          JASON MITCHELL SCHEFF, ESQUIRE
                                  DOJ-USAO
13                                Western District of Virginia
                                  310 First Street, SW, Suite 906
14                                Roanoke, VA  24011
                                  540-857-2250
15

16

17   For the Defendant:          BEATRICE DIEHL, ESQUIRE
                                  Office of the Federal Public
18                                Defender
                                  Western District of Virginia
19                                210 First Street SW, Suite 400
                                  Roanoke, VA  24011
20                                540-777-0891

21   FTR Operator:  K. Saville

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24

              PROCEEDINGS RECORDED BY ELECTRONIC RECORDING;
25   TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Strauss, 7:24MJ46, 4/10/2024

1                        INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE GOVERNMENT:              PAGE

3    SPECIAL AGENT MILLER

4     Direct Examination by Mr. Scheff                     7
      Cross-Examination by Ms. Diehl                      32
5     Redirect Examination by Mr. Scheff                  42
      Recross-Examination by Ms. Diehl                    43

6

7    WITNESSES ON BEHALF OF THE DEFENDANT:

8    JEREMY STRAUSS

9     Direct Examination by Ms. Diehl                     55
      Cross-Examination by Mr. Scheff                     68
10    Redirect Examination by                             98

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Strauss, 7:24MJ46, 4/10/2024

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

3           EXHIBIT:                  Marked       Received

4           1                          12            12

5           2                          15            15

6           3                          17            17

7           4                          18            18

8           5                          19            19

9           6                          23            23

10          7                          25            25

11          8                          31            31

12          9                          32            32

13   EXHIBITS ON BEHALF OF THE DEFENDANT:

14          EXHIBIT:                  Marked       Received

15          1                                   55            55

16

17

18

19

20

21

22

23

24

25

USA v. Strauss, 7:24MJ46, 4/10/2024

1  (Proceedings commenced, 4:30 p.m.)

2          THE COURT:  All right.  Madam Clerk, will you please

3  call the case.

4          THE CLERK:  United States of America versus Evan

5  Strauss, 7:24MJ46.

6          THE COURT:  Let the record reflect that the

7  government is present by counsel.  The defendant is present, as

8  is his counsel.

9          Again, Mr. Strauss, my name is Kai Memmer.  We saw

10 each other a few days ago.  I am the magistrate judge here in

11 the Western District.  We are here today for purposes of a

12 preliminary hearing and a detention hearing.  The purpose of

13 the preliminary hearing is to determine if there is probable

14 cause to believe that you committed the offenses charged

15 against you, and the detention hearing will determine whether

16 or not you will be detained pending trial.

17         If I could, again, Mr. Strauss, as we did Monday, I'm

18 going to have you stand, sir, and be sworn in by the clerk.

19         (Defendant sworn).

20         THE COURT:  You may be seated.

21         Mr. Strauss, again, can you please state your name

22 for the record?

23         THE DEFENDANT:  Evan Charles Strauss.

24         THE COURT:  All right.  And sir, do you feel

25 clear-headed today?

USA v. Strauss, 7:24MJ46, 4/10/2024

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And do you understand why you're here?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  All right.  Very well.  Again,

5   Mr. Strauss, because these charges were brought in a criminal

6   complaint, you are entitled to a preliminary hearing under

7   Federal Rule of Criminal Procedure 5.1.  Again, the purpose is

8   to determine whether there is probable cause to believe that

9   you committed the offenses charged against you.

10          And Ms. Diehl, it's my understanding that you all

11  wish to go forward with the preliminary hearing at this time?

12          MS. DIEHL:  Yes, Your Honor, we do.

13          THE COURT:  All right.  Very well.  Mr. Scheff, I'll

14  hand it over.

15          MR. SCHEFF:  Thank you, Your Honor.

16          I'd just like to put two things on the record.  One,

17  Your Honor, is that the exhibits that we're going to be

18  introducing at today's hearing, the parties have agreed to file

19  them under seal.  I'm also going to be providing Your Honor two

20  versions of some of the exhibits, one version that is

21  unredacted and one version that has redactions.  Defense

22  counsel has seen everything that's going to be introduced and

23  provided to the Court today, including the unredacted versions

24  of the exhibits.

25          I'd also like to put on the record -- although this

USA v. Strauss, 7:24MJ46, 4/10/2024

1  will come in a little bit of time, I just don't want to forget

2  an hour or so into this hearing -- the government made a *Jencks*

3  request with respect to the defense witnesses that are going to

4  be called today.  Defense counsel produced a redacted version

5  of Jeremy Strauss's email.  The government has objected to

6  being provided a redacted version of the email, and has that

7  the Court review that email to consider whether anything that

8  has been redacted actually relates to the substance of his

9  testimony once he testifies, and whether an unredacted version

10  or a less redacted version should be provided to the

11  government.

12          THE COURT:  All right.  Thank you for that.

13          MS. DIEHL:  And Your Honor, as the government

14  mentioned or hinted at, we have no objection to filing the

15  exhibits under seal.  In fact, we may have an exhibit of our

16  own that we would also like to file under seal.

17          Additionally, we did provide a redacted version just

18  because we didn't want to put the government on their left

19  foot.  If, indeed, the redacted version comes in, at least they

20  have something ahead of the hearing.  But we do have copies of

21  an unredacted version if the time comes and Your Honor believes

22  that an unredacted version is appropriate.

23          THE COURT:  And given the agreement, I'm happy for

24  either counsel to address it, but I think we ought to address

25  it on the record, given Local Rule 9.  If you could simply

Miller - Direct

1    state the basis for the agreement, why it's necessary to seal

2    the documents in this case.

3            MR. SCHEFF:  Yes, Your Honor.  These documents

4    contain a significant amount of personal information relating

5    to the minor victim in this case, as well as members of her

6    family.  These are also documents that will ultimately be

7    subject to -- that the government will request a protective

8    order for as a part of the discovery disclosure that we'll meet

9    in this case.  And for those reasons, that is why the

10   government is seeking that these documents be filed under seal.

11           MS. DIEHL:  And Your Honor, regarding -- if we do

12   enter this exhibit, there is personal information about

13   Mr. Strauss's family as well.  And because this all involves

14   Internet -- the term is "doxing" from all sides, we want to

15   make sure that every side is protected from the entire

16   community of the Internet that tends to use people's personal

17   information against them.

18           THE COURT:  Very well.  Thank you.  I appreciate it.

19           MR. SCHEFF:  Thank you, Your Honor.

20           With that, the government calls Special Agent Miller

21   to the stand.

22       SPECIAL AGENT MILLER, CALLED BY THE GOVERNMENT, SWORN

23                       DIRECT EXAMINATION

24    BY MR. SCHEFF:

25   Q    Sir, can you please state your last name for the record?

Miller - Direct

1  A    Miller.

2  Q    What do you do for a living?

3  A    I am a special agent with the FBI currently assigned to

4  the Roanoke Resident Agency, part of the Richmond Field

5  Division.

6  Q    How long have you been a special agent with the FBI?

7  A    Over 20 years.

8  Q    What sort of training do you have to -- did you receive to

9  become a special agent?

10 A    My initial training was at the FBI Academy in Quantico,

11 Virginia.  And I've had various other trainings over the last

12 20 years to include financial crimes, crimes against children,

13 and national security training.

14 Q    Are you familiar with the affidavit in support of the

15 complaint in the case of Evan Strauss?

16 A    Yes.

17 Q    Do you adopt that affidavit as a part of your testimony

18 today?

19 A    I do.

20 Q    Has the defendant, Evan Strauss, been interviewed as a

21 part of this case?

22 A    Multiple times.

23 Q    Have Mr. Strauss's answers been consistent when he's been

24 questioned about the same thing more than once?

25 A    No.

Miller - Direct

1  Q    The affidavit states that Mr. Strauss ran an online group

2  called "Purgatory."

3      Are you familiar with Mr. Strauss running any other online

4  groups?

5  A    Yes.  He ran multiple different groups online.

6  Q    What sort of activities did Purgatory and those other

7  online groups engage in?

8  A    A variety of online criminal activity to include doxing of

9  information, hacking, denial of service attacks, and also

10  extortion of minor males and females to provide elicit photos

11  and images of self-harm.

12  Q    When you say "elicit photos," what exactly do you mean?

13  A    If they're underage females or underage males, they would

14  send these photos of themselves and their genitalia and other

15  parts that would be considered elicit.

16  Q    Are you aware of Mr. Strauss specifically engaging in

17  extortion of girls to provide sexually explicit images and

18  images of self-harm?

19  A    Yes.

20  Q    And how did you become aware of that?

21  A    Through his interviews, as well as interviews of minor

22  victim witnesses.

23  Q    And what would Mr. Strauss do with those images when he

24  obtained them?

25  A    He would distribute those to other members of the

Miller - Direct

1  community that he was in, and then also use them for other

2  extortion activities in the future.

3  Q    The affidavit refers to a person identified as Victim 1.

4  Are you familiar with who Victim 1 is?

5  A    Yes.

6  Q    How old is she?

7  A    17.

8  Q    What state does she live in?

9  A    Wyoming.

10  Q    The affidavit also states that Victim 1 was twice

11  interviewed by an FBI child and adolescent forensic

12  interviewer, and I want to ask you about some of the

13  information that Victim 1 provided in those interviews.

14      Did Victim 1 tell Mr. Strauss that she was 17 when they

15  first met?

16  A    Yes.

17  Q    When Mr. Strauss was interviewed, did he say whether he

18  knew how old the victim was?

19  A    Yes, he did.

20  Q    What did he say?

21  A    He knew that she was 17 years old.

22  Q    According to Victim 1, how old did Mr. Strauss tell Victim

23  1 he was?

24  A    She thought he was an 18 year-old.

25  Q    Is Mr. Strauss 18?

Miller - Direct

1   A    No.

2   Q    How old is he?

3   A    26.

4   Q    The affidavit also mentions that Mr. Strauss threatened

5   members of Victim 1's family.

6        Was he able to actually find out who the members of Victim

7   1's family were?

8   A    Yes, he did.

9   Q    And how did he do that?

10  A    Various social media searches, open source searches to

11  identify not just their names, but also ages of both of the

12  adults that she lived with, and also found out she had siblings

13  as well.

14  Q    Would he share with Victim 1 that he had gathered this

15  information?

16  A    Yes.

17  Q    Did Mr. Strauss ever tell Victim 1 how he felt about her

18  talking to or dating other guys?

19  A    Yes.  He was not happy with that happening.

20  Q    Are you aware of Victim 1 beginning a relationship with a

21  guy from Alabama in December of 2023?

22  A    Yes.

23  Q    I'll refer to him as Individual 1.  And I want to ask you,

24  how did Mr. Strauss react to Victim 1 entering into a

25  relationship with Individual 1?

Miller - Direct

1   A    I think he was very unhappy and possibly enraged.

2           MR. SCHEFF:  Your Honor, may I approach the witness

3   and the bench to provide the packet of exhibits that I intend

4   to use?

5           THE COURT:  Yes.

6           MR. SCHEFF:  So we'll start with the first item in

7   that packet.  And Your Honor, this is one of the exhibits that

8   I have provided a redacted and unredacted version.

9    BY MR. SCHEFF:

10  Q    So what is Government's Exhibit 1?

11  A    This is an image that was on Mr. Strauss's Instagram.  It

12  has Victim 1's face, Victim 1's mother, and also a picture of

13  Victim 1's thighs with various scars on them from cutting.

14          MR. SCHEFF:  Permission to admit Government Exhibit 1

15  into evidence.

16          THE COURT:  Any objection, Ms. Diehl?

17          MS. DIEHL:  No objection, Your Honor.

18          THE COURT:  It will be admitted.

19          (Government Exhibit 1 marked.)

20          (Government Exhibit 1 admitted.)

21   BY MR. SCHEFF:

22  Q    Special Agent Miller, was this Instagram amalgamation of

23  pictures related at all to Victim 1 entering that relationship

24  that we discussed?

25  A    Yes.

Miller - Direct

1  Q    How is it related?

2  A    He was very unhappy with finding out about the

3  relationship and told her that she had three days to end it;

4  otherwise, he was going to commit various acts of violence to

5  her and her family.

6  Q    And by "he," do you mean Evan Strauss?

7  A    Evan Strauss, yes.

8  Q    And so you got a redacted version and an unredacted

9  version of the document.  Generally speaking, what's under

10 those black redaction marks on the redacted version of the

11 document that's going to be filed as the exhibit?

12 A    Names and other personal information for Victim 1 and her

13 family.

14 Q    The affidavit also mentions that Mr. Strauss demanded that

15 Victim 1 engage in certain behaviors, and that he'd scream at

16 her and threaten her if she refused.

17      Did Victim 1 ever try to block Mr. Strauss on social

18 media?

19 A    Yes.

20 Q    And what would happen when she did?

21 A    Mr. Strauss would engage her either by creating a new

22 profile and engaging her current accounts; or if she shut an

23 account down and set up a new account, he would locate that

24 account and engage her in the new account.

25 Q    The affidavit also talks about Mr. Strauss getting Victim

Miller - Direct

1 to cut herself.

2     Did Mr. Strauss initially deny ever getting anyone to cut

3 themselves when he was interviewed last week?

4 A    Yes.

5 Q    Did he deny that multiple times?

6 A    Multiple times, yes.

7 Q    Did he later admit that he had actually gotten Victim 1 to

8 cut herself?

9 A    Yes.

10 Q    The affidavit also talks about Mr. Strauss getting Victim

11 1 to send him pictures of her cutting herself.

12     What did Mr. Strauss do with those pictures?

13 A    He sent those pictures to other members of the community,

14 and also sent an email to the Wyoming Department of Family

15 Services with those pictures and with the intent of reporting

16 her to Family Services.

17         MR. SCHEFF:  So I'm going to go to the next document

18 in that packet.  And Your Honor, this is another version where

19 I provided both a redacted and an unredacted version of the

20 exhibit.

21  BY MR. SCHEFF:

22 Q    And so Special Agent Miller, what do you have there that's

23 marked as Government's Exhibit 2?

24 A    This is a series of emails that were recovered from one of

25 Mr. Strauss's phones involving an exchange between him using an

Miller - Direct

1  email address, and also the other exchange was from the Wyoming

2  Department of Family Services.

3  Q    And whose email address is this mainhang62@gmail.com email

4  address?

5  A    Mr. Strauss's.

6  Q    How do you know that?

7  A    It came from his phone with other email addresses.

8  Q    So he had various email accounts on his phone?

9  A    Yes.

10  Q    Did Mr. Strauss also admit to sending these emails to the

11  Department of Family Services?

12  A    Yes.

13        MR. SCHEFF:   Permission to admit Government's Exhibit

14  2 into evidence.

15        MS. DIEHL:   No objection.

16        THE COURT:   So admitted.

17        (Government Exhibit 2 marked.)

18        (Government Exhibit 2 admitted.)

19   BY MR. SCHEFF:

20  Q    Special Agent Miller, if you go to the bottom, what is on

21  line 8 of this Cellebrite extraction?

22  A    This is an email sent by Mr. Strauss on December 22nd,

23  2023 to the Department of Family Services at Wyoming reporting

24  that Victim 1 has various cuts and marks on her thighs.

25  Q    And if you go to the line above that, what is that,

Miller - Direct

1   generally speaking?

2   A    That is a response from the Wyoming Department of Family

3   Services asking for more information.

4            THE COURT:  I'm sorry, Mr. Scheff, where are you on

5   Exhibit 2?

6            MR. SCHEFF:  At the bottom of page 2, Your Honor,

7   line 7.

8            THE COURT:  Thank you.

9    BY MR. SCHEFF:

10  Q    And if we go up a little bit to -- well, the bottom of

11  page 1 and top of page 2, lines 3 and 4, what are we looking at

12  there?

13  A    Those are attachments that were put on the email, which

14  ended up being pictures of Victim 1 and the injuries that she

15  had on her legs.

16  Q    So if we go to the next document in the packet --

17           MR. SCHEFF:  And Your Honor, again, one of these

18  pages, there is a redacted version and an unredacted version

19  that's been provided to the Court.

20   BY MR. SCHEFF:

21  Q    So Special Agent Miller, if you look at Government's

22  Exhibit 3, what are these two pictures?

23  A    These are pictures of Victim 1's thighs with various cuts

24  on them, and also the address associated with Victim 1.

25  Q    Are these two of the pictures that you just mentioned were

Miller - Direct

1   sent to the Department of Family Services in Wyoming?

2   A    Yes.

3           MR. SCHEFF:  Permission to admit Government's Exhibit

4   3 into evidence.

5           THE COURT:  Ms. Diehl?

6           MS. DIEHL:  I am so sorry, Your Honor.  What was

7   Exhibit 3 again?

8           MR. SCHEFF:  The picture attachments to the emails.

9           MS. DIEHL:  To the emails.  No objection, Your Honor.

10          THE COURT:  It will be admitted.

11          (Government Exhibit 3 marked.)

12          (Government Exhibit 3 admitted.)

13   BY MR. SCHEFF:

14   Q    And you said that these are the victim's legs.  How do you

15   know that?

16   A    During the victim's interview she identified herself in

17   those photos.

18   Q    What did the Department of Family Services in Wyoming do

19   after receiving this information?

20   A    They alerted local law enforcement and they conducted a

21   visit at Victim 1's residence.

22   Q    Let's go to the next document in that packet, Government's

23   Exhibit 4.

24         What is that document?

25   A    This is a police report from the Goshen County Sheriff's

Miller - Direct

1    Office dated December 27th, 2023, documenting the visit from

2    family services and the sheriff's office.

3    Q    And what was the date of that visit?

4    A    December 27, 2023.

5         MR. SCHEFF:  Permission to admit Government's Exhibit

6    4 into evidence.

7         MS. DIEHL:  No objection, Your Honor.

8         THE COURT:  It will be admitted.

9         (Government Exhibit 4 marked.)

10        (Government Exhibit 4 admitted.)

11    BY MR. SCHEFF:

12   Q    Did Mr. Strauss threaten to send the pictures that he got

13   of Victim 1 cutting to anyone else besides the Department of

14   Family Services and to other members of Purgatory?

15   A    Yes.  He also threatened to send those to members of

16   Victim 1's family.

17   Q    Did Mr. Strauss use any other method to try to intimidate

18   Victim 1?

19   A    He also threatened to swat her, and also, you know, make

20   her images known throughout the community.

