## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 7:24-CR-18 |
| | : | |
| EVAN STRAUSS | : | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America submits this sentencing memorandum and respectfully requests, for the reasons set forth below, that the Court sentence defendant Evan Strauss to a term of imprisonment of 300 months, to be followed by a lifetime term of supervised release.

### FACTUAL BACKGROUND

Evan Strauss has a lengthy history of engaging in illegal, disturbing, and terroristic behavior, often targeting minors. Much of this behavior was through Mr. Strauss's involvement in Purgatory, an online group whose members would commit various internet crimes against members of the public and each other, including doxing, SWATting, and social manipulation. Presentence Investigation Report ("PSR") ¶ 9 (ECF No. 72). They would also extort young women into sending them sexually explicit content, cutting themselves, or engaging in some other form of self-harm. PSR ¶ 26. Mr. Strauss and other members of Purgatory would engage in these activities to target perceived rivals, to gain online notoriety, to assert power over their victims, to make money, and sometimes just for fun. Evan Strauss Stip. of Facts ("Md. Stip. of Facts"), at 1, *United States v. Jarboe et al.*, 1:24-CR-23 (D. Md.) (ECF No. 112-

1); PSR ¶ 26. Mr. Strauss was the head of Purgatory and oversaw much of this illegal and antisocial activity. PSR ¶ 9.

## I.    Conduct Involving Minor A

It was through his activities with Purgatory that Mr. Strauss met, and solicited, Minor A—a seventeen-year-old girl from Wyoming—around November 1, 2023. PSR ¶¶ 9, 10. Mr. Strauss knew that Minor A was only seventeen, and he also knew that she struggled with mental health issues and engaged in self-harm. PSR ¶ 10.

At first, Minor A and Mr. Strauss were in a consensual relationship. PSR ¶ 10. But things quickly took a turn. Within a matter of days, Mr. Strauss became controlling and abusive. Gov't Ex. 1, at 1–2. He began to cyberstalk her. PSR ¶ 3. He would scream at, harass, intimidate, and threaten Minor A. PSR ¶¶ 10, 28. He created strict rules for their relationship, such as a prohibition on speaking with other males and a requirement that he and Minor A constantly talk on the phone. PSR ¶ 28.

He repeatedly threatened Minor A and members of her family. PSR ¶ 10. He threatened to hurt or kill Minor A, and he threatened to hurt or kill members of her family while making her watch. PSR ¶¶ 10, 28; Gov't Ex. 1, at 1. He threatened to kill her cat. PSR ¶ 28. He threatened to have her sisters removed from the family home. PSR ¶ 10. He threatened to SWAT her. PSR ¶ 10.

And Mr. Strauss did his best to ensure that Minor A knew these were not idle threats. He told her he had killed animals before. PSR ¶ 28. And he showed Minor A

2

how he had done his research. He shared with her that he had learned particular information about her and her family, showing her that he knew sufficient information to be able to act on these threats. PSR ¶ 10.

Mr. Strauss threatened Minor A, seemingly at least in part out of pure enjoyment, because he enjoyed having power over her. *See* Md. Stip. of Facts, at 1. But Mr. Strauss also used these threats to try to get things in return. He got her to cut herself, including carving his online moniker, "Reaper," into her thigh. PSR ¶¶ 9, 11. Mr. Strauss not only "got off" on Minor A cutting herself, PSR ¶¶ 28, 31, but he also took pictures of those cuts to use as blackmail, PSR ¶ 11. He told Minor A that he would send the pictures to the Wyoming Department of Family Services ("DFS") if she did not do as he asked. PSR ¶ 11. He tried to get her to send him nude photos, which she sometimes did. PSR ¶ 11. And he got her to masturbate for him. PSR ¶ 11.

Around December 19, 2023, Minor A began dating a different person, referred to in the Statement of Facts as Individual 1. PSR ¶ 12. This same person is referred to in Mr. Strauss's Maryland case as Victim #1,[1] Md. Stip. of Facts, at 2–3, but will be referred to here as Individual 1 for purposes of consistency. When Mr. Strauss learned about this relationship, he tried to get Minor A to break up with Individual 1 by doxing her (i.e., publicizing her personal information). PSR ¶ 12. In particular, he posted a collage on Instagram full of pictures of Minor A and members of her family

---

[1] One of Victim #1's online monikers included "cursx." Md. Stip. of Facts, at 3. As is apparent later in the PSR, this was a moniker used by Individual 1. *See* PSR ¶ 32 (identifying Minor A's boyfriend's username as "CurseX").

and of personal identifying information ("PII") about her family members. PSR ¶¶ 12,
32; Gov't Ex. 2.

Three days later—just before Christmas—Mr. Strauss ramped up his
vengeance campaign. Notably, he carried out one of his earlier threats and reported
to DFS that Minor A was sending nude photos to people online and was engaging in
self-harm. PSR ¶ 13; Gov't Ex. 3. While true, Mr. Strauss conveniently left out that
Minor A was acting as she was to ward off his threats, not to mention that he was
filing this report for purposes of revenge and intimidation rather than out of genuine
concern for Minor A's well-being. *See* Gov't Ex. 3. Concerned for her safety, DFS sent
a team out to Minor A's home to check on her. PSR ¶ 13.

On January 1, 2024, Minor A was part of a call with Mr. Strauss, Individual 1,
and another member of Purgatory, Individual 2, when Individual 2 threatened to
SWAT Minor A.[2] PSR ¶¶ 14, 30. Mr. Strauss intervened, but for a price. PSR ¶¶ 14,
30. He later asked for a token of appreciation, asking Minor A to send him a picture
of her vagina with "Reaper owns my pussy" written on it, and she complied. PSR
¶¶ 14, 30; Gov't Exs. 4, 5.

