**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE No.: 7:24-CR-00018 |
| | ) | |
| EVAN STRAUSS | ) | |
|       Defendant | ) | |

### EVAN STRAUSS SENTENCING MEMORANDUM



**"*Once the internet colonizes you in a bad way, so your future too*." – Lapatha, Rey Lawrence**

In a basement in Moneta, Va, his face drenched in the pallor of the blue light from his various computer monitors, Evan Strauss could become a new person.

In the digital world, he became not Evan, but "Reaper.[1]"

Evan was in his 20s but had never lived anywhere but with his parents. Evan had to rely on his parents – he couldn't maintain a job; he couldn't navigate the complexities of daily adult life (such as withdrawing money from the bank or handling his SSI checks). Evan didn't have friends, not really; he did not understand so many social cues. Evan had to graduate with a Special Education degree; he was an outsider, a weirdo.

In Evan's mind, Evan was... a loser.

"Reaper" was a leader, "Reaper" was powerful, "Reaper" had friends all over the country. He was looked up to; he wasn't someone who was disabled or nerdy or misunderstood. He was cool and mysterious. Reaper was everything Evan was not.

And so, when Evan logged on to his computer he shed his distresses and trauma and insecurities (or so he thought), and he donned the persona of "Reaper," the leader of an online community that sowed chaos – because it was cool, because it was a game, because it wasn't real life.

## EVAN'S HISTORY AND CHARACTERISTICS

### *Growing Up*

Evan Strauss was not born to Jeremy and Jennifer Strauss. They adopted him after he bounced between foster homes as an infant. His birth mother was an alcoholic and drug user and his birth father was arrested, leaving Evan alone. He was physically neglected by both parents until Strauss's saved him.

---

[1] Reaper was one of Evan's online handles. A handle is a username but is not private and is often used on social media sites or web forums. See "Handle," TechTerms.com, https://techterms.com/definition/handle.



It became apparent early on that Evan struggled and would need to adapt in ways most people would not.

He was developmentally delayed, he struggled with learning to walk, he had severe tantrums and had uncontrollable tantrums when he was removed from his parents, even if they were only in the other room. He began mental health medications as early as the age of 2.[2]

**Sensorimotor History Questionnaire for Preschoolers**

| Subscale | |
|---|---|
| A. Self-Regulation (Activity and Attention Level) | At Risk |
| B. Sensory Processing of Touch | At Risk |
| C. Sensory Processing of Movement | Within Normal Limits |
| D. Emotional Maturity | At Risk |
| E. Motor Maturity (Motor Planning and Coordination) | At Risk |

[3]

---

[2] Throughout this memorandum, Counsel relies on a pretrial psychological examination as support and evidence of these claims. This will be attached as Ex. 1.

[3] Screenshots of documentation from Integrated Therapy Services for Children and Families, Inc. on October 28, 2000.

In summary, sensory integration observations reveal 1) under-reactivity to vestibular and proprioceptive input resulting in more intense sensory seeking behaviors with movement and oral input, 2) over-reactivity to tactile input, 3) poor self-regulation and attentional skills, 4) low muscle tone in the trunk, and 5) dyspraxia (motor planning dysfunction). Evan's sensory-motor profile make parenting difficult and it was observed that successful and satisfying interactions between Evan and is parents are limited.

<u>**Summary**</u>

Evan is an active young boy who is struggling primarily with regulating his behavior and activity level. Regulatory difficulties are noted with his inconsistent sleep patterns, behavioral outbursts, low frustration tolerance, difficulty with limit setting, aggressive behaviors, difficulty separating from parents, need for constant attention and sensory stimulation, and lack of successful interactions with parents and peers. This is felt to be related to his sensory profile (vestibualar and proprioceptive under-reactivity and tactile over-reactivity) as well as motor planning delays. He is noted to have functional skill delays in the areas of bilateral coordination, balance/postural stability and trunk muscle tone. His play skills are also affected in that he craves stimulation, has difficulty staying on task, desires a high level of control, has difficulty with ideation, does not readily engage in symbolic play or imitation and struggles with turn-taking.

While he clearly struggled growing up, Evan was not all tantrums and tears. He adored his parents and became very close with his grandparents. Growing up with two caregivers in every sense of the word (his father is a nurse, and his mother was a home healthcare aide), he grew up learning that it was important to help people. Not just people, his family often adopted stray animals and there was a revolving door of people they assisted. Growing up and even to this day, Evan loves animals.





However, his struggles did persist. Even as late as the age of 10, Evan could not go to the bathroom alone because he did not want to be separated from his parents.[4]

Things did not get better at school. Evan had emotional outbursts – he just did not know how to manage his emotions like others around him. Other children would get sad or angry or scared and maybe struggle with expressing themselves, but it was impossible for Evan. He would get so frustrated with what he was feeling he would scream or yell or cry uncontrollably. He had to have special classes, as testing revealed that Evan had a low IQ along with a slew of other mental health concerns.

Evan could not make friends, as reported by his mother[5] and he would come home from school crying. Evan told Matthew Hancock, the FPD's mitigation specialist, "Yeah sometimes I was scared, because some days it didn't stop. It felt like it didn't stop. Like the names, getting pushed, getting hit, stuff thrown at me. Bullies. It was hard to deal with."[6] Even when he did bond with other children, they were always younger than himself. This is likely given his developmental and intellectual abilities not matching up with his actual age.

Despite Evan's struggles in school and in developing social relationships with his peers, he and his parents often spent time together, went on trips, and he looked up to his father. Evan loved spending time with both of his grandparents and he developed a love of the outdoors.




---

[4] Ex. 1, pg 12.
[5] *Id* at pg 11.
[6] See Ex. 2.



Notably missing from any of the above, happy photographs are images of Evan with anyone in his age group, or anyone outside of his family.

No one can argue that Evan was without love or care growing up. He had the kind of family that many only dream about, but he was still incredibly lonely and oftentimes depressed.

Evan received a host of diagnoses throughout the past 26 years and as a child went through a laundry list of medications: Depakote, Adderall, Concerta, Strattera, Dexedrine, Ritalin, Seroquel, Focalin XR, melatonin, trazadone, mirtazapine, and Risperdal. Beyond just his underlying diagnoses, going off and on these various medications and figuring out what worked and what did not could not have been easy. If Evan were not already experiencing anxiety and depression from his underlying diagnoses, the mere side effects of so many varying medication regimes did not help the situation.

In addition, Evan struggled with fully understanding the world around him, at least to the same level as his peers. In 2015 he was tested and received an IQ score of 75, considered "very low range." Currently, based on testing of a defense-hired psychologist, Evan scores a Full-Scale IQ of 73, with his highest two scores in verbal comprehension (with a score of 81 in the 10th percentile) and in visual-spatial (with a score of 83 in the 13th percentile).[7]

With such intellectual disabilities, hand in hand with autism, depression, and anxiety, Evan occasionally lashed out at his parents. He had no desire to either hurt them physically or emotionally, but he did not know how to express himself, how to tell them that something was wrong.

Because of this, in 2018, Evan was admitted into the Poplar Springs Hospital when he was 17 for inpatient evaluation and stabilization. He was admitted into an adult unit.

**HISTORY AND ONSET OF PRESENT ILLNESS**: This is a 17-year-old Caucasian male living with his parents in Nathalie, Virginia, in 12th grade, diagnosed with bipolar disorder with previous hospital admissions in North Carolina in UMC at age 6, and Morris Behavioral Health Center at age 17.