21   Q    Did Victim 1 say whether she was aware of Mr. Strauss

22   threatening other girls?

23   A    Yes, she was.

24   Q    And how did she become aware of that?

25   A    Friends in the community told her about Mr. Strauss's

Miller - Direct

1  reputation and things he said he had done in the past.

2  Q    Just to be clear by "the community," you're referring to

3  this online community, right?

4  A    That's correct.

5  Q    So if we go to the next document marked as Government's

6  Exhibit 5, what is that?

7  A    This is a chat that was recovered from Mr. Strauss's

8  Instagram account.

9  Q    And whose Instagram account is the Hells Ruin account

10  that's noted on this chat?

11  A    Mr. Strauss.

12  Q    How do you know that?

13  A    He admitted to it in his -- one of his interviews.

14  Q    Is this other Instagram account Victim 1's account?

15  A    Yes, it is.

16        MR. SCHEFF:  Permission to admit Government's Exhibit

17  5 into evidence.

18        MS. DIEHL:  No objection, Your Honor.

19        THE COURT:  It will be admitted.

20        (Government Exhibit 5 marked.)

21        (Government Exhibit 5 admitted.)

22   BY MR. SCHEFF:

23  Q    And the first message in this chat, does that message

24  reflect a request from Mr. Strauss for Victim 1 to send him a

25  picture of her vagina?

Miller - Direct

1   A    Yes.

2   Q    Did Victim 1 send Mr. Strauss the photo that he requested?

3   A    Yes.

4   Q    How do you know that?

5   A    She said so in her interview, and we also recovered a

6   picture of that on one of Mr. Strauss's phones.

7   Q    And does the picture that was recovered match this request

8   in terms of the message that was written on Victim 1's vagina

9   in the picture?

10  A    Yes.

11  Q    The affidavit discusses a video that was recorded on

12  January 2nd involving Victim 1 masturbating.

13       Does that video show Mr. Strauss's face?

14  A    Yes, it does.

15  Q    And where was that video taken?

16  A    It looks like it was taken in his room.

17  Q    Can you tell that from the background?

18  A    Yes.

19  Q    When Mr. Strauss was interviewed last week, did he

20  initially deny engaging in child exploitation?

21  A    Yes, he did.

22  Q    Did he initially deny doing anything sexual with Victim 1?

23  A    Yes.

24  Q    Did he later admit that he had actually engaged in

25  masturbation with Victim 1?

Miller - Direct

1   A    Yes.

2   Q    What was his explanation for why he had lied?

3   A    He claimed that he had been extorted by other members of

4   the online community to engage in this behavior.

5   Q    And who did he say had recorded the video as a part of

6   this supposed extortion plot?

7   A    Another member of the community.

8   Q    Can you confirm whether that's true?

9   A    No.

10       That somebody else recorded it?

11  Q    Right.

12  A    It appeared that he recorded it himself.

13  Q    And how can you tell that he recorded it himself, and that

14  he was not telling the truth when he said someone else recorded

15  it?

16  A    Watching the video, it shows that he went from a chat to a

17  screen-recording application to record the activity, and then

18  it did not appear consistent with somebody else doing it.  It

19  appeared that he was doing it.

20  Q    Was Victim 1 ever swatted?

21  A    Yes.

22  Q    Let's turn to the next document in the packet,

23  Government's Exhibit 6.

24       What is that document?

25  A    This is another report from the Goshen County Sheriff's

Miller - Direct

1  Office dated January 13th, 2024.

2          MR. SCHEFF:  Permission to admit Government's Exhibit

3  6.

4          MS. DIEHL:  And I believe this is the one we're going

5  to object to.  I don't have it in front of me, but if this is

6  involving alleged swatting.

7          MR. SCHEFF:  Yes.

8          MS. DIEHL:  Yes.  This is the one we're going to

9  object to as to irrelevant for purposes of the preliminary

10  hearing.

11          THE COURT:  What's the basis?

12          MS. DIEHL:  Well, Your Honor, while this was a swat

13  of someone related or in a relationship -- I'm sorry, I saw

14  this once, and I don't have it in front of me -- with -- thank

15  you.

16          Alleged swatting of I believe it was --

17          MR. SCHEFF:  So we might be confused about what this

18  is.  So this is the police report.  I think opposing counsel

19  might be talking about a swatting call on Victim 1's boyfriend.

20  This is related to the swatting of Victim 1.  So I don't know

21  if that changes opposing counsel's objection.

22          MS. DIEHL:  Your Honor, we would still maintain --

23  we'd maintain our objection for both.  Although this is

24  swatting of Victim 1, there is nothing tying it to Mr. Strauss,

25  especially because Victim 1 was involved in this community.  It

Miller - Direct

1  could have been any number of people.

2        THE COURT:  Mr. Scheff?

3        MR. SCHEFF:  Your Honor, I think that's a matter of

4  weight and not admissibility.  And I can also ask Special Agent

5  Miller whether he is aware of Mr. Strauss's -- Mr. Strauss

6  having any involvement in this swatting call.

7        THE COURT:  All right.

8   BY MR. SCHEFF:

9  Q   So Special Agent Strauss [sic], you mentioned Victim 1

10 having been swatted.

11     Are you aware whether Mr. Strauss was involved in that

12 swatting of Victim 1's house?

13 A   Victim 1 stated that she was told by friends of hers that

14 Strauss had claimed that he was the one who initiated the

15 swatting.

16        MR. SCHEFF:  Your Honor, I would again move to admit

17 Government's Exhibit 6.

18        MS. DIEHL:  And Your Honor, we would maintain our

19 objection given that response.

20        THE COURT:  Thank you.  The objection is overruled.

21        (Government Exhibit 6 marked.)

22        (Government Exhibit 6 admitted.)

23  BY MR. SCHEFF:

24 Q   Special Agent Miller, are you aware of Mr. Strauss

25 recently being arrested by the Franklin County Police

Miller - Direct

1    Department?

2    A    Yes.

3    Q    If you turn to the next document in your packet,

4    Government's Exhibit 7, what is that document?

5    A    This is a police report from the Franklin County Sheriff's

6    Office dated February 12th, 2024.

7            MR. SCHEFF:  Permission to admit Government's Exhibit

8    7.

9            MS. DIEHL:  Your Honor, we will object to this,

10   especially given the fact that we're at the preliminary hearing

11   right now, not the detention hearing.  This has nothing to do

12   with whether or not there was probable cause for what is

13   alleged in the complaint, understanding that Mr. Scheff may try

14   to admit this into the detention hearing for separate purposes,

15   but at this point in time it is inadmissible and not related to

16   probable cause.

17           THE COURT:  Mr. Scheff?

18           MR. SCHEFF:  Judge, I'm considering this to be both

19   the preliminary hearing and the detention hearing.  And I think

20   that the Court can decide what is pertinent to the preliminary

21   hearing and what is pertinent to the detention hearing, but I

22   don't think it makes sense to have Special Agent Miller testify

23   only as the preliminary hearing and then again only as to the

24   detention hearing.  I'm trying to streamline things.

25           MS. DIEHL:  Understand that, Your Honor; however, my

Miller - Direct

1  understanding is Special Agent Miller was not involved in this

2  incident.  And so questioning him about this regarding the

3  detention hearing and whether or not Mr. Strauss is a danger to

4  the community -- we wouldn't object to this piece of evidence

5  being admitted for the detention hearing, but having Special

6  Agent Miller talk about it, we would object to.

7          THE COURT:  All right.  Again, the rules of evidence

8  do not apply to the evidence.  I'm going to consider it for the

9  weight, and I can separate for purposes of detention and the

10 preliminary hearing this particular document and the contents

11 of it.

12         MS. DIEHL:  Yes, Your Honor.

13         THE COURT:  The objection is overruled.  And this

14 will be considered for detention purposes, as the government

15 has indicated.

16         Go ahead, Mr. Scheff.

17         MR. SCHEFF:  Thank you, Your Honor.

18         (Government Exhibit 7 marked.)

19         (Government Exhibit 7 admitted.)

20 BY MR. SCHEFF:

21 Q    Special Agent Miller, when was Mr. Strauss released from

22 custody as to this incident related to Franklin County?

23 A    A couple of days after the incident, less than a week.

24 Q    Did he contact anyone after he was released from custody?

25 A    Yes, he did.

Miller - Direct

1  Q    Who did he contact?

2  A    Victim 1.

3  Q    And how did he contact Victim 1?

4  A    Through an anonymous communication.

5  Q    And how did Victim 1 -- what made Victim 1 believe that it

6  was Mr. Strauss who was contacting her?

7  A    Again, friends in the community notified her that it was

8  Strauss making the contact.

9  Q    Was the timing of that contact consistent with about when

10 Mr. Strauss was released from custody?

11 A    Yes.

12 Q    And as far as you're aware, is that Franklin County case

13 still pending?

14 A    Yes.

15 Q    When Mr. Strauss was interviewed, did he admit to having

16 child pornography on his phone -- interviewed the first time, I

17 should say?

18 A    I don't know if it was the first time.

19 Q    At any point when he was interviewed, did he admit to

20 that?

21 A    Yes, he did.

22 Q    And what did he say were the ages of the girls and women

23 depicted on his phone?

24 A    14 and up.

25 Q    In reviewing Mr. Strauss's phone, has law enforcement

Miller - Direct

1  found pictures of naked young women?

2  A    Yes.

3  Q    Is it possible to confirm whether most of those women are

4  underage?

5  A    Not at this time, no.

6  Q    Do they appear young enough that they could be underage,

7  but old enough that it's hard to tell whether they're just

8  older teenagers for a lot of them?

9  A    Yes.

10 Q    In reviewing Mr. Strauss's phone, has law enforcement

11 found pictures of young women engaging in self-harm?

12 A    Yes.

13 Q    Approximately how many images of young women who are naked

14 and/or engaging in self-harm were found on Mr. Strauss's phone?

15 A    Approximately 20.

16          THE COURT:  20?

17          THE WITNESS:  20, yes, ma'am.

18  BY MR. SCHEFF:

19 Q    When Mr. Strauss was interviewed last week, when did he

20 say was the last time he was online?

21 A    Before his arrest by the Franklin County Sheriff's Office.

22 Q    So before mid February?

23 A    Before mid February, yes.

24 Q    Did he discuss in his interview talking online with

25 someone with the user name "Gore is Lovely"?

Miller - Direct

1   A     Yes.

2   Q     And when did he say that he last chatted with Gore is

3   Lovely?

4   A     Before his arrest by the Franklin County Sheriff's Office

5   in mid February.

6   Q     Were those statements about Mr. Strauss's online activity

7   and his communications with Gore is Lovely true?

8   A     No.

9   Q     How do you know that?

10  A     We received a report of communications between one of

11  Mr. Strauss's accounts and Gore is Lovely, and also copies of

12  those chats.

13  Q     Was there also IP address information in that report?

14  A     Yes.

15  Q     And what did that show for the account known to be --

16  known to belong to Mr. Strauss?

17  A     It showed it was coming from Franklin County, Virginia.

18  Q     And that's where Mr. Strauss lives?

19  A     That's correct.

20  Q     Are you -- so the affidavit mentions that Mr. Strauss met

21  Victim 1 on Xbox.

22        Are you aware of Mr. Strauss meeting another girl on Xbox

23  besides Victim 1?

24  A     Yes.

25  Q     How old was that girl?

Miller - Direct

1  A    16.

2  Q    Is it possible that she might have been younger?

3  A    Yes, it is.

4  Q    And where does she live?

5  A    Oh, Florida.

6  Q    Yes.

7  A    Yes.

8  Q    Did Mr. Strauss solicit that girl?

9  A    Yes.

10 Q    For what?

11 A    Images of nudity and self-harm.

12 Q    And did she send those images to him?

13 A    Yes.

14 Q    If you go to the next document in your packet,

15 Government's Exhibit 8, what is that document?

16 A    This is a TikTok communication involving Mr. Strauss and a

17 victim in North Carolina.

18 Q    I may have -- did I go out of order?  Is that your last

19 exhibit or is there --

20 A    This is --

21 Q    Did you miss one?

22 A    No.

23 Q    Here.

24 A    Number 9.

25 Q    Okay.  So what's Government's Exhibit 8?

Miller - Direct

1  A    Okay.  This is another report by the Franklin County

2  Sheriff's Office dated October 28th, 2022.

3  Q    And what does that report relate to?

4  A    This involves a female from North Carolina who was

5  recovered at Mr. Strauss's house.

6        MS. DIEHL:  Objection, Your Honor.

7        Your Honor, again, related to -- first, the objection

8  related to the preliminary hearing.  This doesn't have anything

9  to do with probable cause for the underlying offense.  And

10 related to the detention hearing, this was a case that there

11 was no convictions, it was dismissed, and it involves

12 Mr. Strauss and his family getting someone who they thought was

13 in distress.  When they learned of her age, they cooperated

14 with the FBI and ensured that she was returned home.  She was a

15 runaway from a bad situation.

16       THE COURT:  Again, on the -- in terms of detention, I

17 can separate what is -- what is relevant to the preliminary

18 hearing and the detention, and the Court will do that.

19       Certainly have an opportunity to cross-examine as to

20 the weight of this or the other side of it, as it were, in

21 terms of what you would like the Court to consider.  But I'm

22 going to allow it.

23       MS. DIEHL:  Yes, Your Honor.

24       MR. SCHEFF:  Permission to admit Government's Exhibit

25 8.

Miller - Direct

1          THE COURT:  Over the defendant's objection, it will

2    be admitted.

3               (Government Exhibit 8 marked.)

4               (Government Exhibit 8 admitted.)

5     BY MR. SCHEFF:

6    Q    Special Agent Miller, how old was the girl in that report?

7    A    16.

8    Q    And how did that girl get to Mr. Strauss's house?

9    A    Mr. Strauss and his stepfather retrieved her from North

10   Carolina and drove her back to the house in Franklin County.

11   Q    Was that girl subsequently returned to her home that night

12   or shortly thereafter?

13   A    Yes.

14   Q    Let's go to the final exhibit in your packet, Government's

15   Exhibit 9.  What is that?

16   A    This is a TikTok communication from the North Carolina

17   victim and Mr. Strauss.

18   Q    A series of communications, right?

19   A    A series of communications, yes.

20   Q    And whose messages are the blue messages?

21   A    That is the North Carolina victim.

22   Q    And the green?

23   A    That is Mr. Strauss.

24   Q    And where were these messages recovered from?

25   A    TikTok.

Miller - Cross

1  Q    These messages, where were they -- sorry, where were they

2  recovered from?

3  A    Oh, Mr. Strauss's phone.

4           MR. SCHEFF:  Permission to admit Government's Exhibit

5  9.

6           MS. DIEHL:  No objection, Your Honor.

7           THE COURT:  They will be admitted.

8           (Government Exhibit 9 marked.)

9           (Government Exhibit 9 admitted.)

10  BY MR. SCHEFF:

11  Q    Special Agent Miller, are you aware of Mr. Strauss taking

12  other girls from out of state and bringing them back to his

13  house?

14  A    Yes.

15  Q    And what do you know about that?

16  A    In his interview he admitted to getting females from South

17  Carolina and New York and bringing them back to his house in

18  Franklin County.

19           MR. SCHEFF:  I've got no further questions, Your

20  Honor.

21                     CROSS-EXAMINATION

22  BY MS. DIEHL:

23  Q    I think I have to say good evening, Special Agent Miller.

24  A    Good evening.

25  Q    So just to be abundantly clear, you were not the

Miller - Cross

1  investigating agent in this case, correct?

2  A    That is correct.

3  Q    So you came in for the purposes of this hearing, right?

4  A    That is correct.

5  Q    Okay.  And so everything you know is based on review of

6  the investigation, but not based on your personal

7  investigation, correct?

8  A    That's correct.

9  Q    Okay.  And so what you -- I want to go over some of the

10 things you reviewed in preparation for today.

11       It sounds like you reviewed the police reports, right?

12 A    That's correct.

13 Q    You reviewed the phone of Mr. Strauss?

14 A    Parts of the extraction from Mr. Strauss's phone.

15 Q    Okay.  So only parts of the extraction that were given to

16 you.  You didn't review the whole phone?

17 A    That is correct.

18 Q    Okay.  And did you watch the interrogation?

19 A    Yes.

20 Q    Okay.  Both of them?

21 A    Just the one from the time of his arrest.

22 Q    Okay.  And so the second time he was spoken to by the

23 police, that was not recorded, or you didn't watch the

24 recording?

25 A    There was an audio recording at the time of the search

Miller - Cross

1   warrant.  I did not watch that.  I read the summarizing report.

2   Q    Okay.

3   A    And then I watched the video from the time of his arrest.

4   Q    Okay.  Understood.

5        So I first want to talk about when we discussed Mr. Evan

6   Strauss speaking to the alleged victim, this -- save for the

7   video recording, these are all via text, right?  And when I say

8   via text, I mean written communication.

9            THE COURT:  I'm sorry, what was the question?

10    BY MS. DIEHL:

11  Q    Yes.  So when Evan Strauss is speaking to alleged Victim

12  1, this is through written communication, right?

13  A    Other than the videos?

14  Q    Other than the video.

15  A    As far as I know, yes.

16  Q    Okay.  And this is through a screen name, correct, Hells

17  Ruin?

18  A    I believe that was one of the screen names he used.  I

19  don't know what other screen names he used.

20  Q    So there were potentially multiple screen names, right?

21  A    Yes.

22  Q    And save for that one recording that I know we spoke

23  about, there is no way to know who is behind that screen name,

24  right?

25  A    Well, there were communications on his phone that would be

Miller - Cross

1  in his possession.  So yes, that would be a way to identify

2  that.

3  Q    That's one way to identify, right?

4  A    That's correct.

5  Q    Okay.  And multiple people can potentially access screen

6  names, right?

7  A    As far as I know, yes.

8  Q    Okay.  Now, when Mr. Strauss was speaking to -- I believe

9  in the recording of the interrogation, he mentioned that

10 someone named Syskey threatened him to do some of this, right?

11 A    I believe that was the name he used, yes.

12 Q    Okay.  And Syskey is someone part of the community, right?

13 A    I believe so, yes.

14 Q    Okay.  Now, Syskey is also the term for malware where

15 people can steal passwords and user names, right?

16 A    I don't know.

17 Q    Okay.  You're not aware that Syskey is a malware used to

18 steal passwords?

19 A    No, I'm not.

20 Q    Okay.  But this was someone that Mr. Strauss was concerned

21 about, right?