Mr. Strauss and other members of Purgatory were simultaneously targeting
Individual 1. Also on January 1, 2024, Mr. Strauss circulated PII for Individual 1 and
his mother in a Telegram chat. Md. Stip. of Facts, at 2–3. The following day, another
member of Purgatory posted on Telegram a link to a website that this person said
that he and Mr. Strauss had created. *Id.* at 3. That website contained PII for

---

[2] Individual 2 is one of Mr. Strauss's co-conspirators in his Maryland case. *See* PSR ¶ 30; Brayden
Grace Stip. of Facts, at 1, *Jarboe*, 1:24-CR-23 (ECF No. 102-1).

Individual 1. *Id.* That same day, another member of Purgatory made a SWATting call targeting Individual 1, whereby the caller contacted the Houston County Sheriff's Office in Alabama (where Individual 1 lived) and threatened to burn down a piece of property. *Id.*; PSR ¶ 30. The caller falsely identified himself as Individual 1, said he had shot his son, and threatened to kill any law enforcement officers who responded to the scene. Md. Stip. of Facts, at 3. Law enforcement responded with a SWAT team. *Id.*

That same day—January 2, 2024—Mr. Strauss and Minor A were engaging in an Instagram live chat when Mr. Strauss asked her to masturbate with a hairbrush. PSR ¶¶ 15, 24. Minor A complied under duress, fearing potentially violent consequences if she did not do as she was asked. PSR ¶ 15. And, unbeknownst to Minor A, Mr. Strauss used a screen recording app to record Minor A masturbating. PSR ¶¶ 15, 24.

Approximately two weeks later, Minor A was SWATted, too. PSR ¶ 30; Gov't Ex. 1, at 2. Minor A believes that Mr. Strauss paid someone to call her local police department claiming to be her and saying that she had hand grenades and that she had chopped off her siblings' heads and tied them up. Gov't Ex. 1, at 2.

## II.    Strauss's SWATting

Mr. Strauss and his friends wreaked havoc on more people than just Minor A and Individual 1. On January 4, 2024, Mr. Strauss made a SWATting call of his own. Md. Stip. of Facts, at 3–4. He called the Newark Police Department in Delaware—in the middle of a school day—and falsely reported a school shooting incident at Newark

High School, claiming to be trapped inside a classroom. *Id.* at 3. One of his coconspirators subsequently called the Newark police pretending to be the shooter. *Id.* at 3–4. Police responded to the scene, and the school was placed on lockdown. *Id.* at 4.

Over the next couple of weeks, Mr. Strauss and his co-conspirators also participated in making SWATting calls aimed at the Albany International Airport in Albany, New York, and a private home in Eastman, Georgia. *Id.* at 4–5.

### III.  Strauss's Conduct Involving Other Minor Girls

In addition to his predation of Minor A, Mr. Strauss also targeted other minor girls. He disseminated explicit images of minors in Purgatory. PSR ¶¶ 22–23. He admitted to law enforcement that he collected child pornography and said that his phone contained nude images of girls as young as fourteen. PSR ¶ 24. He even talked in Purgatory about wanting to rape a little girl. PSR ¶ 22.

Most notably, it seems that Mr. Strauss used Purgatory to extort a number of young women. *See* PSR ¶¶ 22–23. While not all of their identities and stories are known, one other victim besides Minor A has been identified, a 14-year-old girl from Florida ("Minor B"), whom Mr. Strauss extorted in a similar fashion as he did Minor A. PSR ¶ 24. Minor B met Mr. Strauss online, and they dated for a few weeks. PSR ¶ 24. She knew Mr. Strauss to enjoy "gore" content, and he would ask her to engage in self-harm including carving his name into her body. PSR ¶ 24. She would send him these pictures, as well as pictures of her breasts. PSR ¶ 24. And Mr. Strauss sent her

pictures of his genitals. PSR ¶ 24. The two also discussed meeting up in person, although they never did. PSR ¶ 24.

And even outside of his Purgatory activities, Mr. Strauss was involved in behavior that looks eerily similar to trafficking. On October 28, 2022, Mr. Strauss (who did not have a driver's license) convinced his father to drive him down to North Carolina to pick up a 16-year-old girl ("Minor C") with severe mental health issues and bring her back to Franklin County. Detention Hr'g Tr. 30:1–5, 31:6–10 (ECF No. 36); Gov't Ex. 6, at 1. Mr. Strauss told his father she was eighteen. Detention Hr'g Tr. 86:12-23. When his father found out that Minor C was sixteen, he told Mr. Strauss to call the police. *Id.* at 90:1–8. Mr. Strauss lied and told his father that he had. *Id.* at 90:12–19. In the meantime, Minor C had been reported missing, and law enforcement eventually discovered where she was and came and rescued her. *Id.* at 30:1–5, 90:20–22.

Lest there be any doubt about Mr. Strauss's intentions with Minor C, their romantic communications after this abduction—continuing for months—are yet another example of Mr. Strauss's sexual interest in young girls.[3]

Nor was this abduction an aberration. Mr. Strauss subsequently acted similarly with a 16-year-old girl from South Carolina ("Minor D"). Detention Hr'g Tr. 91:14–18, 93:4–15, 94:22–23. Again, Mr. Strauss manipulated his father into driving down with him to South Carolina to pick up Minor D, telling him that Minor D was

---

[3] Mr. Strauss's messages are in green, while Minor D's are in blue.

eighteen. *Id.* at 93:16–94:14. Eventually, Mr. Strauss tired of Minor D, and he got his parents to send her home. *Id.* at 94:18–21, 95:6–11.