**COURSE OF HOSPITALIZATION:** Evan was admitted to adult unit at Poplar Springs Hospital. This is a structured therapeutic program that caters to the individual's emotional and physical well-being. Evan was given the opportunity to participate in several modalities of therapy including family and group. After initial evaluation, the patient was placed on close observation. Admission labs were obtained. The patient was started on risperidone. Risperidone was increased 0.5 mg twice a day. The patient remained on clonidine and trazodone 200 mg at bedtime. The patient remained compliant with medication. He participated in groups and activities. His mood symptoms improved. Towards the later part of stay in the hospital, the patient was calm, cooperative, and was able to contract for safety.[8]

---

[7] Ex 1 at pg 15.
[8] An excerpt from medical records from Poplar Springs.

It was either during this or during his stay at Morris Behavioral Health Center that Evan was sexually assaulted (he does not remember the name of the facility).[9] While this act of violence against him still effects Evan to this day he luckily does not have an official diagnosis of PTSD based on this act.[10]



Ultimately, Evan was able to graduate High School with a special education degree, in spite of all the struggles he faced in school.

Unfortunately, after graduation, Evan's life stalled. He attempted to work at Wendy's, but that didn't work out. He still lived with his parents as an adult, but was very much still a child.

Evan and his father would play video games together, but as Mr. Hancock points out in his statement, soon Evan got deeper and deeper into the world of online gaming and from there, something darker.

### *Adult Life*

Adult life was not very different for Evan than when he was growing up. He no longer went to school, but otherwise he still lived with his parents and relied on them. He could not manage a job, he still struggled with managing his emotions, and he didn't have any real friends. He lived in the basement. Even when the FBI comes to his house, for this case, just prior to his interrogation inside an FBI car, he can be seen asking his mom if he can get his vape to smoke. His age was 26, but he was not acting like a 26-year-old.

In the online world, Evan found friends. He still struggled with autism, anxiety, depression, and his intellectual disability; but he was safe behind a computer screen.

At the time, and throughout his history, as his mother told Dr. Dickson, Evan struggled with cutting, "Jennifer recalled that if the cutting got a little deep Mr. Strauss would come up and ask for hydrogen peroxide, so she never knew whether to believe him or not when he said he was not afraid to die."[11]

---

[9] See Ex 1 at pg 3 and pg 4.
[10] Id at pg 19.
[11] Ex 1 at pg 10.

While Evan was inadvertently indoctrinating himself, falling deeper and deeper into the recesses of the internet, he was also making friends. Meeting people online was much easier than meeting people in the real world. The anxiety of talking to someone, of introducing himself to a group, was gone. There was safety in a world that was not "real."

Evan met girls that he tried to save and woo and he met men that supposedly taught him what being a "real man" meant.

He got in over his head. He thought he knew what he was doing. He shed the Evan and created "Reaper." "Reaper" became the "leader" of Purgatory. His actions as "Reaper" are discussed in more detail below.

During this time, his mother noticed changes to Evan. He stopped eating, lost weight, but still claimed to be fat.[12] He wasn't himself. He became more withdrawn.

For all of the nonsense of "Reaper's" bravado, his actions online were clearly affecting Evan. And still, Evan wanted to be normal.

He is now engaged to Faith; someone he was in an "on-and-off again" relationship since he was about 20. But his mother isn't so sure Evan knows what having a fiancé really means. He was only ever in one relationship prior to Faith and as his mother said, "I don't know that he knew really what having a girlfriend was. He doesn't drive and to him it was having that person there. He knew at his age he should have a girlfriend but he didn't really understand the meaning of what having a girlfriend was."[13] Evan was just trying desperately to do what normal people do, including having a relationship. But as an adult without a driver's license, a job, and living with his parents, he was unable to carry on a normal, intimate relationship.

So just as Evan was trying to learn to be "normal," and was trying to learn what being in a relationship was; and just as he was getting more and more involved as "Reaper," in a toxic online community that taught him that to be cool was to be cruel; he met M.P.

### WHO IS M.P. – OR THE NEED FOR RESTITUTION

Across the country, bathed in the glow of a computer screen, was M.P., the victim in this case.

Evan is not the only person to consider in this case. There is a victim, Evan's victim. It is important to weigh the credibility of a victim and determine the effect of the crime on that person for both determination of enhancements (discussed later) and in making an

---

[12] Id.
[13] Id at pg 11.

individualized assessment of this case. Counsel discusses the victim here, not in an effort to embarrass or castigate, but to show honest concerns with the validity of her statements and government's likely arguments.

Like a twisted mirror, like Evan, M.P. was a lonely young woman. She struggled to make meaningful friendships IRL and was the target of bullying, so much so that she left high school to be homeschooled. Like Evan, she was addicted to the internet and engaged in risky, inappropriate behavior online. She found community with a group of dark, lonely, young (mostly) men. The members harassed and bullied and tracked each other through the internet.

At 17-years-old, and a self-proclaimed internet addict herself,[14] she was no stranger to the wonders and horrors of life online. Before ever meeting Evan online, M.P had gone to therapy, presumably to address her habitual cutting and the bullying she received at traditional high school. Additionally, before meeting Evan online, she had sent nude content to other men when she was 14 or 15 years-old until her mother found out and rightfully, made her stop. M.P. had gotten in trouble with social media prior to Evan Strauss entering the picture. As her mother and M.P. told law enforcement the day they came to perform a welfare check on her, "they had to have a talk a while ago about sending strangers nude photos". Although Evan was toxic for M.P.; she had gone through something similar when she was younger and went to therapy prior.

Despite the talk with her mother earlier, M.P. did not stop. She did not stop going on social media and did not stop her behavior.

It is true that in becoming a part of the online community, Purgatory, and interacting with the members, M.P.  was in over her head. It is also true, as indicated in his agreed statement of facts, Evan did not help the situation by bullying, pressuring, and threatening M.P.  Unfortunately, that was the name of the game in this specific online ecosystem.

M.P. met Evan online and they started a virtual dating relationship. Evan and M.P. never met "IRL," internet slang for "in real life". As discussed above, Evan has issues with emotional regulation, and when interacting with M.P. he was playing the role of "Reaper," a darker, mysterious, twisted online persona. During his rages he would occasionally threaten M.P. He threatened to send a SWAT team to her home or at one point, after they "broke up," to her boyfriend's home.

---

[14] See Ex 3.

But they also spoke about their lives, insecurities, and engaged in this dark online behavior together. It was not always toxic: they spoke when M.P. was sick, Evan cried to M.P. about his life, they played video games, they shared online friends in common.

As seen in the government's report of its first interview with M.P., Evan often spoke to her about his mental health. In fact, it was usually Evan crying to M.P. about all of his struggles.

> ███████ did not know what REAPER knew about her as a person. She believed REAPER knew about her cutting history. ███████ occasionally talked about her mental health or issues with REAPER; however, most of the time it was REAPER talking about his mental health. ███████ stated that REAPER would cry to her and she would just sit there and let him cry. Towards the end, she did not care anymore. [15]

Evan, as Reaper, was often vulnerable and submissive in interactions with M.P.

As M.P. indicates above, she did not begin cutting because of Evan. This was, unfortunately, an activity that both Evan and M.P. struggled with. Of course, Evan ultimately coerced M.P. into cutting his handle, "Reaper," into her thigh, which he used to report her to CPS. While this was undoubtedly traumatic for M.P. – it is false to say that she only cut herself because of Evan or once she met him. In their impact statements both M.P. and her mother indicate that there is untreatable lifelong trauma because of Evan. M.P. claims she cannot look at her legs without thinking about "Reaper," and her mother indicates that discovering M.P.'s cuts – implying that action began with and because of Evan – was when things began to unravel. However, M.P. cut herself prior to meeting Evan and cut herself at the time for reasons wholly unrelated[16].