22 A    Yes.

23 Q    And he told the FBI this?

24 A    Yes.

25 Q    Okay.  Are you aware of a doxing website against

Miller - Cross

1  Mr. Strauss that Syskey posted online?

2  A    I remember hearing something about it, but I don't know --

3  I have no details on it.

4  Q    Do you remember if Mr. Strauss was the one who told people

5  about this?

6  A    I don't know.

7        MS. DIEHL:  Your Honor, permission to approach the

8  bench for -- to enter Defense Exhibit 1 into the record under

9  seal.  And I provided a copy to the government.

10  BY MS. DIEHL:

11  Q    And so you have never been on the website

12  EvanStrauss.info?

13  A    No.

14  Q    Okay.  And so you would be unaware if this website posted,

15  for instance, exactly what was on Exhibit 1 online?

16       You don't know what's on the website?

17  A    That's correct.  I have no idea what's on the website.

18  Q    Okay.  And the alleged Victim 1 claimed that she didn't

19  want these images out publicly, correct?

20  A    I believe that's the case, yes.

21  Q    She had no involvement, didn't -- was forced into this,

22  correct?

23  A    That's correct.

24  Q    Okay.  However, she was part of the community; is that

25  right?

Miller - Cross

1   A    I don't know if she was part of the community, but she was
2   at least aware of the community and had some involvement in the
3   community.  I don't know if she was actually a member of the
4   community.
5   Q    But aware of the existence?
6   A    Uh-huh.
7   Q    And so just because none of us are Gen Zers, I want to
8   make sure we're clear on what all of this is.
9        The community is a group on Discord, right?
10  A    I don't know if that's the platform they use or if they
11  bounce between platforms, but it's a group of people that are
12  online.
13  Q    It's a group of people online.
14       And within the community there are subgroups, correct?
15  A    That's my understanding, yes.
16  Q    And one of the subgroups is Purgatory, right?
17  A    That is my understanding.
18  Q    And that is the subgroup that Mr. Strauss claims to have
19  been involved with, right?
20  A    That's correct.
21  Q    Okay.  Now, are you aware that Mr. Strauss is autistic?
22  A    No.
23  Q    Are you aware that Mr. Strauss has an IQ of 75?
24  A    No.
25  Q    Was the FBI aware of that before they interrogated him?

Miller - Cross

1   A    I don't know.

2   Q    Did they ask his legal guardians for permission to

3   interrogate him?

4   A    I don't know.

5   Q    Are you aware that Mr. Strauss's family has been swatted?

6   A    I believe I heard that through some of the discussions

7   involving this case, but I have no details on it.

8   Q    And I don't know, because I was writing notes, if this

9   came out on your direct, so I apologize.

10       For the record, swat is when someone calls the police

11  about an incident, correct, and then the police come to the

12  house?

13  A    Yes, but it's a fabricated incident, and the intention of

14  intimidating the victim or basically sending a message.

15  Q    So like a fake bomb threat or something like that?

16  A    That's a good description, yes.

17  Q    Now, regarding the swatting incident against Victim 1, she

18  said that she thought it was Mr. Strauss because she heard of

19  it through friends, correct?

20  A    That's correct.

21  Q    She didn't know personally if it was Mr. Strauss, correct?

22  A    Not to my knowledge, no.

23  Q    And as far as to your knowledge, there is no evidence

24  besides what she heard through friends, linking Mr. Strauss to

25  that swat, correct?

Miller - Cross

1  A    That's correct.

2  Q    In fact, the person who made the call said their name was

3  Matt, right?

4  A    I believe that's in the report, yes.

5  Q    Similarly, after Mr. Strauss was in custody, she heard

6  through friends that he tried to contact her, right?

7  A    She heard through friends that the contact that she

8  received was Mr. Strauss, yes.

9  Q    Correct.  So she did not know personally that the contact

10  she received was Mr. Strauss, correct?

11  A    That's correct.

12  Q    Okay.  Are you aware that Mr. Strauss cuts himself?

13  A    No.

14  Q    Did he tell the FBI that he himself was threatened

15  to cut -- or was told to cut himself?

16  A    I believe that was part of one of his interviews, yes.

17  Q    He had to cut names into his body or else people would do

18  things to his family, correct?  That was in the interview?

19  A    I'm not 100 percent sure, but I do recall he was

20  threatened to perform the same acts that you just described,

21  cutting himself.

22  Q    And I want to talk about this North Carolina incident.

23  There were no arrests based on that incident, correct?

24  A    Not at this time, no.

25  Q    Okay.  In fact, the person who was 16, the family thought

Miller - Cross

1  she was older, correct, based on what they told the FBI?

2  A    I don't know.

3  Q    In the report they thought she was -- they said they

4  thought she was older, right?

5  A    Can I look at the report?

6  Q    Sure.  Go ahead.

7        THE COURT:  And when you say "family," you're

8  referring to the Strauss --

9        MS. DIEHL:  The Strauss family, yes, Your Honor.

10       THE COURT:  Exhibit 8?

11       MR. SCHEFF:  Yes, Your Honor.

12       MS. DIEHL:  It's difficult without having it in front

13  of me, Your Honor.  I'm not trying to cast aspersions on the

14  government.

15       MR. SCHEFF:  No aspersions taken.

16       THE WITNESS:  It says in here that she said that her

17  husband went to get them and was under the impression that the

18  victim -- the North Carolina victim was 17, almost 18, and

19  didn't realize that she was only 16.

20  BY MS. DIEHL:

21  Q    And they went down there because they thought she was

22  undergoing some sort of abuse, mental or otherwise, right?

23  A    I believe that's the story they said, yes.

24  Q    And as soon as the FBI came, they cooperated, right?

25  A    As far as I know, yes.

Miller - Cross

1  Q    And the 16 year-old was taken back to her family?

2  A    That's correct.

3  Q    Okay.  And you did not see any text messages from Victim 1

4  stating she was 17, correct?

5  A    That's correct.  I have not seen those.

6  Q    You have not seen any Instagram messages from Victim 1

7  stating her age, correct?

8  A    I have not seen those.

9  Q    You have not seen any messages from this 16 year-old girl

10 stating she was 16, correct?

11 A    That's correct.

12         MS. DIEHL:  May I have a moment, Your Honor?

13         THE COURT:  Yes.

14         (Pause.)

15  BY MS. DIEHL:

16 Q    Special Agent Miller, who were the friends Victim 1 was

17 discussing that told her this was Evan Strauss?

18 A    It's my understanding it was friends in the same community

19 that Mr. Strauss is a member of.

20         MS. DIEHL:  Thank you.  No further questions, Your

21 Honor.

22         THE COURT:  Ms. Diehl, point of clarification.  Is

23 Defendant's Exhibit 1 this collective exhibit of four pages or

24 is it --

25         MS. DIEHL:  It is the collective exhibit, Your Honor.

Miller - Redirect

1   And I did not enter it because Special Agent Miller didn't know

2   about it.  So I can wait until my case, but this is evidence we

3   would admit as Defense Exhibit 1.

4           THE COURT:  I'll hold it together until you're ready

5   and I'll try to remind you if you want to do it then, or I'll

6   admit it now, unless there's an objection by the government.

7           MR. SCHEFF:  Your Honor, I was going to object to

8   authenticity because --

9           THE COURT:  Then we'll hold off until you get ready.

10  We'll hold off until you get ready.  I'm holding it together as

11  one -- I didn't want to mess up your pages.

12          MS. DIEHL:  Yes, Your Honor.  So no further questions

13  for Special Agent Miller.

14          THE COURT:  All right.  Thank you.

15          Mr. Scheff?

16          MR. SCHEFF:  Just a couple of brief follow-ups.

17                     REDIRECT EXAMINATION

18   BY MR. SCHEFF:

19  Q    Special Agent Miller, with regard to the North Carolina

20  case, are you aware whether any investigation into that case is

21  ongoing?

22  A    It's my understanding it's an ongoing investigation by the

23  FBI in North Carolina.

24  Q    I would also point you to Government's Exhibit 2 to the

25  first email in the chain chronologically, the one on line 8,

Miller - Recross

1  the email that you identified as being an email from

2  Mr. Strauss to the Department of Family Services on December

3  22nd of 2023.

4       Does Mr. Strauss identify the victim's age in that email?

5  A    Yes.  He says she is 17.

6            MR. SCHEFF:  Nothing further.

7            MS. DIEHL:  I do have one follow-up, Your Honor --

8  two follow-ups, because I learned never to promise one.

9            THE COURT:  Absolutely.

10                      RECROSS-EXAMINATION

11  BY MS. DIEHL:

12  Q    Special Agent Miller, if someone receives child porn

13  without asking for it --

14  A    I'm sorry?

15  Q    If someone receives child porn without asking for it, or

16  clicks on it, or however, if it's an accidental receiving of

17  child porn, what are they supposed to do with it?

18  A    I would guess they would delete it and report it to the

19  authorities.

20            MS. DIEHL:  Thank you.  No further -- one moment,

21  Your Honor.

22            (Pause.)

23  BY MS. DIEHL:

24  Q    And Special Agent Miller, do you know, if someone deletes

25  something off their phone or computer, if that deletes it from

USA v. Strauss, 7:24MJ46, 4/10/2024

1  that hard drive?

2  A    From my training, it depends on how it's deleted, what the

3  platform is.  So sometimes it can be recovered.  Sometimes it

4  can't.

5  Q    So it could potentially still be on the computer if you

6  tried to get rid of it?

7  A    That's my understanding.

8           MS. DIEHL:  Thank you.  No further questions.

9           THE COURT:  Anything further, Mr. Scheff?

10          MR. SCHEFF:  No, Your Honor.  And that's all the

11  evidence we intend to present.

12          THE COURT:  Thank you very much.

13          THE WITNESS:  Yes, ma'am, thank you.

14          THE COURT:  Mr. Scheff, argument regarding -- on the

15  preliminary hearing?  Are we at that stage?  I'm assuming

16  you're done with your evidence.

17          MS. DIEHL:  Yes, Your Honor, I think we're at that

18  stage.

19          MR. SCHEFF:  Your Honor, I'm going to be extremely

20  brief on this because we've got a lot more to come.

21          Really all I have to say is there was a video

22  recording of this 17 year-old victim found on Mr. Strauss's

23  phone.  The recording reflects him using a third-party app to

24  record her masturbating, which is in direct contradiction to

25  him saying that somebody extorted him into doing this, and that

USA v. Strauss, 7:24MJ46, 4/10/2024

1  they were the ones who were recording this on his behalf,

2  because the app -- the phone shows him switching between apps

3  to make the recording.  And you don't even have to believe a

4  single thing that Victim 1 has had to say, as reported by

5  Special Agent Miller, because the video was found on

6  Mr. Strauss's phone and it shows that he recorded it.  That

7  more than meets the probable cause standard, and frankly,

8  everything else is just gravy.

9          THE COURT:  Ms. Diehl?

10         MS. DIEHL:  Yes, Your Honor.  While probable cause is

11 a low standard, I would not say that everything else is just

12 draping, if everything else are defenses to the case.

13 Understanding the government might think that that is

14 unimportant, it is very important when we're determining a

15 criminal case.

16         MR. SCHEFF:  I said "gravy," just to be clear.

17         MS. DIEHL:  Gravy, oh.

18         MR. SCHEFF:  I wasn't trying to belittle anything you

19 had to say, I was just saying we don't need anything else.

20         MS. DIEHL:  Understood.  Understood.  I heard

21 "draping."  I apologize.  However, gravy is the most important

22 part of a meal.

23         So regarding that, while there are things, according

24 to an agent who has never seen -- or has only looked at the

25 evidence -- we don't have the evidence before the Court.

USA v. Strauss, 7:24MJ46, 4/10/2024

1  Understanding that hearsay is admissible at preliminary

2  hearings, we do not have any text messages, messages, TikTok

3  messages that show that these people told Evan Strauss how old

4  they were, nor do we have Evan Strauss -- we have his

5  connection to an email and to these -- and to these user names,

6  but we don't know who actually was using the user names.

7  Specifically, Mr. Strauss said in his interrogation that he was

8  being threatened and was under duress under someone known as --

9  I'm going to say the name wrong -- Syskey.  And, in fact,

10 Syskey -- it is the defense's proffer that Syskey is recording

11 all of this and accessing people's passwords and emails and

12 information.  And because duress is a defense, there is not

13 probable cause.

14         Thank you, Your Honor.

15         THE COURT:  Thank you for your argument and

16 presentation.

17         Based upon the evidence presented and proffered by

18 the government, as well as the testimony of the special agent,

19 I find that there is probable cause to believe that Mr. Strauss

20 committed violations of 18 U.S.C. 2241(a) and 2252(a) --

21 (a)(5)(B) relating to the production and possession of child

22 pornography.

23         All right.  Understanding much of the evidence is the

24 same, or some of that evidence may be used in the detention

25 purposes, let's go ahead and proceed on to the detention

USA v. Strauss, 7:24MJ46, 4/10/2024

1  hearing.  As I recall, I asked the government its basis for the

2  detention hearing on Monday and that was conceded; is that

3  correct that there is obviously an (f)(1)(E) basis for a

4  detention hearing, correct, Ms. Diehl?

5          MS. DIEHL:  Yes, Your Honor, there is.

6          THE COURT:  All right.  And as well as a presumption?

7          MS. DIEHL:  Yes, Your Honor, based on the charge,

8  there is.

9          THE COURT:  All right.  Very well.

10          Mr. Scheff, any additional evidence or proffers with

11  regard to -- on the detention side of the ledger?

12          MR. SCHEFF:  No, Your Honor.

13          THE COURT:  Very well.

14          Ms. Diehl?

15          MS. DIEHL:  Yes, Your Honor.  We would first like to

16  admit Defense Exhibit 1 under seal.  And I understand the

17  government is going to object to authenticity.  I can wait

18  until his argument is done and then I can argue.

19          THE COURT:  Mr. Scheff, what's the basis of the

20  government's objection?

21          MR. SCHEFF:  Your Honor, we don't know where this

22  came from.  It's -- I mean, it appears to be a printout of a

23  website from today.  I don't know who printed this out or who

24  accessed this website.  There is really nothing to -- I

25  understand that the rules of evidence don't apply here, but we

USA v. Strauss, 7:24MJ46, 4/10/2024

1   still have to have some basis for figuring out where things

2   came from.  There is really no authentication of this document

3   whatsoever.

4           MS. DIEHL:  Your Honor, if I may?

5           THE COURT:  Yes.

6           MS. DIEHL:  The first is on the bottom left corner of

7   the first page it says www.evanstrauss.info/team.  I would

8   proffer that I am the one who accessed the website and printed

9   it.  And anyone can go on that website as it is live right now

10  and find this website.  Specifically on the left corner of the

11  top of the page it does say "accessed today" and that date.

12  Because it shows the date of the access, the time of the access

13  and the website in which it was accessed, it is authentically a

14  website.  And we can argue as to relevance, but this shows that

15  it was a website accessed today and a printout of the website.

16          And if that is not enough, I can certainly pause

17  proceedings and have a witness access the website and come in

18  and testify that they have done so.

19          THE COURT:  And all of these pages are from the

20  website?

21          MS. DIEHL:  Yes, Your Honor.  And Your Honor,

22  additionally, some of the evidence within these pages, I can

23  have his parents say that this is accurate information, but

24  that further goes to authenticity.

25          THE COURT:  Offered for the purpose of what?  I'm

USA v. Strauss, 7:24MJ46, 4/10/2024

1  trying to get to the bottom of -- so counsel accessed a website

2  and printed these pages today?

3          MS. DIEHL:  Yes, Your Honor.

4          THE COURT:  That's the representation, Ms. Diehl?

5          MS. DIEHL:  Yes, Your Honor, offered for several

6  purposes regarding the detention hearing and dangerousness.

7          The first is that Mr. Strauss himself -- and perhaps

8  I should have admitted this prior to the argument on the

9  preliminary hearing, but it still goes to weight of the

10  evidence and seriousness of the offense because this shows that

11  this community does this to each other, and nothing between any

12  of them is trustworthy; specifically, Mr. Strauss himself has

13  been a victim of doxing, of swatting.  His address is listed.

14  The GPS picture of his home is listed.  His parents' jobs,

15  emails, phone numbers are listed.  And this is all public.  And

16  perhaps most importantly, it shows that Syskey, who he told the

17  FBI about but they did not investigate, created this website.

18  And additionally -- and why we're asking --

19          MR. SCHEFF:  Your Honor, I'd object to the fact not

20  in evidence that the FBI didn't investigate anything with

21  respect to Syskey.

22          MS. DIEHL:  I believe that's what the agent stated,

23  but we --

24          THE COURT:  Let me just -- what this shows is that

25  there is information on a website that you were able to access

USA v. Strauss, 7:24MJ46, 4/10/2024

1   as of 10:27 today, correct?

2            MS. DIEHL:  Yes, Your Honor.

3            THE COURT:  Like not 10:26, but 10:27 today, not

4   yesterday, not a month ago, but 10:27 today?

5            MS. DIEHL:  On a public website, yes, Your Honor.

6            THE COURT:  All right.

7            MS. DIEHL:  It also shows, Your Honor, whether or not

8   the FBI investigated, that Syskey -- which is the person that

9   Mr. Strauss said was terrorizing him into doing these things --

10  someone named Syskey is taking ownership of this website.

11           And additionally -- and one of the reasons we are

12  asking to file it under seal -- is the person who is Victim 1

13  has -- someone who claims to be Victim 1 has taken ownership of

14  posting on this website as well, and has posted -- we did not

15  provide this because of the sensitive nature -- but under the

16  tab Exhibit 1 that government has taken a lot of time to file

17  under seal -- has posted on this website publicly.

18           MR. SCHEFF:  Your Honor, I'd again object to arguing

19  facts not in evidence that Victim 1 is the one who has posted

20  these things.  I appreciate counsel's representation that

21  something was posted on this website.  I don't think that

22  counsel can say, even by proffer, who posted anything that may

23  have been posted on that website.

24           MS. DIEHL:  Your Honor, to be clear, I stated that

25  someone claiming to be the victim has taken ownership of this

USA v. Strauss, 7:24MJ46, 4/10/2024

1    website.

2            THE COURT:  What I'm troubled with is obviously from

3    an authenticity standpoint, I mean, on a website I understand

4    that counsel can go to that website and obtain this information

5    this morning, but in terms of where the information came from,

6    I mean, there is -- there is a definite forensic issue related

7    to it.  I'm trying to figure out how -- what the value of this

8    is from the defendant's position, understanding that the --

9    that evidence doesn't necessarily -- we're dealing with a

10   different standard on a detention hearing.