## PROCEDURAL BACKGROUND

On April 4, 2024, Mr. Strauss was charged by Complaint with Sexual Exploitation of Children, in violation of 18 U.S.C. § 2251(a) (ECF No. 3). On May 9, 2024, a grand jury sitting in this District returned a five-count indictment charging Mr. Strauss with Stalking, in violation of 18 U.S.C. § 2261A(2) (Count One); Coercion and Enticement (18 U.S.C. § 2422(b)) (Count Two), two counts of Sexual Exploitation of Children (Counts Three and Four), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) (Count Five). Indictment (ECF No. 41). On November 22, 2024, the defendant pleaded guilty pursuant to a plea agreement to Counts One and Five. PSR ¶ 3.

Mr. Strauss also has pending charges in the District of Maryland. On April 30, 2024, he was charged in a six-count Superseding Indictment with cyberstalking Individual 1 (Count Two) and threatening to set his property on fire (Count Three); transmitting the threat to the Newark Police Department (Count Four); threatening to use explosives at the Albany International Airport (Count Five); transmitting the threat regarding the home in Eastman, Georgia (Count Six); and participating in a conspiracy to commit these offenses (Count One). Superseding Indictment, *Jarboe*, 1:24-CR-23 (ECF No. 39). Just a few days ago, Mr. Strauss pleaded guilty to all six charges. Plea Agreement, at 1, *Jarboe,* 1:24-CR-23 (ECF No. 112).

The PSR implies that the SWATting investigation in Maryland was initiated as a result of Minor A's statements to DFS that she was being threatened. *See* PSR ¶ 21. This is untrue. *See* United States' Corrections, Clarifications, and Objections to the Initial PSR ("Prior to this search warrant, the Government was not aware of the defendant's predation of Minor A or the complaint that he had filed with the Wyoming Department of Family Services ("DFS")). The Government respectfully requests that the last two sentences of paragraph 21 be moved to a separate paragraph to make clear that the investigation did not originate with the complaint to DFS.

## LEGAL STANDARD

In determining the appropriate sentence to be imposed upon the defendant, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). These factors require the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1). The Court must also consider the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* §3553(a)(2). The other important § 3553(a) factors that the Court must consider are the kinds of sentences available, the Sentencing Guidelines range, any pertinent policy statement issued by the Sentencing Commission, "the need to avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct," and the need to provide restitution to any victims. *Id.* § 3553(a)(3)–(7).

With respect to the guideline range, although application of the Guidelines is no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 245 (2005), the Guidelines still play a "central role" in the sentencing decision, *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016). Indeed, in most instances, "the Guidelines are not only the starting point . . . but also the lodestar." *Id.* at 200. Still, the Court must consider each defendant "as an individual" and consider whether the guideline range appropriately accounts for all relevant factors in a given case. *Pepper v. United States*, 562 U.S. 476, 487–90 (2011).

In this case, the most pertinent § 3553(a) factors, each of which will be addressed in greater detail below, are: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct; and (5) the need to protect the public.

## THE SENTENCING GUIDELINES

Probation has calculated the Base Offense Level to be a level 32, to which no party has objected. The parties are also in agreement as to the § 2G2.1(b)(2)(A) and (b)(6) enhancements for the commission of a sexual act and the use of a computer, respectively. The defendant objects to the application of the remaining enhancements.

10

## I.    The Distribution Enhancement[4]

The defendant contends that the consistent statements of two of his co-conspirators, *see* PSR ¶¶ 22, 23, are insufficient to support the distribution enhancement. Def.'s Corrections & Objs. to the PSR ("Def.'s Objs."), at 5 (ECF No. 74). This evidence alone is sufficient to establish this enhancement by a preponderance of the evidence. *See, e.g.*, *United States v. Barnes*, 141 F.4th 882, 886–87 (7th Cir. 2025) (affirming application of role enhancement where district court credited co-conspirator's testimony in spite of discrepancies); *United States v. Lotharp*, No. 20-4579, 2023 WL 2136373, at *1 (4th Cir. Feb. 21, 2023) (per curiam) (affirming enhancement where district court relied on co-conspirator's statements in calculating drug weight); *United States v. Ceja*, 810 F. App'x 477, 478 (8th Cir. 2020) (per curiam) (same where district court relied on testimony of two co-conspirators in support of enhancement); *United States v. Morris*, 583 F. App'x 724, 726 (9th Cir. 2014) (per curiam) (same where district court relied on testimony of a co-conspirator and an affidavit). And the defendant cannot muster any evidence to rebut what these co-conspirators told law enforcement. He instead relies on the assertions that these statements were made "pursuant to a plea agreement" and the supposition that no photos or videos containing child pornography were found on Mr. Strauss's cell phone besides those depicting Minor A. Def.'s Objs., at 2–3, 5. These arguments are flimsy and wrong.

---

[4] This section also addresses the defendant's objections to PSR ¶¶ 22, 23, and 24, because they are bound up with the dispute about the distribution enhancement.

First, the defendant's chronology is off base. Owen Jarboe and Brayden Grace made these statements about Mr. Strauss in January 2024. PSR ¶¶ 22–23. They did not plead guilty until April 2025 and June 2025, respectively. *Jarboe*, 1:24-CR-23 (ECF Nos. 94, 101).