Indeed, although Evan reported M.P. to CPS not out of benevolence but out of the revenge-type game members of their shared niche online community typically engaged in; this report is ironically what brought the issue to the attention of law enforcement and M.P. may have never reengaged with therapy had a report to CPS never been made.[17]

Law enforcement came to check on M.P., based on Evan's CPS report, on December 22, 2023. However, despite claiming that she stopped speaking to Evan and indeed had

---

[15] This is an excerpt of M.P.'s interview, provided to Defense as part of discovery.

[16] As discussed later, M.P. engaged in the doxxing of Evan, either posting or allowing pictures of herself to be posted on a public-facing website. Of those photos, which were posted as evidence of Evan's crimes, notably missing are photos of M.P.'s legs with numerous and significant cuts. That is likely because it was not Evan who encouraged or asked M.P. to make those cuts.

[17] As can be heard in Ex 3, M.P. was engaged in therapy prior to Evan entering the picture. However, M.P. and her mother did not like therapy and stopped. As of December 22, 2023, while M.P. was still actively involved with Evan, she was not attending nor wanting to attend therapy until law enforcement encouraged it.

removed herself from the group completely, this was not true. Law enforcement also made it clear the support they could provide should any more threats or concerning behavior occur and warned M.P. against engaging not only in self-harm but also risky internet behaviors. This was not to shame or blame M.P., but to ensure she was protected.

M.P. continued to engage with Evan and other members of this toxic online community.

Later, in May 2024, during M.P.'s child forensic interview (CAFI), M.P. again was not completely open about her involvement with Evan. She claimed that anything sexual occurring between them stopped in November, prior to when the police showed up at her door.

██████ was dead.  Everything sexual that occurred between ██████ and REAPER occurred before they broke up on or around November 18, 2023 when REAPER

This is not true. The Instagram live chat, which is the basis for the child pornography charge, occurred on January 2, 2024. This after M.P. knew "Reaper" was on law enforcement's radar and that she could call the police if he threatened her. Evan and counsel recognize that M.P. has stated she engaged in this behavior because of Evan's threats against her and that she was worried if she said no then her family would be the victim of a "SWAT." He also recognizes that given his earlier behavior toward M.P. and her knowledge of his activities with Purgatory, that was likely a fear she had.

We should not, however, completely rob M.P. of her agency as a young woman.

M.P. was very knowledgeable of social media and the community she was in. She was also aware that if she was scared that Evan would do something she could call the very same officers who had visited her several days prior. M.P. could not legally send photos or videos of a sexual nature of herself – she was only 17 years old. However, she was 17 years old. 17-year-old girls are able to and often are exploring their sexuality; the same is likely true of M.P.

There is a qualitative difference between prepubescent and even post-pubescent young teenage girls and older teenagers. At 17, rather than 14 or 15, a female's developmental milestones include completion of puberty, developing more intimate relationships and has more interest in romantic relationships.[18]

---

[18] Developmental Milestones for Teens, Coral Care, https://www.joincoralcare.com/developmental-guides/milestones-teens-13-18-years; see also Teenage Sexual Development and Sexual Behavior: 15-17 Years, Raising Children Network, https://raisingchildren.net.au/teens/development/puberty-sexual-development/teenage-sexual-behaviour-15-17-years.

M.P. had a shaved pubic area; she began sending photos when she was even younger to different strangers online, which obviously does not excuse Evan nor make his recording of this video okay, but it does show the level of comfort M.P. had with this kind of behavior. It also shows that M.P. was not fully honest with the interviewer during her CAFI.

```
    During their chats, REAPER wanted ████████ to touch herself. ████████ blank
it out because she is not a sexual person; however, she remembered one time
when REAPER wanted her to touch herself and to use a brush. ████████ stated
that REAPER always wanted to see her thighs, especially after she cut.  If
```

The video itself contradicts M.P.'s claim.

Prior to engaging in masturbation on the video chat with Evan, he and M.P. engage in texting (through the Instagram app) back and forth.

Evan clearly solicits and asks for the engagement. At no point does Evan nor Counsel deny such, and at no point is Evan claiming that soliciting such activity from a minor is acceptable.

M.P.'s response, however, is not that of someone who is not a sexual person or of someone who is dreading the interaction.



This conversation also shows the complexity of the power dynamic involved. This is nuanced beyond what the indictment or stipulated statement of facts show.

Evan as the "leader" of Purgatory bullied, coerced, doxxed, and SWATed M.P. He was also an adult, albeit an adult with stunted intellectual and emotional development. M.P. was 17 years old.

But M.P. also knew Evan struggled with mental health issues, at the time of this conversation her family and the police knew that she had been cutting and talking to someone online and she knew she could lean on them for support. She was being asked to get on a chat with Evan, and called him her "puppy," while he called her "mommy." This shows the opposite of what someone would expect – she had agency, control, and was using terminology that would indicate she was more in control in this moment.

M.P. was dominant and Evan was submissive.

This dynamic continued after M.P. engaged in masturbation on video with Evan. Counsel has only included a screenshot, but the video shows M.P. vaping, blowing smoke into the camera seductively and smiling afterwards. Again, this is indicative of a young woman exploring her sexuality. She was in a toxic, inappropriate, and illegal online relationship with Evan, but it was also something she actively engaged in. These interactions are important to truly understand their dynamic, but they also show that M.P.'s claims in her impact statement are exaggerated or have grown with hindsight. They also completely belie the government's request for an enhancement on sadomasochism based on the masturbation video, as it was clearly not "inherently embarrassing" nor painful for M.P.



Similar to Evan, behind the computer screen, M.P. could be a different person. She was no longer the girl who got bullied and moved from traditional high school to being homeschooled. A fact which negates the level of claims within the two victim impact statements – M.P. started struggling with many of the issues her mother discusses far before she met Evan.

M.P. could be older, cooler, and part of a group. Although many of the messages are gone, it's clear that she was at the very least assisting in gathering information on people for the community even weeks after the video chat with Evan.



A screenshot from Evan's phone, provided by the government and attached here as Exhibit 4, shows M.P. sending Evan screenshots of information on various people, to include what appears to be a Facebook post showing someone at their employment. She then texts Evan, "this is the real Trojan."

Earlier, on January 1, 2024, M.P. texts Evan a document, states "Here ya go," "Dealt with," and "Made it more believable…" While it is unclear exactly to what she is referring, it is likely the very type of activity that Evan committed against M.P.: collecting information about a person and then either Doxxing them, reporting their activities to authorities, or SWATting.

Then, to get back at Evan for what he did to her, M.P. turned her skills to doing the same to him.[19]

## OPERATION MEMBERS

*This operation was a long time in the making, we didnt have to many hands on deck with this one however the team consisted of myself, Sysk3y (founder of WHT). Tuyal (ex Purg). and ███ (Evans victim). all info and doxxing done by Tuyal and ███ and made by me <3*

M.P. worked with "Sysk3y" and "Tuyal" to target not just Evan but also members of his family. Using the skills she had once employed while part of the Purgatory group, M.P.

---

[19] Upon defense notifying government of this website, government took screenshots of the site. They have redacted M.P.'s name, but the public website shows her name where the redactions are located.

did all the information gathering and doxxing. This again directly contradicts what she told law enforcement in her CAFI in March 2024.