11           MS. DIEHL:  Your Honor --

12           THE COURT:  Help me a little bit more, because I'm

13   not getting there.  Help me a little bit more.

14           MS. DIEHL:  First, respectfully, the same thing about

15   authenticity can be argued for all of government's Internet

16   evidence, understanding that the agent -- who had nothing to do

17   with this case -- has testified that in the investigation files

18   of the United States government there is something off of

19   Mr. Strauss's phone, but he testified as to Instagram, TikTok

20   messages, all of these things that have the same authenticity

21   issue.  And that is the concern with the Internet.

22           However, secondarily, if the Court would like -- we

23   would need a recess -- I could call our mitigation specialist

24   who has accessed this website yesterday and I believe -- I

25   believe Monday.  So it was at least out there for three days.

USA v. Strauss, 7:24MJ46, 4/10/2024

1          Regarding -- again, regarding the authenticity as to

2    who posted it, we don't have that, but that is the exact

3    concern.  It goes to the weight of the government's evidence

4    because they are arguing that it is -- if it came from this

5    person, then it is obviously Mr. Strauss.  Well, similarly

6    here, anyone can take responsibility for these things.  And

7    regardless of who posts it, what it does show to dangerousness,

8    right, is that Mr. Strauss is already being threatened.  His

9    family is already being threatened by some outside source,

10   right?  And so there are reasons for him to lay low, for lack

11   of a better term.  And there are serious concerns for his

12   family as well.  And the fact -- if the government is trying to

13   paint this case as Mr. Strauss is the puppet master behind all

14   of these doxings and these swats and sextortion, or whatever it

15   may be, this shows that the wider community has their hands in

16   all of these pots.  And it is not a slam dunk case, as the

17   government would argue, that it is Mr. Strauss, because, in

18   fact, he has been a victim of these very same people, just as

19   he told the FBI he was.

20          THE COURT:  Mr. Scheff?

21          MR. SCHEFF:  Your Honor, I would add a couple of

22   things.  It's very different pulling something off of

23   Mr. Strauss's phone, meaning he had it -- regardless of who

24   posted it in the first place, he had it in the phone that was

25   seized from him or getting something from Instagram, not pulled

USA v. Strauss, 7:24MJ46, 4/10/2024

1  off of Instagram in terms of going on the Internet, but getting

2  something from corporate Instagram versus going on the Internet

3  and pulling something off.  That's the first thing, Your Honor.

4         I don't doubt my colleague's representation that she

5  went on the website and that she saw it.  I think that

6  addresses part of the authenticity issue.  As Your Honor

7  addressed, however, we have something with regard to a website

8  from this morning, and we have something not coming from legal

9  process from the website, but just something pulled down from

10  the page, which is incredibly different, particularly when

11  we're talking about something captured at this point in time.

12         And the other thing that I would push back against on

13  the argument that the defense is making, we've never tried

14  to -- let me be clear.  I'm not arguing here that Mr. Strauss

15  is the only person in this community who is doing these things.

16  There are certainly others, and I don't think that Special

17  Agent Miller said that Syskey is not being investigated.  I

18  think Special Agent Miller said that he didn't believe

19  Mr. Strauss when he said that Syskey had forced him to engage

20  in this masturbation session because it was Mr. Strauss who was

21  recording it, as you can see from the phone.

22         So it frankly doesn't matter whether Mr. Strauss was

23  the only person involved in this or whether there were multiple

24  people involved in it, as long as Mr. Strauss was responsible

25  for some of these activities, which is what we are trying to

USA v. Strauss, 7:24MJ46, 4/10/2024

1   prove today.  Honestly, there is no honor among thieves.  So

2   it's not at all surprising that Mr. Strauss, having involved

3   himself in this community, is now perhaps getting threats

4   himself.  It's not at all clear why that's relevant, first of

5   all.  And I also come back to the authenticity of this in terms

6   of this being pulled down from a website this morning.

7          THE COURT:  Could I ask -- please stand, but can I

8   ask a few questions.

9          MS. DIEHL:  Yes, Your Honor.

10          THE COURT:  Perhaps I missed it.  Is this -- is this

11   his website that has arguably been hacked, or are you saying

12   that this is a created, fabricated -- completely fabricated

13   website?

14          MS. DIEHL:  This is a dox website, a completely

15   fabricated website.

16          THE COURT:  I just wanted to make sure, because I

17   don't know that that had been clear.

18          MS. DIEHL:  Yes.  So dox websites are -- if I may

19   proffer --

20          THE COURT:  Please.

21          MS. DIEHL:  -- when you put someone's information out

22   there, you name the website either their name or their user

23   name or whatever it is, and it has information about them.  And

24   it is typically used to either threaten them, extort them, or

25   just punish them.

Strauss - Direct

1              THE COURT:  I'm going to allow it.  It's a detention

2    hearing.  I'm going to allow it, and the Court will evaluate

3    the weight of it and its importance and relevance to the issues

4    before the Court.

5              This will be admitted as Defense Exhibit 1.

6              (Defense Exhibit 1 marked.)

7              (Defense Exhibit 1 admitted.)

8              MS. DIEHL:  Your Honor, at this time we call

9    Mr. Jeremy Strauss, if you would just allow a moment for

10   Mr. Franklin to grab him.

11             (Pause.)

12             I probably should have asked that before I sent him

13   out.  I apologize, Your Honor.

14             THE COURT:  Asked what?

15             MS. DIEHL:  Permission for him to grab him.

16             JEREMY STRAUSS, CALLED BY THE DEFENSE, SWORN

17                       DIRECT EXAMINATION

18    BY MS. DIEHL:

19   Q    Good evening, Mr. Strauss.  Thank you so much for your

20   patience.

21        I'm going to ask and start with a very obvious question.

22   How do you know Evan Strauss?

23   A    He is my son.

24   Q    Now, I believe an agent called you his stepfather, but

25   he's adopted.  You are his father, correct?

56

Strauss - Direct

1  A    Correct.  We finalized at 23 months.

2  Q    At 23 months?

3  A    Uh-huh.

4  Q    So you have been Evan's father since he was a baby?

5  A    Yes.

6  Q    Okay.  Can you just tell the Court a little bit briefly

7  about why you adopted Evan and where he came from?

8  A    My wife was his case manager when he went into foster care

9  at five months.  He had been -- at that point, he had been

10 listed as failure to thrive.  He went with a foster family who

11 was with him for about a year.  And my wife and I had been

12 trying to have children of our own and had been unsuccessful,

13 and found out later on that there was physical complications as

14 to why that was.

15      At five months when she was -- he was one of her first

16 clients, and she -- she told me, she goes, We're going to adopt

17 him at some point.  She goes, At least -- she says, I'm going

18 to adopt him, at least.  And at 17 months his foster family

19 came to us one night after we had decided we weren't going to

20 move out of state and said to us, He's going up for adoption.

21 And we basically had to make that decision that night to pursue

22 that, and then by the next day we were already contacting the

23 appropriate channels to get that going.

24 Q    And since he was adopted, have you all lived in the

25 Virginia area?

Strauss - Direct

1   A    No.  We started out in Wisconsin, which is where he was

2   born as well.

3   Q    And when did you move to Virginia?

4   A    It was the spring of 2000.  He was not quite -- I think he

5   was about two years old at that point when we moved.

6   Q    And has he been going to school in Virginia --

7   A    Uh-huh.

8   Q    -- his entire school life?

9   A    In Virginia.  We did live in North Carolina for a few

10  years, and he did go to school one year in Tennessee.

11  Q    Okay.  And does Evan have a job?

12  A    No.

13  Q    Is he on disability?

14  A    Yes.

15  Q    Why is that?

16  A    He -- due to his abilities, he really doesn't have the

17  comprehension to understand certain things that he needs to do.

18  Even when he tries to do a job, focus-wise doesn't stay that

19  long before he loses that focus.  He's very wanting to help and

20  work, but that long term -- to stay involved in that, he

21  doesn't really have that.  He doesn't -- I don't think he has

22  that maturity yet to understand how to handle a long-term job

23  commitment.

24  Q    I kind of want to go real quick just through yes or noes,

25  some of his mental health.

Strauss - Direct

1      So is he autistic?

2  A    Yes.

3  Q    Okay.  ADHD?

4  A    Yes.

5  Q    Manic depressive?

6  A    Yes.

7  Q    Bipolar?

8  A    Correct.

9  Q    And the last time he got an IQ test it was 75, somewhere

10 around there?

11 A    I believe it was 75, yes.

12 Q    Okay.  And is he currently on medication?

13 A    He restarted medication recently.  We were in the middle

14 of titrating it up, but we've had some issues with

15 appointments.  And so we haven't been able to finish the

16 titration at this point, but he has been handling it well.  And

17 that's the first medication he's been on in a while, and he's

18 doing much better.  Much better.

19 Q    And are you and your wife his legal guardians currently?

20 A    Correct.

21 Q    And so if he is required to go to doctors' appointments or

22 a psychiatrist, would you take him there?

23 A    Correct.

24 Q    Okay.  And before -- I want to go chronologically, but

25 before we do that, do you work from home?

Strauss - Direct

1  A    Yes.

2  Q    As a nurse?

3  A    Correct.

4  Q    And your wife also works at home?

5  A    Correct.

6  Q    And I know there was an incident in February with Evan.

7  A    Uh-huh.

8  Q    And was that in -- were you involved in that incident?

9  A    Yes.

10 Q    Okay.  It sounds like -- and correct me if I'm wrong --

11 there was an argument that escalated partially because he

12 wasn't on medication?

13 A    That's correct.

14 Q    Okay.  Has he been better since being on medication?

15 A    Absolutely.  He has been considerably better.

16 Q    And so this February incident you were the named victim in

17 that case?

18 A    Correct.

19 Q    Despite being the named victim in that case, are you

20 willing to have Evan back in the home?

21 A    Absolutely.

22 Q    And why is that?

23 A    For one thing, the fact that he's on medications, and

24 we -- by being a nurse -- are much more aware of what to be

25 looking for if he's taking it or not taking it.  And I've been

Strauss - Direct

1  able to tell over the last few weeks that he has been, in fact,

2  taking it.  You can tell a definite mood change in behavior.

3  He's much more calm, docile, and much more willing to be

4  accepting and helping.

5  Q    And have you talked to him about that incident --

6  A    Yes.

7  Q    -- and to be aware for those triggers?

8  A    Uh-huh.

9  Q    Would you describe him as a violent person?

10  A    No.

11  Q    I also want to talk about this incident with someone -- a

12  girl from North Carolina.

13      Can you kind of summarize that for the Court, what

14  happened there?

15  A    He had told me that he had a friend that was having some

16  troubles with her family, and is at the point where they were

17  just not getting along anymore.  And she was wanting to get out

18  of that situation.  At that point I assumed that she was of

19  age, and he told me that she was 18.  She told me she was 18 at

20  the time.

21      We did go down there, and he spent the evening with her

22  and with the family, and everything seemed to be fine.  But she

23  decided she wanted to get out of that situation.  So she came

24  back home with us.

25  Q    So you weren't trying to kidnap anyone?

Strauss - Direct

1  A    Absolutely not.

2  Q    Okay.  So why did you bring her home?

3  A    She told us that she had a lot of issues going on with her

4  family.  Her mom was kind of not really in the picture for

5  things and just they were always at odds.  The grandma had a

6  lot of mental health issues, so there was a lot of screaming

7  and things going on there too that I think was really drawing

8  and driving her to want to get out of that situation, because

9  nobody else was addressing those needs for that family.

10 Q    What did you do as soon as you found out she was not 18?

11 A    I told him he needed to contact the authorities.

12 Q    And when the authorities came, did you cooperate?

13 A    Yes.

14 Q    Well, first, did he call the authorities?

15 A    I believe he did.

16 Q    Okay.  And what happened once they got there?

17 A    When they showed up, they came in.  They removed her to

18 one vehicle.  They came in.  They talked to him and removed him

19 to a vehicle -- they could speak.  We basically sat on the

20 front porch with a few of the officers while they were in the

21 home doing their investigation.  And, you know, we just -- we

22 were there just waiting for them to complete what they needed

23 to do.

24 Q    Are you aware that Evan uses the Internet a lot?

25 A    Yes.

Strauss - Direct

1  Q    Okay.  And are there computers in your home?

2  A    Correct.

3  Q    Okay.  In fact, like we said, you and your wife work at

4  home, right?

5  A    Yes.

6  Q    I'm assuming with computers?

7  A    Correct.  Both of them have to be -- they're both

8  connected with ethernet.

9  Q    So that leads me to my next question.  If -- and I think I

10 called him Ethan again.  I'm so sorry.

11     If Evan is released, what are you and your wife doing in

12 the home to make sure that there is no access to the Internet

13 or to computers?

14 A    We are already in the process of changing the locks or the

15 handles on the doors to both her room, which serves as her

16 office, and my office downstairs so that we can have them

17 locked with a key.  So it won't be the type where you can put

18 it in there and just turn it.  It will actually have a keylock.

19     And then as for the Internet, we are looking at ways to

20 try to turn off the broadband part of that spectrum so that

21 only the ethernet cable directly wired from the router to our

22 computers would be accessible for Internet.

23 Q    And are you and your wife willing to abide by any

24 conditions that Evan won't have any cell phones or access to

25 XBox or something like that?

Strauss - Direct

1   A    Yes.

2   Q    In fact, has Evan indicated he doesn't want to be involved

3   with technology?

4   A    He has quite a few times in the past as well.  There's

5   been times when he'll tell me that he doesn't want to be

6   involved with some of that anymore because there's -- he was

7   scared of things.  There was something going on.  And so he

8   would tell us at times, I don't want to do it, but then he

9   would get drawn back into being on the Internet again.  But if

10  it's possible to keep him off of it, absolutely.

11  Q    Has he indicated fear for his family regarding some of the

12  Internet activities?

13  A    Absolutely.  Absolutely.

14  Q    Does he have a driver's license?

15  A    No, just an ID.

16  Q    I guess this is an obvious follow-up question, but does he

17  have his own car?

18  A    No.

19  Q    So to get anywhere, it would have to be you or your wife?

20  A    Right.

21  Q    And are you willing to be a third-party custodian for

22  Evan?

23  A    Yes.

24  Q    Let me just make sure you understand.  And I'm sure if you

25  were, the judge is certainly going to make sure you understand

Strauss - Direct

1   what that means, but there will be conditions, and you have to

2   make sure he abides by those conditions.

3   A    Okay.

4   Q    So would you be willing to call probation if he doesn't?

5   A    Yes.

6   Q    Okay.  Willing to take him to court?

7   A    Yes.

8   Q    If he has home detention or GPS monitoring, you'd have to

9   make sure that he abides by those rules and any curfew?

10  A    Yes.

11  Q    And we sort of already asked the technology question.

12       There is one other person living with you; is that right?

13  A    There's two, actually.

14  Q    Two.

15  A    Well, three if you count my wife as well.

16  Q    And we may call your wife.

17       So who are the other two living with you?

18  A    The other one is my mother-in-law, Judy.  She's been

19  living with us for the last couple of years since my

20  father-in-law passed away.

21  Q    Okay.

22  A    So she has been in the house, and she helps caretake with

23  things and tries to provide the best she can for Evan and

24  everything else.  She provides a very loving home.  The fact

25  that we can have three generations in the same home together

Strauss - Direct

1  has been a blessing.  It really has.

2  Q    And so does she work?

3  A    No, not anymore.

4  Q    Okay.  So there will be at least three adults in the home?

5  A    Yes.

6  Q    And the other person, is that Faith Thompson?

7  A    Correct.

8  Q    Who is she?

9  A    She is a girlfriend of Evan's.  They have known each other

10 probably about five years now.  He has been there for her in a

11 lot of really dark places.  She has a diagnosis of pancreatic

12 cancer within the last two years, and she's been going through,

13 fighting through that.  So he's extremely concerned for her

14 well-being.

15 Q    And have you spoken to her?  Is she willing to abide by

16 any court conditions?

17 A    Yes, I have spoken with her, and she said yes.

18 Q    Okay.  Are there animals in the home?

19 A    Yes.

20 Q    Are they friendly?

21 A    Uh-huh.

22 Q    Or can they be locked up if probation comes to visit?

23 A    Yeah, we can put them -- we've got places where we can

24 move them to, if we needed to.

25 Q    Are there any firearms in the home?

Strauss - Direct

1  A    None.

2  Q    Do any of you have any felonies?

3  A    No.

4         MS. DIEHL:  Okay.  I think those are all the

5  questions I have right now.  I may have some follow-ups.  Thank

6  you.

7         THE COURT:  Mr. Scheff?

8         MR. SCHEFF:  Your Honor, at this time I would renew

9  my *Jencks* objection with regard to the statement, and would ask

10 the Court review the redactions that defense counsel has

11 proposed to see whether any of those should be disclosed to the

12 government.

13        (Pause.)

14        THE COURT:  Ms. Diehl, have you had an opportunity to

15 articulate the basis under 26.2 whether this is -- that it's

16 not related to the subject matter of his testimony or is it a

17 privilege issue?

18        MS. DIEHL:  It's just not related to the subject

19 matter of his testimony, Your Honor.

20        THE COURT:  The Court finds that the statement --

21 unfortunately, the Court is going to need to undertake a

22 redaction that is not within the options that was provided to

23 the Court, and I'm trying to figure out how we do this.

24        MR. SCHEFF:  If Your Honor just wants to put like a

25 Post-it note over that part or something, I can quickly take a

Strauss - Direct

1  look and give it back.

2          MS. DIEHL:  I also can black -- I have copies, Your

3  Honor, and pens, and I can black out, which will completely

4  black out if it is scanned into the record.  I'm not above old

5  school pen and ink.

6          THE COURT:  I was looking at a different issue in one

7  of the -- in the information.  The Court does find that this

8  email in its entirety relates to the subject matter of

9  Mr. Strauss's testimony.  For that reason, the Court is going

10  to grant the government's motion and provide the government

11  with an unredacted copy of the email.

12          MS. DIEHL:  Yes, Your Honor.

13          MR. SCHEFF:  Thank you.  And Your Honor, may I have

14  just a moment to review that?

15          THE COURT:  Absolutely.

16          MR. SCHEFF:  Thank you.

17          (Pause.)