Second, the defendant erroneously conflates the fact none of the other nude images of girls on Mr. Strauss's phone could be *confirmed* to be child pornography, *see* PSR ¶ 24; Detention Hearing Tr. 26:25-27:9, with the incorrect assumption that none of them *were* child pornography, Def.'s Objs, at 2. That is, although law enforcement found approximately twenty images of young women who were naked and/or engaging in self-harm, because law enforcement was unable to identify who these girls were, it was not possible to verify their age and thus whether they were older minors (e.g., sixteen or seventeen) or younger adults (e.g., eighteen or nineteen). *See* Detention Hearing Tr. 26:25-27:17.

Regardless, there is substantial reason to believe that at least some of these images *were* child pornography, which would further corroborate Mr. Jarboe's and Mr. Grace's statements and would provide additional justification for the distribution enhancement. Principally, when he was interviewed by law enforcement, the defendant *admitted* that he was in possession of approximately twenty-five to thirty images and two to three videos of nude girls as young as fourteen. PSR ¶¶ 24, 34. The defendant ignores this admission entirely.

While the defendant claimed that he was compiling this contraband as "intelligence" for law enforcement, PSR ¶ 24, even taking this as true (and there is

substantial evidence that it was not), that is not the cure-all that he thinks it is. For one thing, law enforcement never asked Mr. Strauss to gather this material; he did that of his own accord. PSR ¶ 25. For another, the defendant, without any form of citation, claims this to be one's "legal obligation," rather than an enhancement. Def.'s Objs., at 5. This is patently untrue. Conspicuously, the child pornography statutes contain no vigilante safe harbor provision to bar prosecution against someone who solicits child pornography for purposes of sending it to law enforcement. *See* 18 U.S.C. §§ 2252(c) (providing for affirmative defense where someone who *possesses* less than three pieces of child pornography and "promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access" them, either destroys the material or "report[s] the matter" to law enforcement and "afford[s]" law enforcement access), 2252A(d) (same).

There is ample evidence to support the distribution enhancement.

## II.    The Vulnerable Victim Enhancement

As the Government previously argued, and Probation now agrees, a vulnerable victim enhancement is appropriate here, where Minor A was unusually vulnerable due to her pre-existing mental health issues, about which the defendant was aware. United States' Corrections, Clarifications, and Objs. to the Initial PSR ("Gov't's Objs."), at 3–5. In opposing this enhancement, the defendant principally relies on a factor of the vulnerable victim analysis that is out of date. Def.'s Objs., at 6–7. Specifically, the defendant relies on two out-of-circuit cases from 1996 (both involving criminal activity from 1993) for the proposition that a victim must be "selected for

13

[her] vulnerability." Def.'s Objs., at 6 (emphasis deleted). The reason why the defendant had to reach back thirty years to find support for this proposition is because this was an aspect of the vulnerable victim analysis that the Sentencing Commission deleted from the Guidelines in 1995. *See United States v. Feldman*, 83 F.3d 9, 16 (1st Cir. 1996) ("This argument prescinds from the Sentencing Commission's advisory (now revoked, but in effect on the date of Feldman's sentencing) that the adjustment here in question 'applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant.'"). Rather, in order to establish this enhancement, the Government need only prove "(1) 'why [the relevant] characteristic made one or more of the victims unusually vulnerable to the offense conduct' and (2) 'why the defendant knew or should have known of this unusual vulnerability.'" *United States v. Lawson*, 128 F.4th 243, 250 (4th Cir. 2025) (quoting *United States v. Shephard*, 892 F.3d 666, 670 (4th Cir. 2018)).

Next, the defendant argues that the vulnerable victim enhancement typically applies in cases involving developmental disabilities or cognitive impairment. Def.'s Objs., at 7. But, while the cases the defendant cites apply the enhancement in these contexts, they do not say it should only apply in this context. Indeed, the Government previously cited a number of cases where a victim's mental health condition provided a basis for this enhancement. *See* Gov't's Objs., at 4.

The defendant also argues that "[t]here is no evidence that Mr. Strauss used [Minor A's] history of cutting against her," Def.'s Objs., at 7, but this is untrue. The

defendant's threats to report Minor A to social services, and his eventual follow-through, are exactly that—his using her cutting against her.

The defendant next makes the staggering argument that Minor A "was certainly more sophisticated than the typical victim considered in these types of crimes," analogizing to a case where a sophisticated businessman was the victim of a fraud and was found not to be unusually vulnerable, as well as citing two other fraud cases. Def.'s Objs., at 7–9. The idea that one could be sufficiently sophisticated to avoid being stalked, threatened, and harassed is as grotesque as it is breathtaking. It is no small wonder that the defendant could not find a case to cite for the proposition that some people are too smart to become a victim of a violent crime.

Even worse, the defendant misses the point. The defendant mistakes the victim's behavior for voluntariness when the evidence actually shows that it is a product of Mr. Strauss's manipulations and the victim's poor mental health. Normal, well-adjusted people do not carve names into their skin. It is precisely because the victim already struggled with mental health issues and with bouts of self-harm that the defendant was able to manipulate her into cutting herself. By any measure, that is a level of "unusual vulnerability" to the defendant's exploitation that justifies the § 3A1.1(b)(1) enhancement.