> manipulative and was using CALEB to get back at him. ▆▆▆ did not spread any information about REAPER to others. ▆▆▆ found out that REAPER was 26 years old but she did not spread that out. SYSKEY found out more information about REAPER and told others. ▆▆▆ stepped away.

Not only did M.P. gather and allow to be published all of Evan's information online; she went after his family.









Perhaps it is understandable and forgivable that M.P., a teenager who was harassed by "Reaper," Evan's online persona, would do the same to Evan. As someone from the USAO said about Evan and this website, "When you sleep with dogs, you get fleas." But the same cannot be said about Jeremy Strauss, Judy Strauss, or the other family members and their personal information gathered and shared by M.P.

At the very least these actions show that M.P. is not as vulnerable as the government may paint her nor is she as destroyed by the actions as she paints in her statements. She is not a shrinking violet; she is a strong, intelligent, independent young woman despite her struggles, and she knows how to defend herself and even go on the offensive.

Unfortunately, in attacking Evan and his family, M.P. also either shared or allowed her information to be shared on this website. This undermines her credibility and claims in her impact statement. Evan threatened to share her information to try and get her to break

up with Caleb or to blackmail her in various ways. This is criminal. But M.P. turned around and let the very information she was scared would be shared to be published on "The Official Dox of Reaper."



        She claims that she cannot look at her thighs without disgust but then posts pictures of this alleged traumatic and horrible experience for everyone to see.



In this section, which is apparently meant to be evidence of Evan's crime, she includes a photo of her thigh with the words in sharpie "CurseX owns me," written on her thigh, even though she has stated this was not done because of Evan.

Picture #4- ███████ confirmed that it was a picture of her thighs. "CURSEX" was CALEB's username. ███████ wrote on her thigh willingly during their relationship. This occurred during a private atory with just ███████ CALEB, and two of her local friends. ███████ suspected that CALEB gave this screenshot to REAPER.

both CALEB and herself from being swatted. ███████ wrote "CurseX owns me" on her thigh after the REAPER cut.

And yet, she wants the internet to see this photo, to expand upon the actual crimes Evan committed. Of course, her statements during her CAFI show that even after cutting "Reaper's" name in her thigh, she was comfortable enough to write that her boyfriend owned her on her thigh.

Nuance is necessary in this case. M.P. was a victim, but she was also far more involved with the community and her interactions with Evan were more purposeful than she let on. She certainly engaged in doxxing and information gathering – with Evan and against him. She feared Evan given his volatility and her knowledge of his online activities, but she also undersold her interest in sexual activities with him and oversold the trauma that is directly related to him.

Ultimately, M.P. is a victim and victims, like everyone, are allowed to be flawed. But her credibility is undermined by her direct contradictions and this must be considered, particularly when government will undoubtedly point to the effect on M.P. as evidence of the severity of the crime and why Evan should get a significant amount of time in jail.

## THE NATURE AND THE CIRCUMSTANCES OF THE OFFENSE AND UNWARRANTED SENTENCE DISPARITIES

This leads to the circumstances of the crime. Government will likely paint Evan as a heartless monster, bent on destroying M.P.'s life. But that is not the case before the Court.

There are cases that involve older men targeting, grooming, and harming young girls. Evan did not do that. This ultimately involved a man who got involved in an online community that's focus was to harm other members of that community. It is strange and dark, but it is something the members did to each other, as discussed above.

It is likely the government will try to discuss that Evan, in 2022, with his father, picked up a 16-year-old girl in North Carolina (and at some point allegedly another girl in South Carolina) and brought her back to their home, as evidence of Evan's criminality or

interest in young girls. First, this is clearly not relevant conduct. However, these incidents are indicative of someone with Evan's unique concerns: he is not at the same level intellectually or emotionally as someone of his biological age, and he gets along with younger people. He has trouble fully grasping the ramifications of decisions. His father, unfortunately, cosigned the behavior. Additionally, Evan thought he was helping these girls (none have alleged any inappropriate physical behavior against Evan) – similar to a High Schooler helping a friend runaway from a troubled family life might think they were helping that friend. Indeed, as mentioned earlier, Evan constantly saw his family bringing in strays – animals and people and giving them a place to stay. These are not the nefarious actions government will certainly paint them as, they are the actions of a young man handicapped by various mental issues, thinking he was playing the savior, no matter how misguided such actions were.

It is not fair to say Evan did not know what he was doing with M.P. because he did. However, it is abundantly clear through his diagnoses, his behavior online, and for anyone who sits and speaks with Evan, that the level of harm he was causing and the full consequences of the actions taken online were not fully understood.

As Dr. Dickson states in her report:

3. In addition to the challenges associated with Mr. Strauss's Moderate Intellectual Developmental Disorder, he also has difficulties related to his symptoms of ASD. In adulthood individuals with this diagnosis often exhibit poor psychosocial functioning as evidence by problems in independent living and gainful employment.
4. Given what we know about individuals with Moderate Intellectual Developmental Disorder and ASD, it is likely that Mr. Strauss's ability to understand and effectively navigate the world of online relationships is significantly impaired when compared to same age peers. He has struggles throughout his life to establish close relationships with others even in in-person interactions and encounters. Mr. Strauss's limited conceptual abilities are also likely to significantly negatively impact his ability to identify and reason logically about the consequences of his behaviors and choices. Based on the totality of the data obtained about Mr. Strauss, it appears he is an individual who has and does deeply desire friendships and connections with others, but he does not have the requisite skills to develop such relationships. He ais also an individual who, per his mother's report, has always been able to relate better to individuals younger than himself, which is likely a function of his limited social and communication abilities. This also likely played a role in his choice to talk to an underage individual online; particularly given the

abstractness of communicating with and forming a relationship with someone who is not physically present in his life.[20]

Evan's behavior, particularly involving blackmailing, DOXxing, and SWATting, is odious and unacceptable. However, it is important to note that he is facing another, separate sentencing in the District of Maryland for similar behavior, and he will serve jail time for such. Thus, we must look to his actions in this case and specifically against M.P.

Evan's actions undoubtedly affected M.P. and there were times, although certainly not always, during their short, online relationship, that Evan meant to cause M.P. distress, as that is what he learned was part and parcel of online relationships.

Evan is not similarly situated as a 40-year-old man looking at photos of a prepubescent girl or teenager. Nor is he even similarly situated to someone who is the same age as him committing the exact same crime in exactly the same manner. He committed an odious crime, but the severity of his actions should be mitigated by the disabilities he suffers and recognition that this behavior is likely symptomatic of his diagnoses and attempts to fit in.

Further, although it is not a popular subject to discuss, there are differences in the type of child pornography one may see. There is a reason that prepubescent individuals or children under the age of 12 receive certain enhancements or that the quantity of images found can increase the severity of the offense. Even when enhancements do not account for differences in sentencing, there are gradations in seriousness. Evan has one pornographic video, which was created during a toxic and threatening relationship, but the video itself appears (but for the victim's age) consensual. Even the explicit photograph, on M.P.'s public mound, does not actually show her genitalia. Evan reported this to the authorities. Again, he did not do this out of benevolence – but certainly reporting it, for whatever the motivation may be – is better than those that keep the videos and photos secret for their own sexual gratification later or for those who use it to share/sell to others for their gratification.

Below is a chart of various Fourth Circuit cases and those in different districts of various sexual exploitation or child pornography cases and the sentences they received. What they show is that those who receive a sentence in what probation is currently calculating as Evan's guideline range committed far worse behavior than Evan did.

In *Crews*, the case where the defendant received the lowest sentence of them all, 100 months, two adult men picked up a 14-year-old had sex with him and videotaped it.