18          THE COURT:  Just to be clear on the record, what's

19  been provided by defense counsel in this case are two versions,

20  obviously unredacted for the Court's in-camera review of this

21  email; likewise, a redacted version with defense counsel's

22  proposal of what should be redacted as not related to the

23  subject matter of Mr. Jeremy Strauss's testimony under Federal

24  Rule of Criminal Procedure 26.2.

25          Having reviewed both the unredacted version and the

Strauss - Cross

1   redacted version, which provides the first and last paragraph

2   as conceding that it is related to the subject matter of

3   Mr. Strauss's testimony, and in considering the testimony

4   that's been provided, again, the Court believes that it should

5   be provided -- it should be produced in whole as related to his

6   testimony.

7           MR. SCHEFF:  Thank you, Your Honor.

8                       CROSS-EXAMINATION

9    BY MR. SCHEFF:

10  Q    Good evening, sir.  My name is Jason Scheff.  I'm an

11  assistant United States attorney.  I'm the prosecutor who is

12  handling this case.  And I've got some questions for you, okay?

13       Does Evan spend a lot of time on electronic devices?

14  A    Yes.

15  Q    Does he get mad when he can't access the Internet?

16  A    He gets frustrated with it at times.

17  Q    Do you remember the FBI coming to search your house on

18  January 24th?

19  A    I believe that was the day that I was out with my dogs at

20  the vet, and so I was questioned remotely.  But yes, they did

21  search the house that day.

22  Q    Are you aware that your wife wanted the FBI to arrest Evan

23  that day?

24  A    I was aware she said at that point it was for his safety.

25  She felt that that might be the best root cause for that time.

Strauss - Cross

1  Q    Are you aware that she was concerned that if he wasn't

2  arrested, he might become angry and violent?

3  A    I was not aware of that.

4  Q    Are you aware that your wife thought that if he wasn't

5  arrested, that Evan would think that he had outsmarted

6  everybody?

7  A    That is quite possible, yes.

8  Q    Are you aware that your wife thought that if he wasn't

9  arrested, that it would embolden him?

10 A    I don't know if I would say embolden him.  He definitely

11 has the desire to want to succeed in anything he does, but he's

12 been like that since birth.  Even with his failure to survive,

13 he has done things to survive when the odds were against him.

14 Q    Do you remember speaking with the FBI after -- about a

15 week or so after the search of your house?

16 A    I'm trying to remember for sure if I did or not at that

17 point.  I don't know what it would have been regarding to.

18 Q    Do you remember speaking with the FBI about the

19 possibility of changing your WiFi password so that Evan

20 couldn't get online?

21 A    Yes.

22 Q    But you were afraid of how Evan would react to that,

23 right?

24 A    We were concerned, yes.

25 Q    Do you also remember discussing the possibility of Evan

Strauss - Cross

1  giving up the phone in exchange for the WiFi password?

2  A    No.

3  Q    If there had been such a proposal, do you think that

4  that's something Evan would react well to?

5           MS. DIEHL:  Your Honor, objection to speculation.

6           THE COURT:  He's had 25 years of experience with this

7  young man.  I think the question is proper.  I'll consider it

8  for what weight it's worth.

9           The question -- I'm going to overrule the objection.

10          THE WITNESS:  What was the question again?

11  BY MR. SCHEFF:

12  Q    Sure.  Do you think that Evan would react well to being

13  asked to give up a phone in exchange for getting the WiFi

14  password?

15  A    I don't know if he would react well.  You know, in the

16  past -- in the past his anger was much worse at times with

17  things like that, but we have seen recently with the new

18  medications that he has been much more willing to compromise

19  and be respectful of what other people want.

20  Q    When were those -- when did those -- when did he start

21  taking those new medications?

22  A    They started probably early February, I believe -- late

23  January, early February.  He's only been on them for about a

24  month now.  He was supposed to be titrating up, but we haven't

25  been able to get back to the provider to get that next step.

Strauss - Cross

1  Q    You're aware that Evan's electronic devices were seized in

2  the course of the search warrant, right?

3  A    Yes.

4  Q    After that, did Evan try to get any new electronic

5  devices?  Are you aware of him trying to do that?

6  A    Yes.

7  Q    And how did you become aware of that?

8  A    He told us.

9  Q    And what did you say?

10 A    I asked him for them.

11 Q    I'm sorry, I'm not understanding.

12 A    I asked him for them when he told me he had them.

13 Q    So he told you that he had obtained devices, and then you

14 asked him for them?

15 A    Yes.

16 Q    Before he told you, were you aware that he had obtained

17 them?

18 A    No.

19 Q    Do you know how he obtained them?

20 A    No.

21 Q    Did he give them up when you asked for them?

22 A    Not at first, but he did eventually give them up.

23 Q    Was he angry about that?

24 A    Not like he had been.  I think he realized what he had

25 done was wrong and that he needed to do the right thing.

Strauss - Cross

1  Q    And then when Evan was arrested by Franklin County, he had

2  more phones that were found, right?

3  A    That's correct.

4  Q    Were you aware of those phones before then?

5  A    No.

6  Q    Do you know how he got those?

7  A    No.

8  Q    Are you aware of Evan going online since he was arrested

9  by Franklin County?

10 A    I'm not aware of that at all.

11 Q    Have you seen him with any electronic devices since then?

12 A    No.

13 Q    Are you aware of him accessing any electronic devices

14 since then?

15 A    No.

16 Q    Are you aware that your wife told the FBI that she

17 considered Evan to be manipulative?

18         MS. DIEHL:  Your Honor, objection to the questions

19 about being aware of what Mrs. Strauss said.  I understand he

20 can say yes or no, but defense certainly has no evidence of any

21 of these statements.

22         MR. SCHEFF:  I do, Your Honor, which is why I'm

23 asking it.

24         THE COURT:  Any other basis, Ms. Diehl?

25         MS. DIEHL:  Well, Your Honor, two things.  If

Strauss - Cross

 1  government is intending to use this evidence to ask for

 2  Mr. Strauss to be detained, defense should have access to it,

 3  even if it is evidence used against a witness as some sort of

 4  impeachment.

 5          And secondarily, if Mr. Strauss is aware because of

 6  something Mrs. Strauss said, then that is potential marital

 7  privilege as well.

 8          THE COURT:  I'm missing the privilege.

 9          MS. DIEHL:  If he is -- I don't know if the answer is

10  I was there and I heard that, but given the fact that he was

11  walking the dogs when the FBI came, I would assume that the

12  only way he could be aware is Mrs. Strauss told him; and in

13  which case if she told him that, that would be marital

14  privilege.

15          THE COURT:  Marital privilege about what she told --

16  what she told the FBI; isn't that the question?

17          MR. SCHEFF:  It is, Your Honor.

18          THE COURT:  I'm trying to figure out how that could

19  possibly be privileged if she said something like that to the

20  FBI.  I mean, unless --

21          MS. DIEHL:  It is not --

22          THE COURT:  I might be missing marital privilege, but

23  I'm trying to figure out why her comment to the FBI about her

24  perception of her son, how that could be marital privilege.

25          MS. DIEHL:  It would be marital privilege, Your

Strauss - Cross

1  Honor, if she told Mr. Strauss:  I said this to someone, which

2  would be the only way he would know.

3          THE COURT:  I don't think marital privilege is that

4  broad about anything that's ever said to a spouse.  I think it

5  needs to be a little more specific, but if you'd like to find

6  some authority on it, I'd be happy to consider that.

7          MS. DIEHL:  Your Honor may --

8          THE COURT:  Mr. Scheff -- go ahead, I'm sorry,

9  Ms. Diehl.

10         MS. DIEHL:  May I have 30 seconds, Your Honor?

11         THE COURT:  Absolutely.  Ms. Diehl, let me get a

12  response from Mr. Scheff.  It may be that he's going to provide

13  us with some information that might change part of this

14  analysis.

15         Mr. Scheff?

16         MR. SCHEFF:  Your Honor, in response to the first

17  part of my colleague's objection, I'm unaware of any principle

18  of discovery at this stage that would require us to disclose

19  anything related to any evidence we're intending to present at

20  the hearing.  That's just -- if counsel is aware of something,

21  she is certainly free to cite it, but I'm not aware of that.

22         As to the privilege issue, you can't privilege

23  something that you have already disclosed to a third party just

24  because you then told it to your spouse.  If this is something

25  that Mr. Strauss is aware of, he can certainly testify to that.

Strauss - Cross

1  And if he's not, he can say that he's not.

2            MS. DIEHL:  Yes, Your Honor.  Regarding the

3  privilege, as Your Honor knows, the marital communications

4  privilege protects statements or actions that are intended as

5  confidential communication between spouses made during the

6  existence of valid marriage.

7            I don't see any indication that this is -- there is

8  any left or right limit.  I'm sure there is in case law that I

9  may or may not have in front of me; however, a confidential

10  communication made by Mrs. Strauss to Mr. Strauss, "I said this

11  to the FBI," is still confidential.  Now, what she said to the

12  FBI may not be confidential, but the only way Mr. Strauss would

13  know what she said is by her telling him, "I said this."

14            THE COURT:  Mr. Scheff?

15            MR. SCHEFF:  Your Honor, I've got two things on that.

16  One is, as counsel pointed out, it's something that is intended

17  to be confidential, whereas if it's something that was

18  disclosed to a third party, it's obviously not intended to be

19  confidential.

20            Second, I think there are two different things here.

21  One is yes, I'm aware of this information; and yes, my wife

22  told me this information.  I'm happy to forgo the second as

23  to -- and Mr. Strauss certainly does not have to disclose how

24  he learned of information if it's because his wife told him.

25  He doesn't have to say, you know, "my wife told me this."  That

Strauss - Cross

1  doesn't mean that he doesn't have to disclose the information,

2  because the information would not be privileged, even if "my

3  wife told me this" would be, which I still don't think it is.

4          MS. DIEHL:  And Your Honor, not to move on to the

5  second objection, but to move on to the second objection

6  regarding discovery, we've already submitted a discovery

7  request to the government in this case.  And understanding

8  they're awaiting a protective order, which is understandable

9  given the nature of this case, the statements made by

10  Mrs. Strauss to the FBI are not the same level of

11  confidentiality that the other discovery in this case might

12  require.  We've already submitted a request for discovery.  We

13  have not received this discovery.  And as far as I do not have

14  case law to point out why that it would be required to be given

15  to us at a detention hearing because I did not expect this to

16  come up; however, just the basic concept of fairness and due

17  process, defense should have statements made by witnesses that

18  the government tends to elicit during impeachment and

19  cross-examination.

20          MR. SCHEFF:  With respect, Your Honor, the defense's

21  discovery request do not govern the rules of discovery and

22  there is no obligation to turn over discovery prior to

23  indictment.  That indictment is when the government's

24  disclosure obligations kick in, and *Jencks* is with respect to

25  witnesses that are being produced by the party.  What counsel

Strauss - Cross

1  is referring to, statements of witnesses, this is not our

2  witness.  We don't have a responsibility to produce this

3  witness's statement.  This is defense counsel's witness.

4  Defense counsel had access to Mr. Strauss and to his wife to

5  ask them whatever they pleased, and we do not have a

6  responsibility to produce the statements of these witnesses who

7  are not our witnesses.

8          THE COURT:  At this time as I recall it, the question

9  that you posed was whether or not your wife said -- go ahead

10 and give me the question again.

11         MR. SCHEFF:  I'm asking whether Mr. Strauss is aware

12 that his wife told the FBI that she thought Evan was

13 manipulative.

14         THE COURT:  On that question I do not find that

15 privilege attaches.  I won't go into the deep depths of

16 privilege, except to say that that's a disclosure to a third

17 party.  So privilege cannot attach to that particular question.

18 And I agree with the government's position with regard to this

19 being the defendant's witness.

20         So one last time, go ahead and ask the question

21 again, Mr. Scheff.

22         MR. SCHEFF:  Yes, Your Honor.

23         THE COURT:  Ms. Diehl, your objection is noted and

24 it's overruled.

25  BY MR. SCHEFF:

Strauss - Cross

1  Q    Mr. Strauss, are you aware that your wife told the FBI

2  that she considered Evan to be manipulative?

3  A    No, I do not.

4  Q    Do you consider Evan to be manipulative?

5  A    I would not use the word "manipulative."  I would say he

6  is somebody who is wanting to do something to right a wrong.

7  He knows he's done some things that are not right, and I think

8  he's very concerned and protective of us as a family.  I'm not

9  sure what it is that he's told me in the past about what to be

10 afraid of, but he has told me there are people in this world

11 that I need to be afraid of.  And he has been doing the best he

12 could to try to protect us.

13 Q    And you believed him when he said those things?

14 A    Yes, because I believe there are bad people in this world.

15 Q    Okay.  Do you consider Evan to be good at lying to people

16 to get them to do what he wants?

17 A    No.

18 Q    Are you aware that your wife told the FBI that she

19 believes that?

20 A    No, I'm not aware of that.

21 Q    Now, over the past several years there have been times

22 when you've seen Evan get really, really angry, right?

23 A    Yes.

24 Q    And that happens frequently?

25 A    No.

Strauss - Cross

1  Q    How often do you think that happens?

2  A    I would say over the last few years it's gotten a lot

3  less.  There was a time where he was on some different

4  medications, and by the grace of God there was an issue with

5  the insurance not wanting to pay for one of the medications,

6  and they kept raising that medication -- the medication was

7  Depakote -- to help calm his increased anxiety.  The half-life

8  on Depakote is 14 days.  He had not received that medication in

9  21 days.  His volatility went down extremely low compared to

10 that.  I believe that providers, I believe that doctors don't

11 always know what they're doing when they're medicating a child,

12 especially with somebody who has mental health and special

13 needs.  And I think sometimes they need to be in the home to be

14 able to see what's going on, because nobody was there to see

15 what they were doing.  They just -- every time they got a

16 report that he was being agitated they gave him more

17 medication, which drove him worse.  It didn't make him better.

18 Q    When was that 21-day period that you're talking about when

19 he hadn't gotten his medication?

20 A    It was right around when he was about 17 or 18 years old.

21 Q    So that was about eight, nine years ago?

22 A    Yes.

23 Q    But he's had times when he's been really, really angry

24 since then, right?

25 A    There's been a few times.

Strauss - Cross

1   Q    So angry that he punched a hole in the wall?

2   A    Yeah, he's done that.

3   Q    When was the last time that happened?

4   A    I haven't seen that in months, maybe a year.

5   Q    And you've seen Evan get violent sometimes?

6   A    In the past.

7   Q    You've been a victim of that violence before?

8   A    Yes.

9   Q    On multiple occasions?

10  A    Yes.

11  Q    How many times, would you say?

12  A    Two or three.

13  Q    And Evan has sent you to the hospital before, hasn't he?

14  A    Yes.

15  Q    Evan has also been violent towards your wife?

16  A    Yes.

17  Q    Also on multiple occasions?

18  A    Yeah.

19  Q    How many times would you say he's been violent towards

20  her?

21  A    I would say less, maybe twice.

22  Q    Has he been violent towards Faith?

23  A    No, never.

24  Q    Has he been violent towards you since he was arrested by

25  Franklin County?

81

Strauss - Cross

1    A    None.

2    Q    Has he been violent towards your wife since then?

3    A    No.

4    Q    So let's talk about February 12th when Evan was arrested

5    by Franklin County.

6         Who called the police the first time?

7    A    I did.

8    Q    And that was because Evan was arguing with you because he

9    wanted to go to Rocky Mount to buy some marijuana?

10   A    Yes.

11   Q    And then you agreed to take Evan to do that?

12   A    Yes, after -- in order to calm him down.  We were

13   appeasing him at that point.

14   Q    Okay.  But then there was more arguing?

15   A    I'm not sure what caused it, though.

16   Q    Okay.  But then Evan smashed the passenger side mirror of

17   your car?

18   A    Yes.

19   Q    And Evan threatened to paralyze you?

20   A    He did say that, yes.

21   Q    And is that when you called the police?

22   A    Not quite then.  It was a little bit after that.

23   Q    Okay.  And the police did come, right?

24   A    Uh-huh.

25   Q    That's a yes?

Strauss - Cross

1   A    Yes.

2   Q    But then after chatting with you for a little bit, they

3   left?

4   A    The first time, yes, they left.

5   Q    But then about two hours later your wife called the police

6   again, right?

7   A    Yes.

8   Q    And that was after Evan had hit you multiple times in the

9   head?

10  A    Yes.

11  Q    And your wife then tried to separate the two of you,

12  right?

13  A    I actually got between -- I actually got in the middle of

14  everybody, and I was -- basically, I received the brunt of it.

15  Q    Okay.  And Evan put his arms around your wife's neck,

16  right?

17  A    He was reaching for her, yes.

18  Q    And then you and Faith stepped in to try to help?

19  A    Yeah.

20  Q    And Evan bit your arm?

21  A    Yes.

22  Q    And then when your wife tried to call 911, Evan took her

23  phone and threw it outside, right?

24  A    Correct.

25  Q    And was that while she was still on the phone with 911?

Strauss - Cross

1   A    Yes.

2   Q    So I think you said on direct examination that Evan was

3   off his meds at that point?

4   A    Yes.

5   Q    Why was he off his meds?

6   A    He hadn't been on medication in years.  They had been

7   prescribed in December when he saw this new psychiatrist, but

8   Evan has -- he's had a tough time wanting to be back on

9   medications because he's seen what they've done to him in the

10  past, and so that scares him because then he knows he has no

11  control.  So he is not the one that really wants to take

12  medications based on how they have made him feel in the past

13  and how they have caused him to ramp up his own anxieties and

14  anger.

15      So we did talk about it.  And after everything that

16  happened, he was willing then to try the medication, because I

17  kept talking with him and saying, Not all medications will make

18  you feel the same.  I'm here with you on this.  Let's go down

19  this road together and see what happens.  Let's see if this

20  helps you get your focus back together and whatnot, and he did.

21  And I noticed the difference, and he's continued to take them.

22  We just weren't able to finish the titration up to the dose

23  that the doctor wanted him to be on.  Due to illness and other

24  reasons, we weren't able to uphold an appointment.  And so the

25  medication at that point never was titrated higher.  It stayed

Strauss - Cross

1  at the dosage we were at, which he was receiving benefit from.

2  Q    So when did he go back on medication?

3  A    It would have been probably about a week or two I think

4  after the incident -- after he got home from being detained for

5  a week.