Lastly, the defendant argues that Mr. Strauss could not have known that Minor A's mental health issues made her more susceptible to his harassment. Def.'s Objs., at 8. This is doubly wrong. First, that is not the standard. The question is whether the defendant knew (or should have known) *of the vulnerability*, not *why* the

vulnerability made the victim vulnerable. *See Lawson*, 128 F.4th at 250–51 (explaining that courts may "infer" that an elderly victim was targeted due to age-related vulnerability in Jamaican lottery scams). Second, the fact that the defendant struggled with his own mental health issues, ███████████████████████████████ ██████████████████████████, made him *likelier* to appreciate the level of vulnerability of Minor A. It appears that the defendant was able to understand Minor A's struggles with self-harm, and yet he chose to inflict this harm on her regardless.

The vulnerable victim enhancement should also be applied.

## III.    The Sadistic/Masochistic Conduct Enhancement

Lastly, the defendant objects to the sadistic/masochistic conduct enhancement. The Government previously outlined two potential bases for the application of this enhancement: (1) the defendant's efforts to cut herself for his sexual gratification and (2) the humiliation of the forced masturbation. Gov't Objs., at 6. There is also a third, as the defendant intuited, Mr. Strauss getting Minor A to write "Reaper owns my pussy" on her genitals and send it to him.

As to the first, the defendant argues that there was no evidence that the defendant acted out of sexual gratification. This is incorrect. On multiple occasions, Minor A saw Mr. Strauss masturbating to her cutting herself. Gov't Ex. 1, at 3. That in and of itself should be sufficient to prove the inaccuracy of the defendant's contention. But that is not all. Mr. Strauss told Minor A (again, multiple times) that it would turn him on to slit her throat and have sex with her dead body. *Id.* He told her that he thought the idea of having sex with her dead body was "hot." *Id.* He told

her that he "got off" on cutting herself and that he was obsessed with blood. PSR ¶¶ 28, 31. And Minor B, too, knew Mr. Strauss to enjoy "gore" content. PSR ¶ 24.

As to the second, the defendant fixates on whether Minor A appears, in the moment, to be acting willingly. This argument is both legally and factually deficient. It is legally deficient because the question of whether something is sadistic or masochistic conduct is an objective inquiry. *United States v. Johnson*, 680 F. App'x 194, 199 (4th Cir. 2017); *United States v. Corp*, 668 F.3d 379, 389 (6th Cir. 2012); *United States v. Maurer*, 639 F.3d 72, 80 (3d Cir. 2011); *United States v. Freeman*, 578 F.3d 142, 146 (2d Cir. 2009) ("The purpose of the act depicted and the reaction of the actor are irrelevant to this determination." (internal quotation marks omitted)); *United States v. Raplinger*, 555 F.3d 687, 694 (8th Cir. 2009). And it is factually deficient because it ignores the broader context in which the masturbation was occurring. By this point, Mr. Strauss and Minor A were no longer dating. Rather, Minor A had been dating Individual 1 for several weeks, even though Mr. Strauss had been taking steps to try to break them up. Mr. Strauss had also been terrorizing Minor A for nearly two months. Indeed, just about a week earlier, DFS had shown up at Minor A's house after Mr. Strauss had sent them pictures of the cuts he had caused her to inflict upon herself.[5]

---

[5] The defendant also engages in wild and inappropriate speculation—not to mention victim shaming—about how far along in puberty Minor A might have been, the size and composition of her vagina, and whether Minor A has had sex (despite no evidence that she has—recall that Minor A lived in Wyoming, Mr. Strauss lived in Virginia, and Individual 1 lived in Alabama). The Court should disregard this line of argument in its entirety. *Cf.* Fed. R. Evid. 412(a) (generally prohibiting admission of evidence that a victim engaged in other sexual behavior or that a victim was predisposed to sexual activity).

As to the third, in conjunction with the defendant asking Minor A to write the "Reaper owns my pussy" message—a message with an obvious sexual connotation in its own right—he also said to Minor A: "i want to fuk tf out of you to night."[6] Gov't Ex. 4. Twelve minutes later, he asks her if they can have "e-sex" in an hour. Gov't Ex. 4. While Mr. Strauss may have used particular leverage to get Minor A to send him the requested photo, the broader context makes clear that he had, at least in part, a sexual motivation for asking her to send this degrading photo. Moreover, even though Mr. Strauss sought this photo as an expression of gratitude, that does not mean that he was not also seeking to sexually debase Minor A and to get some sexually explicit material for his own personal collection.

At bottom, the idea that being coerced into masturbating with a hairbrush, sending a degrading photo, or carving the name of one's tormentor into one's legs is neither objectively painful nor humiliating defies credulity.

## IV.    The Defendant's Criminal History

As mentioned above, in the last few days (after the PSR was completed), the defendant pleaded guilty in the District of Maryland to six charges. Pursuant to § 4A1.2(a)(4), the defendant now gets one criminal history point.

Although some of these charges are relevant conduct and thus would not count towards criminal history points, *see* § 4A1.2 n.1 (excluding "a sentence for conduct that is part of the instant offense" and noting that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense"), not all of them

---

[6] All typos are in the original. Government counsel understands this message to mean that Mr. Strauss was saying that he wanted to have vigorous sex with Minor A.

are. For example, the defendant pleaded guilty to participating in threats that were made in relation to Newark High School (Count Four), the Albany International Airport (Count Five), and individuals in Eastman, Georgia, on January 4, 2024; January 8, 2024; and January 15, 2024. *See* Superseding Indictment, *Jarboe*, 1:24-CR-23.