---

[20] Ex 1 at pg 21.

*United States v. Crews,* 28 F. App'x 247, 249 (4th Cir. 2002), *as modified* (June 8, 2010). The others have even more disturbing attendant facts.

| Fourth Circuit: | Sentence |
|---|---|
| ***United States v. Johnson,*** **680 F.Appx.194 (4th Cir. 2017)**<br>• Defendant had sexual contact, including sexual intercourse and oral sex, with his prepubescent daughter from age 4 to 7.5 years<br>• Produced 260 images and 102 videos of the victim engaged in sexually explicit conduct | **360 months** |
| ***United States v. James Arbaugh***, **951 F.3d 167 (4th Cir. 2020)**<br>• Defendant charged with violation of 18 USC § 2423(c) based on molesting over 20 children in Haiti where he was missionary | **276 months;** Lifetime supervised release |
| ***United States v. Blank,*** **659 F.App'x 727 (4th Cir. 2016)**<br>• Two counts of production and one count of possession of child pornography<br>• Defendant repeatedly had sex with 15-year-old stepdaughter | **360 months;** Lifetime supervised release |
| ***United States v. Silva,*** **643 F.App'x 306 (4th Cir. 2016)**<br>• Coercing a minor to produce child pornography | **262 months;** Lifetime supervised release |
| ***United States v. Rodriguez,*** **589 F.App'x 148, 149 (4th Cir. 2015)**<br>• Four counts of production | **180 months;** 5 years of supervised release |
| ***United States v. Malloy,*** **568 F.3d 166, 170-71 (4th Cir. 2009)**<br>• Rejecting mistake of age defense and other challenges and affirming mandatory minimum sentence of 180 months for defendant who produced child pornography of himself having sex with fourteen-year-old and another adult | **180 months;** 5 years of supervised release |
| ***United States v. Crews,*** **28 F. App'x 247, 249 (4th Cir. 2002),** *as modified* **(June 8, 2010)**<br>• Rejecting challenge to sufficiency of the evidence and affirming 100 month sentence for production and aiding and abetting production when two adult men picked up 14-year-old, took him to their house, had sex with him and videotaped it | **100 months;** 3 years of supervised release |
| ***United States v. Buculei,*** **262 F.3d 322,327 (4th Cir. 2001)**<br>• Affirming 240-month sentence for one count of production of child pornography, three counts of traveling interstate to engage in a sex act with a minor, and one count of obtaining custody of a minor with intent to produce child pornography | **240 months;** 5 years of supervised release |

| Other cases nationally: | Sentence |
|---|---|
| **United States v. John Holcomb**, No. 21-cr-75 (W.D. Wash.)<br>• Filmed his sexual abuse of 6-year-old girl left in his care<br>• Court called the case one of the most reprehensible it had ever seen, and the Guidelines recommended life in prison. *See* ECF No. 93 at *7.<br>• Mr. Holcomb created videos that showed him penetrating the girl with his erect penis. ECF No. 1 at *5-6. | **240 months;** Lifetime supervised release |
| **United States v. Selina Wynne Duflo**, No. 21-cr-153 (D. Or.)<br>• Sexually abused her own 6-year-old child "over the course of more than a year" and sent videos to her romantic partner in California<br>• Also filmed and sexually abused 2-year-old<br>• Government agreed to recommend 240 months, even though guideline range was 360 months to life, *see* ECF No. 41 at *3<br>• Attempted to render her six-year-old child unconscious using over-the-counter drugs before having her romantic partner, Daniel Seibert, engage in sex acts with the child | **240 months;** 12 years supervised release |
| **United States v. Daniel Seibert**, 8:20-cr-32 (C.D. Cal.)<br>• Related to *United States v. Duflo* case above<br>• Guilty not only of sexually abusing Ms. Duflo's drugged six-year-old child but of (1) sexually abusing a 14-year-old girl *multiple* times; (2) inducing two *other* minors to send him explicit material online; and (3) possessing hundreds of images and at least 8 videos of child pornography | **292 months;** Lifetime supervised release |
| **United States v. Kaleb Scott**, 22-cr-5256 (W.D. Wa.)<br>• Produced and distributed pornography of him penetrating the buttocks of an infant, who was in his care, with his penis<br>• Government and defense jointly recommended sentence of 20 years, notwithstanding that advisory Guidelines range was *life* and that the defendant had a *prior juvenile record involving sexual misconduct* | **252 months;** Lifetime supervised release |
| **United States v. David Gfeller**, 19-cr-6205 (W.D. N.Y.)<br>• Defendant produced a series of pornographic images of his 4- to 7-year-old child, a series that was distributed far and wide overseas, including in Belgium, Germany, Italy, Portugal, and France<br>• Admitted manipulating his child's penis on "multiple occasions" "so that victim would become erect in order...to produce the child pornography." *See* ECF No. 1 at *8-9<br>• Defendant further admitted to masturbating to child pornography he received in exchange for the images of his son. *Id.* at *8. | **15 years;** 15 years of supervised release |

| Other cases nationally: | Sentence |
|---|---|
| ***United States v. Martin Perea,* 15-cr-3052 (D. N.M.)**<br>• Defendant produced 18 videos of ex-girlfriend's 7-year-old daughter, including videos of him penetrating her vagina with fingers and various inanimate objects<br>• When the victim's mother confronted him, he threatened to burn her house down<br>• Government and Perea agreed to sentence between 17-25 years | **300 months;** 25 years of supervised release |
| ***United States v. Andrew Nicholas,* No. 20-cr-949 (D. N.J.)**<br>• Producing and distributing images of child sexual abuse of infant/toddler in his custody<br>• Advisory guideline range of Life | **300 months;** Lifetime supervised release |
| ***United States v. Harvey Stewart,* No. 20-cr-15 (M.D. Ga.)**<br>• Defendant posted images and videos of him digitally penetrating and rubbing the genitals of his young daughter<br>• Defendant further bragged about how he had groomed his daughter to be molested<br>• Government agreed not to argue for more than 25 years in prison | **276 months;** 15 years of supervised release |
| ***United States v. Dylan Seader,* No. 2:22-cr-69 (E.D. Va.)**<br>• Defendant initially arrested for attempting to have sex with undercover agent posing as a 14-year-old girl. ECF No. 31 at *2.<br>• Defendant admitted to chatting with *other* younger girls and to having child pornography on his phone. *Id.*<br>• After searching the phone, police found not only two known series of child pornography, but several videos of the defendant performing sex acts on an *18-month-old child* he was apparently related to. *Id.* | **240 months;** Lifetime supervised release |
| ***United States v. Jessica Barrington,* No. 19-cr-127 (E.D. Wa.)**<br>• Defendant produced pornography of her own sexual abuse of her daughter and sent images of that content to at least ten men she met online.<br>• Defendant offered to a man that he could rape her toddler daughter<br>• Government agreed 20-year prison sentence was reasonable, even with a final offense level of 48 | **240 months;** Lifetime supervised release |