6  Q    And before then, when do you think the last time was he

7  was taking medication?

8  A    I think the last time he actually took any medication was

9  when he was -- that issue back when he was 17, 18 years old.

10  Q    So it had been many years?

11  A    Yeah.  And we had a relatively good time through there

12  where behaviors were well.  Things were good.  He had -- he

13  had -- my father-in-law and him had a very good bond together.

14  They did a lot of things together.  And I think over the last

15  few years with him passing away, it's really left a void in him

16  that's been hard.  And somebody with his mental needs, that

17  was -- they were buddies for 20 years.  They fished together.

18  They went places together.  They lived together.  They did all

19  these things together.  And when that was removed out of his

20  life, I think he started a downward spiral, but it wasn't noted

21  very quickly.  He tried to keep it together and tried to hide

22  it, and I think over time it's gotten worse.

23      He has certain times of the year that are very bad for

24  him.  October is rough because that's the month he passed away.

25  Christmas is awful for him because that was the holiday that

Strauss - Cross

1  Paps did so much for him to make him feel special.  And all of

2  those things are gone in his life now, and I think he struggles

3  with a lot of it.

4      I think he -- you know, we chose him at five months and we

5  told him regardless of the things he's done in the past, we

6  would have done it again in a heartbeat.  There is no question

7  in my mind we would do it again and again and again.  And I

8  would do whatever I could to try to do the best I can for him.

9      We're not perfect.  We're human beings.  My wife and I

10 tried to have children of our own.  We weren't able to.  He was

11 put in our life by God to give us a reason.  He knew it.  We

12 couldn't take care of any other child because he was going to

13 need our help.  And we've done the best we can with him.  We're

14 not perfect.  He's not perfect.  He's gotten into bad places

15 and he's seen bad things and he's been in dark places, but he's

16 not a bad person.  He's just somebody who needs guidance and

17 help.

18     Mental help hospitals are not there for him.  He went to

19 one a few years ago and he was raped.  He's afraid to go to

20 those places.  When we called for 911, he freaks out because

21 he's afraid that he's going to go back there again and he's

22 going to be assaulted again.  These are things in his life that

23 nobody else knows about.

24         THE COURT:  Mr. Strauss, I'm going to get us back

25 on -- I appreciate your testimony.  I want you to answer the

Strauss - Cross

1   questions that Mr. Scheff --

2           THE WITNESS:  I apologize, ma'am.

3           THE COURT:  You don't need to apologize.  I just want

4   to get us back on track.

5           All right.  Mr. Scheff?

6           MR. SCHEFF:  Thank you, Your Honor.

7    BY MR. SCHEFF:

8   Q    Sir, in November of 2022 -- or, excuse me, in October of

9   2022, you drove Evan down to North Carolina to pick up a girl

10  and bring her back to your house, right?

11  A    Correct.

12  Q    And you thought she was how old initially?

13  A    I thought she was 18.  She told me she was 18 and he told

14  me she was 18.

15  Q    She -- well, before you left the house, did you know how

16  old she was?

17  A    I still thought she was 18.

18  Q    Who told you that?

19  A    He did.

20  Q    Evan did?

21  A    Uh-huh.

22  Q    And you believed him?

23  A    Yes.

24  Q    Okay.  And so you said you drove down and you spent the

25  evening with the family and that everything seemed fine, right?

Strauss - Cross

1   A    Uh-huh.

2   Q    That's a yes?

3   A    Yes.  He was with the family.  I was -- I didn't know the

4   family.  He had already been talking to the family.  And from

5   all I knew, he was friends with them.

6   Q    Okay.  And so you didn't spend the evening with the

7   family, but he did?

8   A    No, I did not.

9   Q    And Evan told you that he was hanging out with the family

10  and everything was fine?

11  A    Yes.

12  Q    And so did you ask, you know, if everything was fine, why

13  do we need to pick this girl up and take her home?

14  A    He said she was -- and she said the same thing -- she was

15  not happy in the situation.  She tolerated her mom.  She

16  tolerated her grandma, but she did not like being there

17  anymore, and she wanted to get out of that place.

18  Q    And that information came from Evan?

19  A    And from her.

20  Q    But before you picked her up, that information came from

21  Evan?

22  A    Yes.

23  Q    Did you talk to her parents about any of that?

24  A    No.

25  Q    Why not?

Strauss - Cross

1    A     I never met them.

2    Q     So you --

3    A     Being as she was telling me that she was 18, she was an

4    adult.

5    Q     Okay.  Did you -- so it seemed like you were under the

6    impression that there were some concerns about the home?

7    A     Yes.

8    Q     And the girl also had a younger brother who was living

9    there, right?

10   A     As far as I was aware, yes.

11   Q     Did you pick up the younger brother?

12   A     I did not.

13   Q     Why not?

14   A     He did not -- from what I was told, he did not want to

15   leave.

16   Q     Who told you that?

17   A     He did and she did.

18   Q     "He" meaning Evan?

19   A     Evan.

20   Q     And "she" did meaning the girl?

21   A     Yes.

22   Q     Did you call the police?

23   A     No, I did not.

24   Q     Did you call Social Services?

25   A     I did not.

Strauss - Cross

1  Q     Why not?

2  A     Because I thought she was 18 and she had the right to

3  leave.

4  Q     Well, what about her younger brother who was there?

5  A     Nobody told me that there was any type of assault or

6  anything going on that his life was in danger.  Just because

7  somebody says they don't want to be at home anymore doesn't

8  mean that somebody is there to hurt them.

9  Q     And so when you brought the girl back to your house, you

10 knew that her parents did not know that she had gone with you,

11 right?

12 A     I was not aware of that.

13 Q     You were not aware of that?

14 A     No.

15 Q     You thought her parents knew?

16 A     Yeah, I thought they knew.

17 Q     Why did you think that?

18 A     Because they told me they knew.

19 Q     Who told you?

20 A     Evan and the girl.

21 Q     And you believed them?

22 A     I did.

23 Q     Why didn't you check with the parents?

24 A     I don't know.

25 Q     And then I think you said on direct examination that you

Strauss - Cross

1  told Evan to -- so there came a point where you found out that

2  she was 16?

3  A    Yes.

4  Q    How did you find that out?

5  A    They told us.  Something -- they just -- they divulged it

6  finally.

7  Q    And then you told Evan to call the police?

8  A    Yes.

9  Q    Why didn't you call the police yourself?

10  A    Because I figured it was his responsibility since he was

11  the one that wanted to go down there and get her.

12  Q    And you said you thought that Evan had called the police?

13  A    At first I did, yes.

14  Q    What made you think that?

15  A    Because he told me he did.

16  Q    So you believed him?

17  A    Yes.

18  Q    But you later found out that was not true, right?

19  A    Correct.

20  Q    You found out that the girl had actually been reported

21  missing?

22  A    Yes.

23  Q    And was that surprising to you?

24  A    Yes, it was, because I thought that, like I said, it

25  was -- that she had left on her own accord.

Strauss - Cross

1  Q    Were you aware that Evan told that girl to destroy her

2  phone so she couldn't be tracked?

3  A    No, I was not aware of it.

4  Q    Were you aware that she did destroy her phone?

5  A    I was aware she did throw her phone out the window, yes.

6  Q    While you were in the car?

7  A    Yes.

8  Q    Did you ask her about that?

9  A    I did.  I asked her why she did it, and she said I don't

10  want to be followed.  I don't want my parents knowing where I

11  am.

12  Q    Did you ask her why?

13  A    No.

14  Q    Had there been other girls who Evan has wanted to come

15  stay with you?

16  A    Yes.

17  Q    How many?

18  A    There's been two.  One -- yeah, one came down from New

19  York on her own accord.  She drove down.

20  Q    And how old was she?

21  A    She was 19 -- 18 or 19.

22  Q    How do you know that?

23  A    She told me.

24  Q    And why was she coming down to your house?

25  A    She wanted to meet him and stay with him.

Strauss - Cross

1  Q    And you were okay with that?

2  A    We weren't aware of it until she was already on a bus

3  coming down.

4  Q    Okay.  But then when she got there, you were okay with her

5  then coming to stay with you?

6  A    Well, we tried to keep them apart as much as we could, and

7  tried to get an idea of who she was and what was going on

8  first.  But after a while we started to realize that she had

9  other reasons to be down there, we think.  We think she was

10 trying to find a home to be in because she had a bad home of

11 her own.  And eventually we had talked to her brother and come

12 to find out that she had a habit of lying at times.

13 Q    How long did she stay with you?

14 A    I think she was with us about a month.

15 Q    And why did she leave?

16 A    We basically kicked her out.  We sent her back to New

17 York.

18 Q    And did you ever learn that her age might have been

19 different than you originally thought?

20 A    No, because everything we had been told has been truthful

21 on her.

22 Q    You mentioned a second girl.

23       Well, actually, let me ask you, when was the first girl

24 living with you?

25 A    Honestly, I don't remember.

Strauss - Cross

1  Q    Was it before the North Carolina girl?

2  A    I think it was -- I think it was after, but I'm not

3  positive.

4  Q    Okay.  Let's talk about the second girl.  When did she

5  come live with you?

6  A    Honestly, I don't remember exactly that either.

7  Q    Was that --

8  A    There was just a blur in there where there was a couple of

9  months -- between months with girls coming in that he was

10 talking to and were coming in.

11 Q    Was that before the North Carolina girl, you think, or

12 after?

13 A    I think that was after.

14 Q    And did she come from South Carolina?

15 A    She did.

16 Q    How did she come to live with you?

17 A    She was living in a home with a friend of hers.  She had

18 been kicked out of her place by her mom.  So she was no longer

19 living with her mom.  And Evan and her had been talking, and

20 wanted to see if she could come up here and start a life up

21 here and try to get her feet on the ground here, because she

22 had been trying to get herself set up down there and just

23 couldn't.

24 Q    And how did she get here?

25 A    I brought her.

Strauss - Cross

1  Q    So you drove down and picked her up?

2  A    Uh-huh.

3  Q    That's a yes?

4  A    Yes.

5  Q    Was Evan with you?

6  A    He was.

7  Q    And how old did you think that girl was?

8  A    18 as well.

9  Q    Who told you that?

10 A    He did.

11 Q    Evan told you?

12 A    Yes.

13 Q    You believed him?

14 A    Yes.

15 Q    Did you ever find out that that was untrue?

16 A    Yes, we did.

17 Q    And when -- how long after that did you find that out?

18 A    She was with us probably just a couple of weeks.  We

19 didn't find out right away.  And then when we did find out, we

20 ended up getting her on a plane and shipping her up to her

21 dad's place because her mom did not want her back.

22 Q    How old did you find out she was?

23 A    16.

24 Q    And she had been living with you --

25 A    She was just getting ready to turn 17.

Strauss - Cross

1  Q    And she had been living with you for a few weeks at that

2  point?

3  A    Uh-huh.

4  Q    That's a yes?

5  A    Yes.

6  Q    Was her relationship with Evan romantic?

7  A    Not so much him as her.  She hung on him like a wet rag.

8  And it got to the point where he -- he would -- she would not

9  leave him alone.  She was very, very controlling and very

10 manipulative of him.  And it got to the point where he did not

11 want her around.

12 Q    And Evan's girlfriend, Faith, currently lives with you; is

13 that right?

14 A    That is correct.

15 Q    And I think you said that she and Evan have known each

16 other for about five years?

17 A    Yes.

18 Q    And when did she start living with you?

19 A    Thanksgiving night of '23.

20 Q    Okay.  So she's been living with you for about five-ish

21 months?

22 A    About that.

23 Q    And why did she start living with you?

24 A    They had been friends for a while.  She came down to have

25 Thanksgiving dinner with us and -- because her parents really

Strauss - Cross

1    weren't giving her a lot of support.  And I can -- I hear a lot

2    of the conversations that she has on the phone with her

3    parents.  Some days they're really good and other days they're

4    very volatile.  But she's been living on her own for a while.

5    She had been living with her boyfriend at the time, and

6    apparently this boyfriend also had another girl living with

7    him.  But we noticed the bruises on her body, that he had been

8    abusing her and threatened her.  And so we told her at that

9    point, No, you're getting out of this situation.  We're getting

10   you out of that home.  I mean, she was definitely abused.

11   Q    And she's 22 years old; is that right?

12   A    Correct.

13   Q    And I know that you said she and Evan have known each

14   other for about five years.  Have they been in a relationship

15   since then, or, like did they start off as friends?

16        What do you know about that?

17   A    They started off as friends.  They had a little bit of a

18   relationship at first and then it was -- she has been different

19   with him than any other girl I've ever seen.  She gets him.

20   She understands him.  She knows when to give him space.  He was

21   afraid to have a relationship with her because he was afraid he

22   would lose her as a friend.  She is totally different than

23   anybody he's ever been with, and really probably the best girl

24   that probably he could find that could understand him.  I mean,

25   she is -- she's a little goofy at times.  She's a little wild

Strauss - Cross

1   child, but she's -- but she's good.  She's got a great heart.

2   She helps us around the house.  She helps do things for us when

3   we're gone.  She works, pays rent.

4   Q    Thank you, sir.  Thank you.  I appreciate your answer and

5   I appreciate you answering my questions, and I've got just a

6   couple -- just a few more for you.

7        Were you aware that Evan was chatting online with a girl

8   from Wyoming?

9   A    No.

10  Q    Were you aware that he was making an underage girl from

11  Wyoming cut herself?

12  A    No, I was not aware of that.

13  Q    Were you aware that he was threatening this girl?

14  A    No.

15       MS. DIEHL:  Your Honor, if I may, I believe that

16  Mr. Strauss is going to say no to all of the underlying

17  allegations here.  His parents have purposely tried to avoid

18  knowing the underlying allegations.  I understand that this is

19  a detention hearing.  And if I may proffer, he will say no to

20  all of the allegations, and the government can argue whether or

21  not that makes them proper third-party custodians.  But as far

22  as relevancy, if he's going to say no to all of them and we're

23  willing to proffer that, I don't think it's necessary to ask

24  all of those questions.

25       THE COURT:  Mr. Scheff?

Strauss - Redirect

1          MR. SCHEFF:  Your Honor, I take counsel's point.  I'd

2  ask just to be able to ask one more question just to wrap up.

3          THE COURT:  Sure.

4   BY MR. SCHEFF:

5  Q    Sir, were you aware that your son recorded a 17 year-old

6  girl masturbating?

7  A    No.

8          MR. SCHEFF:  I've got nothing further.

9          THE COURT:  Ms. Diehl, anything else?

10          MS. DIEHL:  Very brief redirect, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MS. DIEHL:

13  Q    Mr. Strauss, there have been times that Evan has been

14  difficult to handle; is that fair to say?

15  A    Yes.

16  Q    And does that stem from some of his mental handicaps?

17  A    Yes.

18  Q    Have you handled those mental handicaps since he was a

19  child?

20  A    Since day one.  I mean, he has had things going.  On, he's

21  been in mental health hospitals as soon as he was in first

22  grade.  He has been in and out of places that are supposed to

23  help him, and we've really found no help.  We got to the point

24  where --

25          THE COURT:  You've got to answer the questions, okay?

Strauss - Redirect

1  So limit your questions.  You need to answer the question

2  asked.  I've given a lot of leeway.

3              MS. DIEHL:  Yes, Your Honor.

4              THE COURT:  And I'd ask you to ask pointed questions,

5  and I'd ask you to provide answers that are responsive to the

6  questions that counsel is asking you.

7   BY MS. DIEHL:

8  Q    It's true you've seen a marked improvement since this

9  round of medication, correct?

10 A    Correct.

11 Q    And regarding when the FBI came and took his phones, there

12 was no court order that he not receive another phone, correct?

13 A    Right.

14 Q    And if this time there were a court order, you would

15 ensure that he did not get another phone, correct?

16 A    Correct.

17 Q    Additionally, at that time after the FBI first came, he

18 was going places, out to eat and things like that with Faith;

19 is that right?

20 A    Uh-huh.

21 Q    Sorry, you've just got to say yes.

22 A    Correct.  Yes.

23 Q    And if there were a court order that he had curfews or

24 wasn't allowed to go certain places, you would ensure that he

25 didn't go certain places, correct?

Strauss - Examination by the Court

1    A    Correct.

2    Q    Just briefly, you and your wife are both care workers; is

3    that right?

4    A    Yes.

5    Q    And she worked for foster care; is that right?

6    A    She has worked for -- she initially worked for the county

7    where we lived at in their --

8    Q    DFS?

9    A    Yeah, you know, health services.  She's been a special

10   needs teacher for many years, pre-K special needs.  Currently

11   she works for a company called Moms in Motion, who works with

12   caregivers for people who have inabilities to take care of

13   themselves.  And she is going to be able to train others to do

14   that work as well.

15          MS. DIEHL:  Thank you, Mr. Strauss.  No further

16   questions.

17          THE COURT:  Anything further, Mr. Scheff?

18          MR. SCHEFF:  No, Your Honor.

19          THE COURT:  I do have some questions, Mr. Strauss.

20          Counsel for your son represented that you all do not

21   want to know the facts of the underlying -- is it the charges?

22   Did I understand that answer when we got into this discussion?

23          MS. DIEHL:  Yes, Your Honor.  Candidly, I have spoken

24   about this with Mrs. Strauss.  She just doesn't want to know

25   the actual allegation of the complaint.  She understands it has

Strauss - Examination by the Court

1  to do with the Internet.  I don't know if I've specifically

2  asked that question of Mr. Strauss, but I know the family is

3  concerned about the underlying complaint allegation.

4          THE COURT:  About knowing about it?

5          MS. DIEHL:  About knowing the details, yes, Your

6  Honor.

7          THE COURT:  Mr. Strauss, do you know the underlying

8  details of the charges against your son?

9          THE WITNESS:  I do not.

10          THE COURT:  Have you made any attempt to learn those

11  details?

12          THE WITNESS:  They've just told me that it has to

13  deal with some Internet, and there was some other issues with

14  child porn.

15          THE COURT:  But you don't want to know any more

16  details?

17          THE WITNESS:  I would be okay with knowing the

18  details, but I believe in my wife's heart, she doesn't want to

19  know.