This activity is not relevant conduct because it does not fit within any of the categories outlined in § 1B1.3. These acts did not occur "during the commission of the offense[s] of conviction" except in the most literal temporal sense. Although, chronologically, these events occurred during the timeframe charged in the Indictment, "the fact that an unrelated offense occurs during the timeframe of another offense does not automatically convert it into 'relevant conduct.' " *United States v. Rodriguez*, 712 F. App'x 281, 282 (4th Cir. 2018) (per curiam). They certainly did not occur in preparation for the offense of conviction or in the course of attempting to avoid detection or responsibility. They were separate criminal activity, if motivated by the same nihilistic and anarchist worldview.

Section 1B1.3(a)(2) does not come into play because these sex offenses (which fall under § 2G2.1) and these threat offenses (which fall under § 2A6.1) are not groupable under § 3D1.2(d). Nor is § 1B1.3(a)(3) applicable—the harm caused by the threats specified above did not "result[] from" anything related to the offenses of conviction (i.e., the conduct pertaining to Minor A). And there is no "other information specified in" § 2G2.1 that would rope in the entirety of the threatening conduct to which the defendant has pleaded guilty in Maryland.

19

Accordingly, some of the defendant's Maryland convictions are not relevant conduct, and he should receive one criminal history point based on the pending charges.

## V.    The Guidelines Calculation

Based on the above, the PSR is correct that the defendant has a Total Offense Level of 41 and that he is a Criminal History Category I, which makes his effective guideline range 300 months, due to the statutory maximums on the charges to which he has pleaded guilty.

## DEFENDANT'S NON-GUIDELINES PSR OBJECTIONS

In addition to the objections addressed above, the defendant makes two other objections to the PSR that merit a response,[7] his objections to ¶¶ 31 and 34. As to the latter, the Government has provided the Court with a copy of this photograph, Gov't Ex. 5, so that the Court can see for itself what the photo shows, rather than getting into an anatomical debate.

As to the objection to ¶ 31, the defendant contends that it is "demonstrably false" that Minor A did not spread any of the defendant's personal information. Def.'s Objs., at 3. In support, the defendant points to a website that the defendant claims the Minor A set up. What evidence does the defendant have that Minor A was supposedly involved with this website? The website says that it was set up by a team of several individuals, including, purportedly Minor A. The problem with this so-called evidence is that not everything found on the internet is true. Just because a

---

[7] The defendant's objections to some of the conditions of supervised release will be separately addressed below.

website says it was created by someone does not mean that it actually was. And the defendant offers nothing to corroborate that Minor A did actually help create this website. As the defendant has previously acknowledged, we do not know who participated in creating this website; we only know who the actually-unknown creators of this website *say* participated in its creation. Detention Hr'g Tr. 50:11–17, 50:24–51:1, 52:1–3.

If anything, the evidence points in the opposite direction. There is one page of this website that has several indicators that Minor A was not involved in creating this website. First, the page revictimizes Minor A by reposting the *same material* that Mr. Strauss used to blackmail Minor A. *Compare* Gov't Ex. 7, *with* Gov't Ex. 2, *and* Gov't Ex. 3, at 5. Why in the world would Minor A repost on a public website the same personal information about herself and her family that the defendant had previously posted online? Second, the page, when referring to Minor A refers to the "girl" and "a minor" rather than identifying Minor A by name, as another page on the website does. It would be awfully strange for someone to create a website, post pictures of themselves on the website, and then refer to themselves in the third person as the "girl" or "a minor." The short of it is that we do not know who created this website, and its existence is not relevant to the PSR or this case.

## ARGUMENT

### I.    The Court Should Accept the Plea Agreement

Because this is a Rule 11(c)(1)(A) plea agreement—in that the Government has agreed to dismiss some of the charges in the pending Indictment—the Court has the

authority to accept the plea agreement or reject it. Fed. R. Crim. P. 11(c)(3)(A). In doing so, the Court should accept the agreement if the Court determines "that the remaining charges reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines. U.S.S.G. § 6B1.2(a); *accord United States v. Walker*, 922 F.3d 239, 250 (4th Cir.), *vacated on other grounds by* 140 S. Ct. 474 (2019). Among other considerations, the Court "should also weigh whether the plea agreement is in the public interest," as determined by "the circumstances of the case" and "consider any danger the defendant might pose to the public." *Walker*, 922 F.3d at 250. In conjunction with "weighing all the relevant circumstances," the Court "must accord due respect to the prosecutorial prerogatives involved in charging decisions." *Id.*

In this case, although the defendant's potential sentencing exposure is below the guideline range and is below what he would have faced had he been convicted of Counts Two, Three, or Four, the plea agreement reflects the seriousness of the defendant's offense conduct, is in the public interest, and accords with the public interest for four primary reasons.

First, and most importantly, at the center of this case is Minor A, and the views of her and her family should be paramount. Minor A and her family support the plea agreement and are eager to put this case behind them. They did not want to endure a trial and are grateful that Minor A does not have to testify. As is reflected in their victim impact statements (ECF Nos. 72-1 and 72-2), Minor A and her family are now

22

on the path to healing, and Mr. Strauss being sentenced should assist in their ability to move on from these traumatic events.[8]

Second, the charges to which the defendant has pleaded guilty fully encompass his offense conduct and reflect the seriousness of the offense. Most notably, Count One reflects the defendant's pattern of stalking and harassment against Minor A, which is at the core of his conduct in this case.