| Other cases nationally: | Sentence |
|---|---|
| ***United States v. Katrina Adams,*** No. 18-cr-31 (E.D. Wa.)<br>• Rule 11(c)(1)(C): Government and defense agreed to jointly recommend 25 years in prison even though offense level after acceptance of responsibility was 51<br>• Conduct included (1) filming her two-year-old daughter masturbating the defendant's boyfriend as the defendant called out instructions; (2) photographing herself masturbating and digitally penetrating the two-year-old's vagina; (3) graphically (and gleefully) offering, over the course of several *weeks* to have the boyfriend rape the two-year-old daughter; and (4) discussing sucking the boyfriend's young son's penis | **264 months;** Lifetime supervised release |
| ***United States v. Alexander Capasso,*** No. 16-cr-318 (D. N.J.)<br>• Rule 11(c)(1)(C) plea recommending a sentence of 15-20 years<br>• Took images/videos of himself molesting a young child over the course of *several months,* and *distributed* those images/videos<br>• Defendant conspired with his girlfriend, Janine Kelley, to engage in the sexual exploitation of children<br>• Janine Kelly was also sentenced to 12 years in prison for her role in engaging in sexually explicit conduct with two children | **240 months;** Lifetime supervised release |
| ***United States v. Andrew Smith,*** No. 20-cr-108 (D. Id.)<br>• Filmed and sexually abused a girl for *three years* from the age of 7 to the age of 10<br>• Defendant, who was the boyfriend of the victim's mother, would *slap* the girl if she resisted participating in the pornography; he gave her marijuana to reduce her inhibitions, he handcuffed her to the bed and forced her to give him oral sex; her taught her how to masturbate using dildos; and he forced her to receive anal sex on her *9th birthday*. *See generally* ECF No. 23 at *3-6.<br>• Defendant had Life guidelines | **25 years;** 10 years supervised release |

Looking at the above cases, Evan's behavior pales in comparison. This is not to say his crimes are not serious nor that his behavior is anyway okay. To be clear, it is not. But a developmentally slow, autistic 20-something who has more in common with the teenagers online than with any of his peers, who bullies a 17-year-old, who (despite her denials) was actively part of an organization whose whole purpose is to bully, who then while in a relationship with that person, has her masturbate on a video chat, and gets her to cut his name in her thigh (not for sexual purposes) is inherently different than any of the above.

He should not be facing the same or more time than Mr. Smith who sexually abused a girl from the age of 7 to 10, or of Ms. Adam's who physically, digitally penetrated her two-

year-old daughter, or of Mr. Gfeller, who manipulated his son's penis from the age of four to seven and then sent the pornographic images across the world.

Evan is simply not in the same category, and he should not receive a similar punishment.

## OBJECTIONS AND ISSUES WITH THE REQUESTED ENHANCEMENTS

Defense objects to the requested sentencing enhancements, as some should not be applicable to the case and others are objected to on policy grounds.

The advisory Guideline Range is only one factor a sentencing court must consider. While a Guideline sentence is considered presumptively reasonable on appeal, there is no such presumption at the district court level. A sentence within the Guideline Range is not presumed to be reasonable; rather, the Court makes an individualized assessment based on the facts of each case. *Gall v. United States*, 552 U.S. 38, 50 (2007). When a Guideline is not the product of empirical data and national experience, it is not an abuse of discretion to conclude that it yields a sentence greater than necessary to achieve § 3553(a)'s purposes. *United States v. Kimbrough*, 552 U.S. 85, 110 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Because the Sentencing Guidelines are no longer mandatory, the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *See Booker,* 543 U.S. at 260–61; *Gall,* 552 U.S. at 59; *Kimbrough,* 552 U.S. at 101; *Rita v. United States,* 551 U.S. 338, 349–50 (2007). District courts must "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough,* 552 U.S. at 101 (quoting *Booker,* 543 U.S. at 245–246). As the Sixth Circuit has recognized, "*all* of the sentencing guidelines are advisory," including those directed by Congress. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id*. at 328.

Although in this case, the guidelines used involve USSG § 2G2.1, USSG § 2G2.2 is a cross-reference, includes many of the same enhancements, and thus the case law or materials cited discussing the issues and concerns with enhancements under USSG § 2G2.2 are as relevant and applicable to this case as they would be for one where the guidelines are calculated pursuant to USSG § 2G2.2.

In *United States v. Shipley*, 560 F. Supp.2d 739 (S.D. Iowa 2008), an Eighth Circuit district court rationalized that § 2G2.2 is not based on empirical evidence.

As Chief Judge Bataillon noted in *United States v. Baird*, No. 8:07CR204, 2008 WL 151258, at *7 (D. Neb. Jan. 11, 2008), the guidelines for child exploitation offenses were not developed using an empirical approach by the Sentencing Commission, but rather were mainly promulgated in response to statutory directives. Specifically, the Protect Act directly amended guideline 2G2.2 by amending the guideline enhancements for specific offense characteristics. These modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses.

*Shipley*, 560 F. Supp. 2d at 744.

The *Shipley* court continued:

The statute here provides a broad range of punishment for this crime, and if Congress does not want the courts to try and sentence individual defendants throughout that range based on the facts and circumstances of each case, then Congress should amend the statute, rather than manipulate an advisory guideline and blunt the effectiveness and reliability of the work of the Sentencing Commission.

I*d*.

The defendant in *Shipley*, who was charged with receipt of child pornography, faced an advisory range of 210 to 240 months, but received a 90-month sentence.

At least one court is raising a question about the empirical basis for the Guidelines established for sex offenses against minors under § 2G2.1:

Some of [the flaws present in 2G2.2] are also present in U.S.S.G. § 2G2.1, which also recommends enhancements for conduct present in nearly every case to which the guideline would apply: a two–or four-level enhancement in § 2G2.1(b)(1) based on the age of the minor involved; a two-level enhancement in § 2G2.1(b)(3) if the offense involved distribution; a four-level enhancement in § 2G2.1(b)(4) if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, not applicable here only because of the inadequacy of proof that the male penis shown in one image with an underage female, which was distributed to the minor, could not be conclusively shown to be the penis of an adult male; and the two-level increase in § 2G2.1(b)(6)(B) for use of a computer or an interactive computer service to entice the minor. Thus, contrary to the prosecution's contentions, U.S.S.G. § 2G2.1 has some of the same flaws that I found warranted categorical rejection of U.S.S.G. § 2G2.2.

*United States v. Jacob*, 631 F. Supp. 2d 1099, 1114–15 (N.D. Iowa 2009).

In the U.S. Sentencing Commission's 2022 Fiscal Year Report, it found that: 58.4 percent of all child pornography offenders received a variance, 55.6 percent received a

downward variance, and their average sentence reduction was 40.2 percent.[21] This is reflective that the guidelines do not adequately reflect culpability or the nature of the crime.

As the Second Circuit has stated, "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 -- ones that can range from non-custodial sentences to the statutory maximum -- bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." United States v Dorvee, 604 F.3d 84, 98 (2nd Cir. 2010). Courts around the country have recognized that the guideline is seriously flawed and entitled to little respect. See, e.g., *United States v. Tews,* No. 09-CR-309, 2010 U.S. Dist. LEXIS 48182, 2010 WL 1608951, at *3 (E.D. Wis. Apr. 20, 2010) (citing *United States v. Howard,* No. 8:08CR387, 2010 U.S. Dist. LEXIS 17740, 2010 WL 749782 (D. Neb. Mar. 1, 2010); *United States v. Manke,* No. 09- CR-172, 2010 U.S. Dist. LEXIS 3757, 2010 WL 307937 (E.D. Wis. Jan. 19, 2010); *United States v. Raby,* No. 2:05-cr-00003, 2009 U.S. Dist. LEXIS 121836, 2009 WL 5173964 (S.D. W. Va. Dec. 30, 2009); *United States v. Burns,* No. 07 CR 556, 2009 U.S. Dist. LEXIS 100642, 2009 WL 3617448 (N.D. Ill. Oct. 27, 2009);  *United States v. McElheney,* 630 F. Supp. 2d 886 (E.D. Tenn. 2009); *United States v. Phinney,* 599 F. Supp. 2d 1037 (E.D. Wis. 2009); *United States v. Grober,* 595 F. Supp. 2d 382 (D.N.J. 2008); *United States v. Stern,* 590 F. Supp. 2d 945 (N.D. Ohio 2008); *United States v. Doktor,* No. 6:08-cr-46, 2008 U.S. Dist. LEXIS 104737, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); *United States v. Johnson,* 588 F. Supp. 2d 997 (S.D. Iowa 2008); *United States v. Noxon,* No. 07-40152, 2008 U.S. Dist. LEXIS 87477, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); *United States v. Ontiveros,* No. 07-CR-333, 2008 U.S. Dist. LEXIS 58774, 2008 WL 2937539 (E.D. Wis. July 24, 2008) (Griesbach, J.); *United States v. Hanson,* 561 F. Supp. 2d 1004 (E.D. Wis. 2008); *United States v. Shipley,* 560 F. Supp. 2d 739 (S.D. Iowa 2008); *United States v. Baird,* 580 F. Supp. 2d 889 (D. Neb. 2008)).