20          THE COURT:  What about your mother-in-law?

21          THE WITNESS:  She would not want to know either.

22          THE COURT:  What about Faith?

23          THE WITNESS:  Faith may want to know.  I'm not sure.

24          THE COURT:  Did that prompt any further questions,

25  Mr. Scheff?

USA v. Strauss, 7:24MJ46, 4/10/2024

1          MR. SCHEFF:  No, Your Honor.

2          THE COURT:  Ms. Diehl?

3          MS. DIEHL:  No, Your Honor.

4          THE COURT:  Thank you very much, Mr. Strauss.

5          MS. DIEHL:  Your Honor, I understand that it is very

6     late.  Would there be a way -- we're not calling another

7     witness.  We would rest.  I would ask for a two-minute break

8     before argument to use the restroom.

9          THE COURT:  Absolutely.  We'll take a five-minute

10    break to use the restroom, and then we'll come back for

11    argument.  Mr. Scheff, anything before we do that?

12         MR. SCHEFF:  No, Your Honor.  We're perfectly fine

13    with that.

14         THE COURT:  You're in agreement.  All right.

15         (Recess.)

16         THE COURT:  Mr. Scheff, argument?

17         MR. SCHEFF:  Yes, Your Honor.

18         I appreciate we've been here a long time.  I'm sorry.

19    The reason for that, though, is because we have a substantial

20    amount of evidence in support of detention, and trying to make

21    sure that we have a full record before this Court.  And so that

22    makes it hard to keep this brief, but I'm going to try my best.

23         So I just want to quickly note --

24         THE COURT:  Let me just stop you.  We are where we

25    are.  You all do what you need to do.  The Court is going to

USA v. Strauss, 7:24MJ46, 4/10/2024

1  hear you.  The Court is going to hear your argument.  I've

2  heard your evidence.  I've allowed the witnesses to say what

3  they need to say.  I'm going to let you argue what you need to

4  argue, and I'm going to let Ms. Diehl argue what she needs to

5  argue.  This man deserves our full time and attention.  We can

6  do better, counsel, in the future with scheduling these things.

7  I allowed this opportunity this afternoon.  And if it's going

8  to take hours and hours, it would have been helpful to let

9  Ms. Saville know earlier, and we could have figured out a way

10  to do it.  But we are absolutely here.  I am not cutting you

11  short, and I want both the government and Mr. Strauss to have

12  absolutely every word that you need the Court to hear on this

13  issue, all right?

14          So I apologize for my tirade, but I do not want you

15  to feel rushed.  I mean, we're here.  Let's get it right and

16  let's do what we need to do, all right?

17          MR. SCHEFF:  Understood.  I appreciate that, Your

18  Honor.  We're grateful for your patience.

19          I do want to quickly note this is a presumption case.

20  I appreciate the defendant has put forth some evidence, which I

21  will get to in a second.  Of course it does not mean the

22  presumption goes away.  It's still a factor to be considered as

23  a part of the entire calculus here.

24          And I also want to note that, frankly, the prevailing

25  concern here is danger to the community.  There is some concern

USA v. Strauss, 7:24MJ46, 4/10/2024

1   about risk of flight, particularly because when Mr. Strauss has

2   been interviewed by law enforcement he has repeatedly lied over

3   and over again.  He also has this large network of online

4   friends all over the country who could presumably help him if

5   he went on the run.  I appreciate defense counsel mentioning

6   how he wants to lay low because he thinks that there are

7   threats against him.  Laying low is also indicative of someone

8   who perhaps wants to try to get away from things and to flee.

9   Having said that, we do recognize he can't drive and that his

10  only ties are to this district.  And so to be candid, danger to

11  the community is really most of the ball of wax here, and I

12  have a lot to say on that.

13          With respect to the factors to be considered in

14  evaluating whether detention is appropriate, I'll start with

15  the nature and circumstances of the offense.  And as a part of

16  that, the statute provides that one of the considerations is

17  whether the case involves a minor victim, which this one does.

18  And beyond that, the nature and circumstances of this offense

19  are horrific.  As the complaint and the affidavit outlines,

20  Mr. Strauss has repeatedly threatened Victim 1, this 17

21  year-old girl from Wyoming who he met online.  He told her he

22  would kill her.  He told her he could kill her family.  He told

23  her he would kill her cat, and he threatened to swat her.  And

24  it's clear that these were not just idle threats, because

25  Mr. Strauss would show the victim that he knew enough to come

USA v. Strauss, 7:24MJ46, 4/10/2024

1   after her.  He published that collage, Government's Exhibit 1,

2   on his Instagram account.  That was a warning.  He did that to

3   threaten her, to show Victim 1 that he had access to her

4   personal information and that of her family, and he was

5   demonstrating to her all the information that he had gathered

6   about her and her mom and her uncle.  He was trying to make her

7   afraid and make her understand that he was capable of acting on

8   his threats.

9        And we also know that Victim 1 ultimately did get

10  swatted.  And regardless of the strength of the evidence as to

11  Mr. Strauss's involvement, it is certainly mighty coincidental

12  that this girl who Mr. Strauss was going after gets swatted

13  less than two weeks after he makes this masturbation video that

14  is part of the core of this case.

15       He also threatened the victim to try to get her to do

16  the disgusting things that he wanted her to do.  He made this

17  surreptitious recording of her masturbating with a hairbrush.

18  He got her to send him a picture of her vagina.  He got her to

19  cut herself, including carving "reaper," his online moniker,

20  into her upper thigh.  And Mr. Strauss did this out of a

21  perverse desire to satisfy his own carnal desires.  He told

22  Victim 1 exactly why he wanted her to cut herself.  As it says

23  in the affidavit, he told her that he, quote, got off on it.

24       And then Mr. Strauss used these photos that he had

25  Victim 1 send him as blackmail material.  He admitted to

USA v. Strauss, 7:24MJ46, 4/10/2024

1    getting her to cut herself.  And he told law enforcement that

2    he did that to, quote, shame her, and to get her to leave him

3    alone.  So he got these photos that he could use as leverage.

4    And then when he got sick of her, when he was done with her, he

5    sent those pictures of her harming herself to Social Services

6    in Wyoming to try to get her off his back because he had had

7    his fun at that point, and he was ready to dispose of her like

8    a piece of trash.

9            Not only did Mr. Strauss admit to contacting Social

10   Services, but those emails and those pictures that he sent were

11   found on his phone.  Your Honor has those emails and those

12   pictures.  That's Government's Exhibits 2 and 3.  And Your

13   Honor can see in those emails all the personal information that

14   Mr. Strauss had been working hard to collect on Victim 1 and

15   her family that he could use against her:  Her name, her age,

16   her address, her mom's name, her mom's age, her mom's phone

17   number, her mom's email address, her dad's name, her dad's

18   phone number, her dad's email address, her Facebook page, her

19   dad's Facebook page, her mom's Facebook page.  And Your Honor

20   can see in those pictures that were attached to those emails

21   how Mr. Strauss had gotten Victim 1 to cut herself, including

22   carving "reaper" into her thigh.

23           Even after Mr. Strauss was arrested in Franklin

24   County, he then reached out to Victim 1 on TikTok, and he told

25   her that it was her fault that he had been arrested.  He is

USA v. Strauss, 7:24MJ46, 4/10/2024

1  just incapable of leaving her alone.  And that --

2          MS. DIEHL:  Objection.  That fact never came out,

3  Your Honor.  We've never heard the fact that he reached out to

4  TikTok and said it was her fault he was arrested.  So we'd ask

5  that you not consider that.

6          THE COURT:  Where was that?

7          MR. SCHEFF:  Your Honor, I know that Special Agent

8  Miller talked about him reaching out to her on TikTok.  I can't

9  remember if he -- I'm happy to strike that.  I can't remember

10 if he said that part.

11         THE COURT:  And I can look at those TikTok --

12         MR. SCHEFF:  Well, we don't have those messages.

13 Those are separate.

14         THE COURT:  Okay.

15         MR. SCHEFF:  I'll stand on that Special Agent Miller

16 said that Victim 1 reported that Mr. Strauss had reached out to

17 her on TikTok after he had been released from custody.

18         MS. DIEHL:  I believe the testimony was that someone

19 reached out to her after he was put in custody, and friends

20 told her that it was Evan.  We have no idea what media or what

21 was said.

22         THE COURT:  That's my recollection.

23         MR. SCHEFF:  Yes.  Your Honor, this is argument.  I

24 think it's fair --

25         THE COURT:  Absolutely.

USA v. Strauss, 7:24MJ46, 4/10/2024

1          MR. SCHEFF:  -- for me to argue that Mr. Strauss was

2     the one who reached out to her based on her hearing that

3     information, and based on the timing of reaching out as well,

4     which Special Agent Miller said corresponded with when

5     Mr. Strauss was released from prison -- or from jail, I should

6     say.

7          So that brings me to the weight of the evidence.  We

8     don't have to rely just on Victim 1's statements.  We have the

9     recording of Victim 1 masturbating, which shows Mr. Strauss's

10    face and it shows the background, that it was taken in his

11    room.  As Special Agent Miller testified, you can see from the

12    video that he was using a third-party app to record the

13    Instagram live chat that they were having.  And we have the

14    portion of the chat where Mr. Strauss was asking Victim 1 to

15    send him a picture of her vagina, which we introduced that chat

16    into evidence.  And then we also have the picture that he then

17    solicited -- that he was soliciting from her that corresponds

18    to that chat.  That recording and that picture were found on

19    his phone when it was seized.

20          So moving on to history and characteristics, we know

21    that Mr. Strauss has this disturbing pattern of going after

22    young girls, whether that's finding them online or actually

23    going in person and picking up some of these young girls to

24    come live with him.  And I'm going to come back to that in a

25    second.  But as for other troubling things we know about

USA v. Strauss, 7:24MJ46, 4/10/2024

1   Mr. Strauss's history and characteristics, we know that he has

2   mental health issues.  We know that there have been issues with

3   his medication.  I appreciate that his dad said that he's been

4   doing much better since he's been on medication.  I'll note two

5   things about that:  He's been on his medication for about two

6   months at this point, which is not at all a long period of

7   time.  And he has been engaging in this behavior for the last

8   few years when he wasn't on medication and apparently did not

9   have sufficient self-awareness to realize that he should have

10  gone back on medication if that was something that was

11  influencing his behavior.  And I'll also note that Jeremy

12  Strauss testified that Evan went back on his medication before

13  the Franklin County assault -- before the Franklin County

14  incident, the assault against his parents.

15          Mr. Strauss also has a history of being extremely

16  volatile and violent, of exhibiting uncontrollable anger.

17  Victim 1 reported that.  His parents reported that.  We also

18  know that Mr. Strauss is a part of several online groups that

19  are involved in significantly violent, dangerous behavior from

20  swatting to sextortion.  And law enforcement has heard from

21  multiple individuals that Mr. Strauss was engaged in that

22  behavior, including extorting young girls for nude pictures and

23  pictures of self-harm that he circulated in the group.  And

24  also, there were approximately 20 images found on his phone of

25  young women who were naked and/or engaging in self-harm.  And

USA v. Strauss, 7:24MJ46, 4/10/2024

1    because it is difficult to identify most of these girls, and

2    because they're of the age where they could be 16, they could

3    be 17, they could be 18, they could be 19, it's hard to say

4    whether these girls are underage or not.

5              We also know that Mr. Strauss is incapable of telling

6    the truth.  He denied in engaging in child exploitation in

7    general or with Victim 1.  And even setting aside the

8    statements of the multiple victims that Mr. Strauss has

9    exploited, again, we know that he exploited Victim 1 because of

10   the evidence that was recovered from his phone.  And we also

11   know that Mr. Strauss lied about someone else recording the

12   video of Victim 1 masturbating, because you can see in the

13   video that he's the one who recorded it.  And we know that

14   Mr. Strauss lied about being online since his arrest by

15   Franklin County because the FBI received Instagram chats

16   showing that he was online.  And we also know that Jeremy

17   Strauss, his father, was not aware of that.  He is unaware of

18   Mr. Strauss being online or having access to electronic devices

19   since his arrest from Franklin County, which we know to be

20   untrue.

21             Lastly, we have the nature and seriousness of the

22   danger that Mr. Strauss poses; and frankly, that danger cannot

23   be overstated.  He is a danger to the people in his house.  He

24   is a danger to any young girl who uses the Internet and finds

25   her way into these online communities.  He is a danger to

USA v. Strauss, 7:24MJ46, 4/10/2024

1  anyone who he might want to target in a swatting attempt.  We

2  have the minor victim in this case who Mr. Strauss threatened

3  to get her to cut herself, to get her to send him nude

4  pictures, and to engage in sexual activity with him.  We have

5  another minor victim, the girl from Florida, who Mr. Strauss

6  also got to cut herself and to send him nude photos of very

7  similar behavior that he exhibited with Victim 1.  We have

8  Mr. Strauss's girlfriend, Faith, who he has apparently been in

9  a relationship with since she was underage.  And we have --

10 according to the pretrial services report, he said that they

11 have been together for six years and she is 22.  Then we have

12 the other girls who Mr. Strauss took from out of state and

13 brought them to come live with him, including the 16 year-old

14 girl who Mr. Strauss and his father picked up from North

15 Carolina.

16         And let me talk about that girl.  Mr. Strauss and his

17 father go to pick her up from North Carolina seemingly because

18 Mr. Strauss tells his parents that she's in a bad home

19 environment.  They don't call the police.  They don't call

20 Social Services.  They supposedly have this concern about their

21 safety because they're believing whatever their son says.  And

22 he says she's 18 and they believe that.  But they also don't

23 remove her younger brother from the home, who they know this

24 child is in the home, and they know -- they seem to believe

25 it's a bad home environment.  And then they bring her across

USA v. Strauss, 7:24MJ46, 4/10/2024

1  state lines to their home in Virginia.  And even when they

2  learn she's 16, they still don't alert anyone.  Mr. Strauss

3  tells his son to call the police.  He trusts his son when his

4  son says that he called the police, which we know is untrue.

5  And his parents instead do nothing of their own accord.  Then

6  there's a missing person report, thankfully, and law

7  enforcement show up and take this girl home around November 1st

8  of 2022.

9       And then Your Honor can see from the TikTok messages

10 in Exhibit 9 that one month later, two months later,

11 Mr. Strauss is still talking to this underage girl.  That in

12 and of itself is concerning, but the content of those chats

13 makes matters even worse.  On the first page of those messages

14 this girl tells Mr. Strauss that she went to a mental hospital,

15 how she has bipolar disorder, borderline personality disorder,

16 major depressive disorder, and anxiety disorder.  He continues

17 to talk to her.  On the next page Mr. Strauss is telling her he

18 loves her, that he's waiting for her until 2024, which I'll

19 note is when this 16 year-old child would be set to turn 18.

20 And in response to that, this child responds that she knows

21 Mr. Strauss is 24, and that he has, quote, done it with 13 and

22 14 year-olds.

23       On page 5 of the exhibit, which is page 20 of the

24 Cellebrite report, Mr. Strauss again says he loves this young

25 girl.  She asks, What about if you go to prison because of the

USA v. Strauss, 7:24MJ46, 4/10/2024

1  other girls?  He doesn't disabuse her of the notion that that

2  might be a possibility.  On page 6, which is page 22 of that

3  report, this girl asks Mr. Strauss what he lied to her about.

4  And on the next page he admits to her that he lied about his

5  age.  He lied about his birthday.  On the next few pages the

6  girl continues to talk about her severe mental issues, and

7  Mr. Strauss continues to talk to her and to groom her.  On page

8  11, which is page 80 of the Cellebrite report, Mr. Strauss

9  calls this 16 year-old girl the love of his life, his fiancée.

10        In short, we have this demonstrated pattern of

11  Mr. Strauss going after young girls, a 17 year-old, multiple 16

12  year-olds.  And his parents have not only tolerated it, they

13  have assisted him in doing so.

14        And that brings me to the last thing that I want to

15  address, and that's the evidence in the release plan that the

16  defense has put forward, all of which ties into the danger that

17  Mr. Strauss poses.  The defense would have Mr. Strauss released

18  right back into the same home where he perpetrated all of this

19  conduct, seemingly under the noses of both his parents, his

20  grandmother, and his girlfriend.  And his parents in particular

21  don't even want to acknowledge what has happened here.  They

22  don't even want to learn about the fact of the conduct and

23  understand what their son has been charged with.  It's shocking

24  that with four other people in this house, he has still been

25  able to engage in any of the behavior we have discussed at the

114

USA v. Strauss, 7:24MJ46, 4/10/2024

1   hearing today, much less all of it.  The level of ignorance and

2   willful blindness by the other people in that home is

3   astounding.

4           The defense also would have Mr. Strauss released back

5   into the custody of the same parents who he has repeatedly

6   beaten in the past, including most recently in February when he

7   smashed the side mirror of his parents' car.  He repeatedly hit

8   his father in the head.  He put his arms around his mother's

9   neck and lunged -- or, rather, he lunged for his mother.  He

10  bit his father's arm and he grabbed his mom's phone when she

11  was trying to call 911 to try to prevent her from reporting

12  this.

13          I appreciate that Mr. Strauss's parents love him, and

14  I understand that they do not want him to be in jail, and I

15  respect their love and their devotion to their child.  And that

16  is why they are in denial, because that love is blinding them.

17  It is truly jarring to have Mr. Strauss -- Mr. Jeremy Strauss

18  stand up there and say that he does not consider his son to be

19  violent when he has been violent towards them.  He is a danger

20  to them, not to mention other people.

21          They have also been unaware of him continuing to

22  obtain electronic devices seemingly unless he volunteers that

23  information or until law enforcement comes and seizes them.

24  And Mr. Strauss testified that not only was he not aware of

25  them, he didn't know how his son had gotten these devices.  It

USA v. Strauss, 7:24MJ46, 4/10/2024

1  also seems from Mr. Strauss's testimony that he will believe

2  just about anything his son tells him.  He has -- he doesn't

3  appear to ever challenge anything that his son has to say to

4  him.  He has the utmost faith in him and belief that he's being

5  honest with them and trying to protect them.

6          Mr. Strauss's parents have shown tremendously poor

7  judgment in abiding his bad behavior, no doubt blinded by their

8  love for their son.  But there have been young girls going in

9  and out of this house, which Mr. Strauss was only able to

10  accomplish with the help of his parents.  His father drove him

11  down to North Carolina to pick up the 16 year-old girl.  His

12  father drove him down to South Carolina to pick up the other 16

13  year-old girl.  And then neither of his parents have the good

14  sense to alert the police, or Social Services, or even give the

15  child's parents a heads up that these kids were there.

16          It seems that if you ask the defendant's parents,

17  they would tell you that their son is a benevolent person

18  seemingly creating a safe haven for girls from broken homes.