Third, as was explained in greater detail above, the defendant's illegal activity over the last several years extends beyond his victimization of Minor A. He was involved in terrorizing other individuals, too, primarily through SWATting. This other behavior can and should be considered by the Court in crafting an appropriate sentence in this case, *see* 18 U.S.C. § 3661, but the Court need not take this other conduct into account to as significant a degree, knowing that the defendant will separately be held to account for this conduct in the District of Maryland. And the Court can and should run the sentence imposed in this case consecutive to any sentence imposed in the District of Maryland to ensure that the defendant is held separately accountable for his various crimes.

Fourth, as will be discussed in greater detail below, there are significant mitigating factors in this case that justify a more lenient sentence than might be appropriate were these same crimes perpetrated by a different defendant. Mr. Strauss—still only twenty-seven years old—started committing this criminal activity

---

[8] It is also very clear from the defendant's objections to the PSR that victim shaming and blaming would have been a significant focal point of the defendant's defense in this case, were this case to go to trial. This undoubtedly would have exacerbated the victim's mental health issues and trauma.

just before turning twenty-six. ████████████████████████████████

████████████████████████████████████████████████████

While the defendant's crime was heinous, the Government recognizes that the defendant's culpability is somewhat diminished by these unique personal characteristics.

## II. The Court Should Impose a Sentence of 300 Months

The Government considers the factors discussed below to be most pertinent to the Court's evaluation of an appropriate sentence in this case and to justify a sentence of 300 months.

### A. Nature and Circumstances of the Offense

The defendant's behavior here was nothing short of monstruous. For nearly two months, he preyed on a vulnerable young woman to fulfill his depraved desires. It was bad enough that he threatened her, that he told her he would kill her, her family, and her cat. It was bad enough that he would threaten to terrorize her and her family by, for example, SWATting them or siccing social services on them. But to threaten Minor A into debasing herself and into carving his name into her skin was particularly cruel. And for what? For his own sexual gratification and to assert power over her. Mr. Strauss treated Minor A like she was disposable, something to be used as he saw fit and then tossed aside when he was done with her.

As Minor A and her parents recount in their victim impact statements, this ordeal has left Minor A and her entire family traumatized. And Minor A must now grapple for the rest of her life not only with the trauma of her own encounters with

Mr. Strauss, but also the guilt that she feels for letting him into her family's lives. As her parents put it: "Her cuts have all healed but she will live with the scars physically and emotionally that were created by Evan for the rest of her life."

The nature and circumstances of this offense are not only unusually serious, but unusually disturbing, and the defendant's sentence should reflect that.

## B. History and Characteristics of the Defendant

It is clear that Mr. Strauss has faced challenges in his life, although there have been bright spots. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

But these early events only tell part of the story from Mr. Strauss's upbringing. After being adopted, Mr. Strauss was raised in a good home with loving parents. PSR ¶ 66. That is not to say things were easy. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



PSR ¶¶ 67, 80, 81;

Def.'s Objs., at 15.[9]

        In the face of all of this, Mr. Strauss did still manage to graduate high school.

PSR ¶ 87. However, he has nearly no employment history and ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ PSR ¶ 88.

        While these struggles certainly do not excuse Mr. Strauss's conduct, they do

provide a partial explanation. Still, the consistent amount of violence and antisocial

behavior in which Mr. Strauss has engaged is deeply troubling. In addition to his

behavior in this case and in his case in Maryland, Mr. Strauss has a long history of

issues with anger and violence, which have manifested most acutely in his frequent

attacks on his parents. PSR ¶¶ 61, 67, 78, 80. Mr. Strauss has gotten so angry that

he has punched a hole in the wall. Detention Hr'g Tr. 79:23:80:2. His father has been

a victim of his violence on two or three occasions, and Mr. Strauss has even sent him

---

[9] The defendant has pledged to provide evidence of this ██████ with interviews and medical records, but the Government has not yet seen any of this supporting evidence.

to the hospital. *Id.* 80:5–81:14; PSR ¶ 61. Approximately two times, Mr. Strauss's mother has been a victim of his violence. Detention Hr'g Tr. 80:15–21. One time, in 2018, Mr. Strauss tried to attack his mother with a baseball bat. PSR ¶ 67.

Most recently, less than two months before he was arrested in this case, on February 12, 2024, Mr. Strauss got into a fight with his father that started over Mr. Strauss's demand that his father drive him to go buy some marijuana. Detention Hr'g Tr. 81:4–10. Mr. Strauss smashed in the passenger side mirror of his father's car and threatened to paralyze his father. *Id.* at 81:16–20. Mr. Strauss's father called the police, and while they responded to the scene, the police ultimately took no action. *Id.* at 81:23–82:4. Then, a couple of hours later, Mr. Strauss's mother called the police after Mr. Strauss hit his father multiple times in the head, tried to strangle his mother, and bit his father's arm. *Id.* at 82:5–21. After his mother tried to call 911, Mr. Strauss took her phone and threw it outside. *Id.* at 82:22–83:3. Although Mr. Strauss was subsequently arrested, these charges were ultimately dropped after he was arrested in the instant matter. PSR ¶¶ 62, 63. These dropped charges make Mr. Strauss's lack of criminal history particularly misleading. That is, his lack of criminal history is not for lack of criminal activity. It is just that most of his criminal activity prior to his involvement in Purgatory involved attacks on his parents, people who would understandably be loath to seek law enforcement's help or to file criminal charges against him.