All told the enhancements suggested/requested account for 12 levels on the guidelines or decades of this man's life. A man with an IQ of 73, with autism, a man who ultimately brought the plight of the victim (recognizing he caused her plight) to the attention of the authorities. Based on the black and white guidelines alone, he is being recommended to have *DECADES* of his life taken away from him. Due to enhancements that are not grounded in any statistical or logical reasoning. Without these 12-levels he would be facing a guideline range of 87-108 months, with them he faces a guideline range that is so high, it is above the statutory maximum.

### *Sexual Act or Sexual Contact (+2)*

---

[21] United States Sentencing Commission, Quick Facts: Child Pornography Offenders, FY 2022, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/research-and-publications/quick-facts/Child_Pornography_FY22.pdf.

While probation was correct in applying this enhancement, it should be rejected on policy grounds. As seen in *Jacob* and can be extrapolated from *Shipley*, U.S.S.G. § 2G2.1 fails to distinguish between the least and most culpable offenders. This is clear from the comparison table listed above. If all of these enhanced guidelines apply – Evan Strauss has higher guidelines than the significantly more egregious and repugnant cases listed above. Only in a world where the guideline enhancements do not adequately address the culpability of the Accused could this happen.

According to the Commission's review of the use of guidelines and SOCs in the Fiscal Year 2023 pursuant to USSG § 2G2.1 this enhancement is applied in 63.3 percent of cases. This shows that the enhancement has subsumed the rule. Similarly to what is discussed regarding the use of the computer, images that portray a sexual act or sexual contact are so ubiquitous that this enhancement does not adequately capture the culpability of the offender.

Particularly in this case, when it can be argued that the more serious actions are those not involving child pornography, and the video that actually shows a sexual act is one in which an older teenager is calling the offender "my puppy" immediately prior and immediately after smiling and blowing smoke into the camera – a two level enhancement does not adequately capture the nature of the offense in this case.

### *Used a Computer (+2)*

This enhancement is not based on any valid reasoning or policy based on an offender's culpability and the use of a computer in these types of crimes is so ubiquitous that this particularly enhancement applies in every case and therefore, a downward variance of (-2) or in the alternative, simply refusing to apply this enhancement is warranted.

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no

longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei *et al.*, *Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007).

In short, the change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased. *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in . . . ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated." *Child Porn Report* at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," *id.* at 322-23.

31

It is hard to imagine a case nowadays involving child pornography that does not, as part of its characteristics, involve a computer. At least one court in this Circuit has agreed. See *United States v. Stitz*, 877 F.3d 533, 535 (4th Cir. 2017) ("[T]he district court took into account that the two-level enhancement under § 2G2.2 (b)(6) for the use of a computer to distribute child pornography was 'put in place at the time when the use of the computer was a more significant fact than it appears to be today.'")

Given that this enhancement simply has no bearing on culpability it should not be applied on policy grounds.

### Engaged in Distribution (+2)

Defense rests on its argument within its presentence objections. There is no evidence Evan knowingly engages in distribution. There are no posts of this video, he did not even send the video to law enforcement, and while he did screen record the video, there is no evidence he distributed the video to anyone.

### Masochistic Content (+4)

Defense largely rests on its previous arguments, only adding that the Court should consider the discussion of M.P. above to consider if any masochistic content, for the purpose of the sexual gratification of Evan, occurred in this case. There is simply no evidence of such, beyond M.P.'s statements in her CAFI, where she has already contradicted herself numerous times.

### Vulnerable Victim (+2)

As argued prior, M.P. is not a particularly vulnerable victim. The fact that she had previously cut herself in and of itself does not make her particularly vulnerable. This is something Evan has done as well. While it could be a sign of a particularly fractured psyche, the fact of the matter is this was common behavior for members of the community, and there is no evidence that M.P. was any more vulnerable than the average 17-year-old because of this fact. Similarly, as discussed above, M.P. had engaged in this type of behavior with other men before (and there is absolutely no evidence that Evan knew of this fact), had been warned against this behavior by her mother, and indeed prior to the masturbation video at least, had spoken to law enforcement about Evan. If anything, this shows she was uniquely armed against this type of behavior and any sort of online predator, rather than being vulnerable to such.

## PLANS FOR THE FUTURE

No matter what the outcome of this sentencing is, and then the sentencing in the District of Maryland, Evan has a long, difficult road ahead of him. Luckily, however, he has plans and goals for his future.

He is excited to "never touch a computer again," as he told Counsel, and he looks forward to trying to find a source of income and living with his family when he gets out. He currently attends Alcoholics Anonymous while in prison, group, and church. He wants to continue when he eventually leaves. He is engaged to Faith and speaks with her every day – a real live, relationship, not online. He wants to do something with animals, even if it's just fostering. He has a cautious optimism about the future.

Dr. Dickson has recommended several interventions that can really only occur post incarceration, which will ensure his entrance into society as a productive adult, something he really has not yet experienced. These include individual and group therapy as well as vocational rehabilitation, things he has not done since he was 18.

His return to society should not be overly concerning to the Court or to prosecution as research has not established that there is a high recidivism rate among sex offenders. The Department of Justice ("DOJ") Recidivism study indicated that 5.3% of released sex offenders were arrested on a new crime.[22] However, the actual reconviction rate of sex offenders for new sex crimes was 3.5%. Thus, one third of those arrested for new sex crimes were not convicted of those charges.

Specifically, those with child pornography charges are unlikely to re-offend, as the studies overwhelmingly show. *See* Written Statement of Richard Wollert, Ph.D., before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years); Helen Wakeling *et al.*, *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex

---

[22] Patrick A. Langan et al., U.S. Dept. of Justice, Recidivism of Sex Offenders Released from Prison in 1994, at 24 (2003) https://www.bjs.gov/content/pub/press/rsorp94pr.cfm.

offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders,* 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court recently put it, "the empirical literature [] generally concludes that there is little—if any— evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall*, 870 F. Supp. 2d at 492.

While Evan is also guilty of cyberstalking, any concerns with his use of a computer when he gets out should be obviated by his conditions both on this federal charge and the one he has plead guilty of in the District of Maryland.

## THE NEED FOR THE SENTENCE IMPOSED

This leads, finally, to why we punish someone. As discussed above, the enhancements, and the Guidelines themselves are substantially more severe than what is necessary under the scriptures of 18 USC § 3553(a).