19  But that's not what we have here.  Evan is a 26 year-old

20  mentally disturbed, sadistic, violent man.  He's not running a

21  home for wayward children.  He's engaging in human trafficking.

22  And while I want to give his parents the benefit of the doubt

23  and assume that they have merely been ignorant of what their

24  son has been up to, they are unwittingly -- they have been

25  unwittingly helping their son abduct young girls from other

USA v. Strauss, 7:24MJ46, 4/10/2024

1  states.  And they've been doing so by relying on nothing more

2  than their son's say-so in helping him do whatever he wants

3  while declining to question him or anybody else to get more

4  information or to alert people whose job it actually is to help

5  girls in need.  It's hard to have confidence in the idea that

6  his parents are suitable third-party custodians when under

7  their watch they have allowed Mr. Strauss to put multiple minor

8  girls in immense danger.

9         The short of it, Your Honor, is that there is clear

10  and convincing evidence that Mr. Strauss poses a danger to the

11  community, to his parents, to young girls, and really anyone

12  with an address that could be used as a swatting target, and

13  we'd ask that he be detained pending trial.

14         THE COURT:  Thank you.

15         MS. DIEHL:  Your Honor, respectfully to the Court and

16  to my colleague, we don't lock people up in jail because they

17  have mental health issues.  And we don't make decisions based

18  on emotion here in this courtroom.  We make decisions based on

19  the law.  And if someone has a mental health condition, we

20  ensure that they get the treatment that they need.  A mental

21  health condition in and of itself is not a reason to put

22  someone behind bars.  And the majority of my colleague's

23  argument was that Mr. Strauss is a danger because he has a

24  mental health condition.

25         Mr. Strauss has had violent episodes in the past with

USA v. Strauss, 7:24MJ46, 4/10/2024

1    his family.  His family, who called the police and were willing

2    to report him to the police when that got out of hand.  And the

3    evidence shows that happened in February.  That's when it got

4    out of hand, that they called the police.  They are willing to

5    report him when he does something wrong.  But the fact that he

6    decompensated in February when all this was going on does not

7    in and of itself make him a danger or unable to live in the

8    community under the eyes of his parents.  You heard testimony

9    that he is on medication that has been working, that with this

10   medication he is understanding the rules.  He is behaving with

11   his family.  He is following the rules and he is listening.

12        The government makes the argument that he hasn't been

13   on this medicine long; it's been two months.  But that's all it

14   takes if the medicine works.  If it works after two months,

15   that prevents someone from decompensating.  Mr. Scheff also

16   argued that Mr. Strauss does not have the sufficient

17   self-awareness to understand that he needed the medication.

18   Mr. Strauss is a 26 year-old man with severe autism, bipolar

19   disorder, and manic depressive.  It makes sense that he didn't

20   have sufficient self-awareness, and he's not required to have

21   successful self-awareness.  That's why he went on medication.

22   That's why we are offering his parents as third-party

23   custodians.

24        The majority of the government's argument was based

25   on the weight of the evidence and the seriousness of the

USA v. Strauss, 7:24MJ46, 4/10/2024

1  offense.  And I can't get up here with a straight face and say

2  that if all of this is true, that it is not a serious offense.

3  Of course it is.  Now, of course, we haven't had the benefit --

4  and I understand the way detention hearings work -- we haven't

5  had the benefit of cross-examining or looking at the evidence,

6  or being able to bring in our own expert witness to testify as

7  to how a third party could get into a phone, or why the fact

8  that Mr. Strauss being swatted and Mr. Strauss being doxed and

9  Mr. Strauss being sextorted matters, why that might matter for

10  him giving his password or his email to someone, or the ability

11  for someone to hack into his phone.

12         The weight of the evidence based on just today in the

13  detention hearing is strong, and it is a very serious crime.

14  But that is not the only things we look at, Your Honor.  This

15  is a presumption case, and so we must start there.  And as I

16  stated in our written motion, Your Honor, the presumption is

17  very easy to rebut.  It is some evidence.  Mr. Strauss has

18  lived in this community for almost his entire life with I think

19  his dad said something briefly in Tennessee, and they moved

20  from Wisconsin.  He takes medication.  That is clearly

21  important.  He must take it or he decompensates.  And that is

22  from providers here in Virginia.  He's gone to school in

23  Virginia.

24         So we've presented some evidence to rebut the

25  presumption; however, that presumption is still there.  It is

USA v. Strauss, 7:24MJ46, 4/10/2024

1   still something to weigh; however, the government must prove by

2   clear and convincing evidence that there are no conditions.

3   And they have argued quite emotionally that things in the past

4   have been bad with the parents and Mr. Strauss.  But

5   Mr. Strauss has never been under court order not to be on

6   electronics.  Mr. Strauss has before been under court order not

7   to speak to minors.  Mr. Strauss has never been on GPS

8   monitoring, nor had a curfew, nor been in home detention.

9   These are all conditions that would absolutely prevent the

10  concerns that government set.

11          First, not having access to the Internet, you heard

12  from Mr. Strauss that this is no longer, we believe what Evan

13  Strauss is telling us.  They're locking the doors that have

14  access to the computer.  They are changing from WiFi to

15  ethernet cable so that he can't access WiFi.  They are ensuring

16  that he will have no phone, XBox, or computers.  And they're

17  going to make sure that he doesn't go out and get them because

18  not only does he not have a license, but they're going to

19  ensure that if he's under home detention and GPS monitoring,

20  he's not going anywhere.  You heard from Mr. Strauss that

21  before -- when the FBI -- and again, he was not under a court

22  order not to get more technology.  He was going out with his

23  girlfriend, Faith Thompson.  That wouldn't be allowed.  There

24  are conditions that would prevent that from happening.  There

25  can be conditions that he continue to attend mental health

USA v. Strauss, 7:24MJ46, 4/10/2024

1  counseling, which I think everyone, including Mr. Strauss,

2  would agree that he wants and needs.

3          There are conditions that can prevent any alleged

4  danger to the community.  And I know Mr. Scheff mentioned risk

5  of flight.  This is not a risk of flight case.  He has nowhere

6  to go.  And all of the danger about swatting, about doxing,

7  about sextortion, about the Internet goes away if Mr. Strauss

8  doesn't have access to the Internet.

9          The government claims that some of the history of

10 Mr. Strauss is so bad because he was speaking to someone who

11 has mental health issues and he continued to groom her.  But by

12 the same measure, Mr. Strauss has all of those same health

13 issues and autism to boot.  This isn't someone who is trying to

14 groom people.  Defense would proffer if these occurred the way

15 it came out it occurred, this is someone who doesn't

16 understand -- especially with these women, he is someone who is

17 raised by healthcare workers who bring in strays, who work with

18 DFS, who are foster parents, and he sees people in trouble.

19 Obviously, he can't go across state lines and not talk to

20 parents and pick up a 16 year-old.  Obviously that's not

21 allowed.  That's obvious to us standing here.  But to Evan

22 Strauss with an IQ of 75, who is autistic, who has to take

23 medication not to deescalate into a manic depressive disorder,

24 that may or may not be obvious.  A court order would make that

25 very, very obvious, and would prevent any of those concerns.

USA v. Strauss, 7:24MJ46, 4/10/2024

1          Your Honor, we're not denying this is a serious

2    offense.  Obviously, we wouldn't have been here for hours and

3    hours if it weren't.  We're not denying that this is a

4    presumption case.  But we don't lock people up for mental

5    health issues and we don't lock people up based on emotion.

6    And the law shows that there has to be clear and convincing

7    evidence that no conditions, none -- or a combination

8    thereof -- can protect society.

9          Clear and convincing evidence, as Your Honor knows,

10   is the second highest burden in the land outside of beyond a

11   reasonable doubt.  And the government has presented a very

12   emotional and powerful speech, but they have not proven that

13   the combination of conditions would protect society.

14   Mr. Strauss, with those conditions, can be released on bond,

15   and they can be severe home detention type restrictions.  We

16   have rebutted the presumption, but even if we haven't, the

17   government has not proven by clear and convincing evidence that

18   these conditions would not suffice.

19          Thank you.

20          THE COURT:  Mr. Scheff?

21          MR. SCHEFF:  I've said my piece, Your Honor.  I'm

22   good.

23          THE COURT:  I want to thank counsel not for time

24   management or providing the Court with how much time this

25   hearing -- it would take in advance, but with your preparation,

USA v. Strauss, 7:24MJ46, 4/10/2024

1  your working together earlier today, and the truly excellent

2  advocacy on the part of both parties.

3        In considering the government's request to detain the

4  defendant, I'm guided by several general principles; first,

5  that at all times the defendant is entitled to the presumption

6  of innocence.  Nothing I say in my findings should be construed

7  to affect that presumption in any respect.

8        Second, under the Bail Reform Act, pretrial detention

9  is an exceptional step.  Under the Act a defendant must be

10  released prior to trial unless a judicial officer finds that no

11  condition or combination of conditions exist which will

12  reasonably assure the appearance of the defendant -- and I'm

13  going to skip that and just go right to danger, because I think

14  that's where we are -- or reasonably assure the safety of any

15  other person or the community.  The Act requires the least

16  restrictive conditions be imposed that are necessary to provide

17  this reasonable assurance of safety.  If I cannot find any

18  conditions that will reasonably assure the safety of persons in

19  the community, then I'm required by the Act to order that the

20  defendant be held in custody.

21        The government on its motion seeks to detain the

22  defendant under 18 U.S.C. 3142(f)(1)(E), the felony charges

23  against Mr. Strauss involve a minor victim.  There is probable

24  cause to believe that Mr. Strauss violated 18 U.S.C. 2251,

25  sexual exploitation of children.  If -- because there is

USA v. Strauss, 7:24MJ46, 4/10/2024

1   probable cause, the rebuttable presumption arises under

2   3142(e)(3) that no condition or combination of conditions of

3   release will reasonably assure the safety of the community.

4        As Ms. Diehl has pointed out, the presumption is

5   rebuttable, which means it can be overcome by the defendant.

6   This happens in two steps.  The first step, the Court must

7   consider whether the defense has met the very low burden of

8   production to rebut that presumption.  And to rebut the

9   presumption a defendant must only produce some evidence that he

10  will not endanger the community if released.  I find that the

11  defendant has not overcome that presumption; but nonetheless,

12  regardless of whether he has or has not, even if he had, I

13  would move on to the 3142(g) factors, even if the presumption

14  had been rebutted, because the burden of persuasion lies with

15  the government.

16       I find that the defendant has not offered evidence

17  sufficient to rebut the presumption.  The third-party custodian

18  simply doesn't do it.  In terms of, if I understand the

19  defendant's argument, is that this is -- these are all mental

20  health issues.  There is no provision by which we can protect

21  the public from what has been offered in evidence presented in

22  this case.

23       In terms of a third-party custodian -- I'm going to

24  get to this a little bit later, but I'll tell you right at the

25  outset that condition or proposal is wholly unacceptable to

USA v. Strauss, 7:24MJ46, 4/10/2024

1  this Court, wholly unacceptable to this Court, that

2  Mr. Strauss's parents and his grandmother could in any -- or

3  his parents -- Mr. Strauss in any way could possibly be an

4  appropriate third-party custodian in this case for this

5  defendant under these circumstances.  It devolved the longer

6  Mr. Strauss was on the stand.  He is not an appropriate

7  third-party custodian.  If there was a neutral -- before he

8  testified in this case, if there was a neutral as to whether or

9  not he could have provided reasonable assurances of the safety

10  of the community, it went in the other direction.  The Court is

11  convinced that, in fact, he would additionally -- the best word

12  and the nicest word I can come up with is enable.  But that is

13  not a proposal that would in any way provide reasonable

14  assurances to this Court to protect the safety of other persons

15  in the community from the conduct and behavior of Evan Strauss.

16          Additionally, no access to the Internet, that doesn't

17  solve the problem.  Mr. Strauss doesn't even want to know what

18  he's been charged with.  He doesn't want to understand the

19  underlying factors.  He doesn't want to understand how it

20  happened.  He doesn't want to understand anything about the

21  victims or anything about why we're here.  And if he doesn't

22  understand why we're here and what the allegations are, how in

23  the world can he possibly protect for this kind of conduct

24  occurring in the future on the Internet?  Simply changing from

25  WiFi to an ethernet is not going to resolve the problem.  They

USA v. Strauss, 7:24MJ46, 4/10/2024

1    have enabled this behavior.

2          Additional devices, while there was no court order

3    requiring that he not access any additional devices, Dad knew

4    he shouldn't have additional devices.  Son knew he shouldn't

5    have had additional devices, but he got them anyway without

6    them knowing.  And he wasn't real happy when they were taken

7    away.  There are devices in the house.  There are adults in the

8    house.  There's a girlfriend in the house.  There's a

9    grandmother in the house.  There are adults in the house.  And

10   this Court can find no electronic device condition that's been

11   provided in any form or fashion, or certainly that's been

12   presented today, that would in any way provide protection to

13   other persons or the public, given the facts that have been

14   well articulated in this very long hearing in terms of his

15   conduct online.  So to those -- to that evidence that I

16   believe -- and arguments that were made on behalf of defendant,

17   it does not rebut the presumption.

18         Now I'm going to switch to my 3142(g) factors.

19   Obviously, the nature and circumstances of the offense, I think

20   everyone in this room recognizes, as does counsel for the

21   defendant, that the charges are incredibly serious and the

22   weight of the evidence is strong.

23         I'm going to move on to the history and

24   characteristics of Mr. Evan Strauss.  Again, flesh on the bones

25   in this hearing only made things worse.  To simply characterize

USA v. Strauss, 7:24MJ46, 4/10/2024

1   his behavior over the past few years as potentially simply

2   being a mental health issue first of all is not warranted by

3   the evidence that was presented to this Court as to a rationale

4   for his behavior over the period of time that we are looking at

5   in terms of his conduct.  There have been numerous situations,

6   not just Victim 1, but obviously other young girls -- this

7   young woman from Florida, young woman -- the conduct and the

8   dangerousness that has been described in terms of his history

9   and characteristics is just extremely troubling.  While he may

10  have been on meds for two months, he's been engaging in this

11  behavior for years.  He has a history of violence against the

12  people that would purport to be his third-party custodians.  He

13  has threatened violence and other injuries to victims and

14  others.  And the government has well established that he truly

15  cannot tell the truth.  He has lied to law enforcement.  He has

16  lied to his father and to his mother, and they continue to

17  believe him.

18        Additionally, the nature and seriousness of the

19  danger, they're all interwoven.  The Court cannot articulate

20  the danger that Mr. Strauss poses to other young girls.  He

21  poses physical and other danger to the people in his home, and

22  he poses significant danger to young girls and to other victims

23  and to those who disagree with or challenge him in any respect.

24        Again, third party, when I look at conditions as to

25  whether or not there are any conditions that could reasonably

USA v. Strauss, 7:24MJ46, 4/10/2024

1   assure the safety of the community, again, the Court has

2   already addressed the lack of access to computer devices.  The

3   Court simply does not see any possible workable solution or

4   condition by which the Court can reasonably assure safety in

5   terms of online presence.  Location monitoring is going to do

6   nothing.  He engaged online with numerous victims.  So whether

7   that's in what part of the house or another, on what device,

8   and given his computer and other talents, that provides the

9   Court zero assurances that the other persons in the community

10  would be reasonably safe with that condition.

11          I'll get back to the third-party custodian.  As I

12  said before, it's stunning to me that Mr. Strauss could testify

13  that after this North Carolina incident when he discovered that

14  his son had lied to him, it's stunning that he went to North

15  Carolina.  It's stunning that he brought a girl back from North

16  Carolina.  It's stunning that he did not confirm her age as the

17  adult who had to drive Evan down there.  It's stunning that he

18  provided no confirmation of it, but when he did discover that

19  she was 16, he's the adult that drove down there and got her.

20  While his son may also be an adult, he put it on his son to

21  call law enforcement.  He's a nurse.  His wife works with the

22  Department of Social Services, and they should understand their

23  obligations in this respect, and he didn't do it.  And then

24  after that incident, a 16 year-old girl from South Carolina

25  comes to stay in their home for weeks.  The Court finds that

USA v. Strauss, 7:24MJ46, 4/10/2024

1  stunning, absolutely stunning.  And not for one second does

2  this Court believe that placement of Mr. Strauss in this home

3  where his behavior has been enabled for years with his parents

4  looking the other way out of love or ignorance or whatever,

5  there is zero excuse.  And I do not find that his father -- or

6  no one else has come forward -- is an appropriate third-party

7  custodian.  I think I've beat this horse.

8        I hope the Court has well articulated its reasons.

9  The Court finds that there is no condition or combination of

10  conditions under the Bail Reform Act that could reasonably

11  assure the safety of other persons or the community.  And for

12  that reason, the Court is left with the only option that

13  Mr. Strauss be detained pending trial.

14        Is there anything else from the government?

15        MR. SCHEFF:  There is not, Your Honor.  I do

16  apologize for our lack of communication with regard to

17  scheduling.

18        THE COURT:  It's okay.  Now you know that I'm going

19  to do what we need to do, but we'll do better.  We'll do

20  better.  But Mr. Strauss deserved every moment of this hearing

21  and the opportunity for every witness to be heard, and for his

22  attorney to have every argument made.  And I hope that you all

23  understand that that's been done today.

24        MS. DIEHL:  Yes.

25        THE COURT:  And I'm not barking at anybody about that

USA v. Strauss, 7:24MJ46, 4/10/2024

1  part.  And I would have stayed here until 10:00 tonight, if we

2  needed to.  It's very, very important to him, and I understand

3  that.  And I hope he realizes that the Court has considered the

4  evidence that it has heard and been presented here today.

5         Ms. Diehl, is there anything else on behalf of the

6  defendant?

7         MS. DIEHL:  Nothing else, Your Honor.  I will

8  certainly overestimate time in the future.

9         THE COURT:  It's all right.  It's all right.  I want

10  to thank everyone -- all of the folks that were necessary to

11  participate in this hearing to be here today.

12         And Mr. Strauss, I do wish you good luck.

13         THE DEFENDANT:  Thank you.

14  (Proceedings adjourned, 7:28 p.m.)

15

16

17

18

19

20

21

22

23

24

25

USA v. Strauss, 7:24MJ46, 4/10/2024

1           C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair                 Date: April 22, 2024

15

16

17

18

19

20

21

22

23

24

25