It is true that Mr. Strauss has not had the easiest life, but this only goes so far. It in no way justifies—or really even fully explains—the immense amount of pain and

harm that he has caused to Minor A and to others. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

**C. The Need for the Sentence Imposed to Reflect the Seriousness of
the Offense, to Promote Respect for the Law, to Provide Just**

### Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct

A substantial sentence is necessary here to send a message to the defendant and others who might consider engaging in similar crimes that such behavior is unacceptable in a civilized society. The defendant's treatment of Minor A in this case was loathsome and cruel and should be condemned in the strongest terms.

Violence against women and girls has been a societal scourge for some time. Indeed, the Violence Against Women Act is now over thirty years old. But this violence has now spread into the online world, allowing violent, maladjusted men to spread their harm beyond their geographic area and to a larger potential victim pool. And online harassment and victimization is a problem that has only gotten worse. This creates an even greater need to mete out substantial punishment for this type of criminal activity and to deter others from engaging in it.

### D. The Need to Specifically Deter the Defendant and to Protect the Public

In addition to general deterrence, specific deterrence is of paramount importance here, as is protecting the public. Mr. Strauss has terrorized an untold number of girls online and offline. While a number have been discussed in this memorandum, it is impossible to tell how many others there might be. A lengthy sentence is necessary to ensure the defendant is sufficiently incapacitated such that he is unable to engage in similar activity for a long time, as well as to ensure that, once he is ultimately released from prison, he will be sufficiently deterred from engaging in similar activity ever again.

Recognizing that the defendant has some mental health issues, ████████
██████████████████████, he still has demonstrated an ability to concoct a plan and to carry it out. He engaged in a large-scale SWATting conspiracy. He thought out how he could extract kompromat from Minor A to get her to do what he wanted her to do. And he knew exactly how to seek vengeance on her once he sought to do so.

Evan Strauss has proven himself to be a violent, dangerous, and malicious person, and his sentence should reflect the grave danger that he poses to the rest of society, as well as the immense need to deter him from engaging in any remotely similar conduct again.

## III. Supervised Release

Because of the concerning nature of the conduct in this case and the defendant's pattern of violence and threatening behavior, a lifetime term of supervised release is appropriate here. As to the specific conditions of supervised release, the defendant has objected to five conditions requested by Probation. The first is Standard Condition 7, that the defendant remain employed. The Government agrees with the defendant that such a condition is not suitable in this case, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ it does not make sense to impose a work

requirement in this case.

The defendant next objects to Special Condition 2, that the defendant not incur

new credit charges or open additional lines of credit without approval. It is the

Government's understanding that Probation included this condition to ensure that

the defendant pays any monetary obligations imposed upon him upon release. As

discussed below, because of the defendant's indigency, the Government is not

recommending that the defendant incur any financial sanction, beyond the

mandatory $200 in special assessments. Assuming that the Court agrees, the

Government does not oppose the defendant's objection, seeing as this credit

monitoring condition should not be necessary to ensure the collection of a $200

judgment.

The defendant objects to Sex Offender Condition 2, which prohibits any contact

with minors, due to the possibility that he may have a child with whom he would like

to have a relationship. The Government opposes eliminating this condition wholesale

but would not object to a modification to this condition allowing the defendant to have

contact with minors who are relatives where the contact occurs only in the presence

of another adult and with the prior approval of his probation officer.

Lastly, the defendant objects to Sex Offender Conditions 9 and 10, which require the defendant to participate in plethysmograph testing and visual response testing, respectively, as a part of sex offender treatment. The defendant's partial basis for this objection is that he says there is no evidence that he maintained sexually explicit material of prepubescent girls or was sexually attracted to them. There is, however, substantial evidence that the defendant maintained sexually explicit material of minor girls (including girls as young as fourteen) and that he was sexually attracted to them. Why else would he be having sexual and romantic communications with so many young girls (e.g., Minor A, Minor B, Minor C) if he had no such attraction? Although these were not prepubescent girls, the defendant offers no reason or authority for why the requirements of sex offender treatment should be any different where a sex offender is attracted to older minors versus younger ones. The defendant is obligated by law to register as a sex offender even though his chosen victims were older minors. He should, accordingly, be subject to the same sensible requirements as other sex offenders.

While the Government understands the additional basis for the defendant's objection to these conditions, it is not prudent to micromanage the conditions of the defendant's sex offender treatment. The defendant should be required to undergo this sort of testing should his sex offender treatment program deem it appropriate.

## IV.    Restitution and Financial Penalties

No restitution has been requested in this case, including by Minor A. The defendant is required to pay a $5,000 special assessment, pursuant to 18 U.S.C.

§ 3014, unless he is found to be indigent, which this defendant is. Accordingly, the Government does not recommend that the defendant be ordered to pay any additional special assessments beyond the standard $200, nor does the Government recommend a fine.

**CONCLUSION**

For the reasons stated above, the Government respectfully requests that the Court sentence Mr. Strauss to 180 months of imprisonment on Count One and 120 months on Count Five, to be run concurrently, for a total term of imprisonment of 300 months. The Government also respectfully requests that this sentence be ordered concurrent to any sentence imposed in the District of Maryland in Case No. 1:24-CR-23. The defendant's term of imprisonment in this case should be followed by a lifetime term of supervised release.

Respectfully submitted,

C. TODD GILBERT
United States Attorney

Date: July 24, 2025                    /s/ Jason M. Scheff
                                       Assistant United States Attorney
                                       N.Y. Bar No. 5188701
                                       United States Attorney's Office
                                       255 West Main Street, Room 130
                                       Charlottesville, VA 22902
                                       (434) 244-5455
                                       Jason.Scheff@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

<u>s/Jason M. Scheff</u>
Assistant United States Attorney