Evan's history and characteristics have been discussed in full here and in the exhibits. It is not necessary to subject someone with Evan's background, mental health, and intellectual disability to decades in prison. That does nothing for society, for Evan, or even for M.P. 96 months or 8 years is a substantial amount of time spent behind bars (saying nothing of what he will face in Maryland additionally for similar behavior – or behavior that occurred concurrently). It is more than enough to meet the purposes of sentencing. 8 years is the entirety of Evan's adult life thus far.

### *Protection of the Public*

As discussed above, the likelihood of recidivism in this case is low, thus the concern for the protection of society is not great. In 8 years, the group formerly known as Purgatory will be scattered to the wind – Evan, even if he were allowed to go back onto chatrooms (which he will not be) – will not know any of the players anymore, will likely be lost in the technological landscape given the advancements that can be made in almost a decade. There are conditions ensuring he will attend sex offender treatment and therapy, and he will not be allowed nor even know how to contact M.P. Supervision conditions will ensure any technology he does have access to will be monitored – all of this affords more guardrails to society than Evan's continued incarceration.

### *Adequate Deterrence*

Regarding deterrence – longer jail sentences do not deter crime. They do not. This is proven.

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects....... Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. This is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1103 (N.D. Iowa 2009)("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").

For anyone concerned that 8 years is not enough of a deterrent for an emotionally and mentally stunted man who loves the outdoors (prior to his very recent devolution into the depths of the internet), they need only explain to someone what prison is like. Or even what jail has been like for Evan. In part due to his competing federal cases, Evan has been moved and lived in: Roanoke City Jail, Western Virginia Regional Jail, Central Virginia Regional Jail, Grady County Jail in Oklahoma, Chesapeake Detention Facility, and Albemarle-Charlottesville Regional Jail. Every time he moves, he loses the belongings he

35

has saved up or his family has paid for – this includes things like sweaters or food – he loses money on his books. His medications are stopped and restarted. For someone who needs and thrives on routine, it's torture. As he has plead to a sex offense he is at the mercy of the individual jail staff members to ensure he is out of general population and safe – not every pod at every jail is welcoming to someone like Evan, not only a sex offender but someone who is slow, relatively young, and naïve to criminal life. Had you told Evan of two years ago this life, which does not even account for the harsher realities of a federal prison, was waiting for him, that alone would have been enough of a deterrent for him or the "Tuyal's" "Sysk3ys" or others of the online world.

An overly harsh sentence is not needed to deter Evan or anyone like him and as the evidence abundantly shows, will not do so.

### Just Punishment

Evan now understands that you can't disappear behind a computer screen. You are still you and the people on the other side of the screen face real harm. Now instead of behind a computer, he is behind bars, and he will be for a long time.

As the Eighth Circuit has recognized, collateral consequences of a conviction, such as registration as a sex offender and loss of reputation, are relevant to the "need" for the sentence to reflect just punishment. *United States v. Garate*, 543 F.3d 1026, 1028-29 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender)); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id*. § 3553(a)(2)(A), and "adequate deterrence," *id*. § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

36

For someone who craves routine and control, he has neither.[23] For someone whose only real friends in his entire life were his parents and grandparents, to the point that he had severe anxiety when separated from them, he will be separated from them for years to come. For someone who suffers severe anxiety just speaking with strangers, he will be living with them shoulder to shoulder. For someone who throughout his life loved the outdoors, he will not be in them unless one counts any limited time in the yards. He will not get to play with his beloved animals. And for his love of the internet and computers, that is completely over. He is learning to readjust every time he is moved to new medication. This is all punishment, it is all weighing heavily on Evan.

It is not necessary to pile on with years more of his life taken away.

### *Provided Needed Medical Care and Correctional Treatment*

Put quite simply, Evan will only get the very basics of what he needs while in the BOP. After time readjusting from whatever medications he was provided by the jail to whatever medications the BOP allows, he will receive his prescriptions. With regard to the therapy and treatment Evan desperately needs, that will likely be put on pause until his incarceration is over. BOP facilities are consistently found to be overwhelmed, short-staffed and unable to adequately care for the amount of prisoners, especially those with mental health disorders.[24]

Dr. Dickson provided a clear, reasonable plan to ensure Evan can learn how to be a productive member of society and how to ensure he is rehabilitated. But none of this plan can occur behind prison walls. It must wait, like Evan, until his sentence is complete.

### **CONCLUSION**

Although he thought it was the new persona he needed, "Reaper," is not Evan. Not who Evan truly was. "Reaper" was an online creation made by a lonely boy who didn't know how to be a man. "Reaper" was able to talk to and control people. But Evan, behind

---

[23] To the extent government may argue that there is abundant routine in jail and prison, that is simply not the case. With wildly inconsistent lockdowns, reactions from fellow prisoners, arbitrary bureaucratic decisions on everything from healthcare to when to be fed to moving institutions; routine is found only limitedly.
[24] See, e.g., Christie Thompson & Taylor Elizabeth Eldridge, Treatment Denied: The Mental Health Crisis in Federal Prisons, The Marshall Project, Nov. 21, 2018, https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons; Thomas L. Root, The Doctor Won't See You Now – Update for January 6, 2025, Lisa Foundation, Jan. 6, 2025, https://lisa-legalinfo.com/2025/01/06/the-doctor-wont-see-you-now-update-for-january-6-2025/, Jaclyn Diaz, DOJ Watchdog: Federal Prison Not Doing Enough to Prevent Inmate Suicides, NPR, Sep. 6, 2024, https://www.npr.org/2024/09/26/nx-s1-5127733/lewisburg-federal-prison-doj-oversight; Investigative Summary: Findings of Misconduct by a BOP Medical Doctor for Inattention to Duty and Carelessness with Respect to Medical Care of an Inmate and Lack of Candor, DOJ OIG, Sep. 17, 2024, REPORT, https://oig.justice.gov/reports/investigative-summary-findings-misconduct-bop-medical-doctor-inattention-duty-and.

"Reaper," while he knew that his actions were cruel, didn't truly understand the extent, as indicated by his developmental delays.

He mistook the blue glow of the computer for the glow of friendship. But the real Evan occasionally shone through – as when he spoke to M.P. and just cried. Evan is not a predator, he was a confused, deeply misunderstood and misunderstanding young man, who didn't have the tools to know how to act like a full-grown adult, so instead he led a community of teenagers and young 20-somethings. Mistaking the constant pings and notifications as the sounds of belonging.

Evan has long since shed his "Reaper" persona, someone who is locked forever in the recesses of the internet. He is already looking forward to a life focused on actual IRL life – his family, his fiancé, his animals, and the beauty of the Blue Ridge where he grew up.

With proper treatment and therapy, Evan can learn emotional regulation, he can learn to overcome his intellectual disabilities and live a fulfilling life. He can turn around the last few years of his life. This cannot happen, however, if the guidelines are allowed to dictate the next two decades of Evan's life.

Eight years, or 96 months, is a SIGNIFICANT amount of time for anyone, but particularly for someone with Evan's developmental, intellectual, and mental concerns. This time recognizes the harm done to M.P., the purposes of sentencing, and the severity of the crime, while still giving Evan a chance to return to society. This is sufficient but not greater than necessary.

"Reaper" has been locked away for good, but it is time for Evan to come out and shine.



Respectfully Submitted,

Evan Strauss
By Counsel

**Beatrice F. Diehl**

Assistant Federal Public Defender
Florida State Bar # 0124667
Attorney for the defendant
Federal Public Defender's Office
210 First Street, SW, Suite 200
Roanoke, VA, 24011
Telephone: (540) 777-0891
beatrice_diehl@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Assistant United States Attorney, this 24th day of July, 2024.

39